Theodore Whitmore STANLEY, Jesse Barber, Joyce Franklin, J.W. Mack; et al., Plaintiffs,

United States of America; Intervenor–Plaintiff,

v.

DARLINGTON COUNTY SCHOOL DISTRICT, a public body corporate; The State of South Carolina; The Department of Education for the State of South Carolina; The Board of Education for the State of South Carolina; William P. Beckham, III, In Official Capacity as Member of the State Board of Education; Samuel M. Greer, In Official Capacity as Member of the State Board of Education; Joseph Peeler Stabler, Colonel, In Official Capacity as Member of the State Board of Education; Cleveland L. Sellars, In Official Capacity as Member of the State Board of Education; Austin Floyd, In Official Capacity as Member of the State Board of Education; Julian B. Wright, In Official Capacity as Member of the State Board of Education; Brenda K. Vernon, In Official Capacity as Member of the State Board of Education; Earl Bostick, Sr., In Official Capacity as Member of the State Board of Education; Maxie Duke, In Official Capacity as Member of the State Board of Education; Laura M. Fleming, In Official Capacity as Member of the State Board of Education; Frank M. Hart, In Official Capacity as Member of the State Board of Education; Beth Pinson, In Official Capacity as Member of the State Board of Education; W. Gregory Horton, In Official Capacity as Member of the State Board of Education; Robert W. Owen, In Official Capacity as Member of the State Board of Education; Ruby Matthews, In Official Capacity as Member of the State Board of Education; Celia Gettys, In Official Capacity as Member of the State Board of Education; Thomas E. McInville, In Official Capacity as Member of the State Board of Education; David M. Beasley, in his Official Capacity as Governor of the State of South Carolina and as Chairman of the State Budget and Control Board; and Barbara S. Nielsen, in her Official Capacity as State Superintendent of Education for the State of South Carolina; The State Budget and Control Board for the State of South Carolina; Grady L. Patterson, Jr., Earle E. Morris, James M. Waddell, Jr., and William D. Boan, In Their Official Capacities as Members of the State Budget and Control Board for the State of South Carolina, Defendants.

DARLINGTON COUNTY SCHOOL DISTRICT; Cross–Claimant,

v.

The STATE OF SOUTH CAROLINA; The Department of Education for State of South Carolina; William P. Beckman, III, In Official Capacity as Member of the State Board of Education; Samuel M. Greer, In Official Capacity as Member of the State Board of Education; Joseph Peeler Stabler, Colonel, In Official Capacity as Member of the State Board of Education; Cleveland L. Sellars; In Official Capacity as Member of the State Board of Education; Austin Floyd, In Official Capacity as Member of the State Board of Education; Julian B. Wright, In Official Capacity as Member of the State Board of Education; Brenda K. Vernon, In Official Capacity as Member of the State Board of Education; Earl Bostick, Sr., In Official Capacity as Member of the State Board of Education; Maxie Duke, In Official Capacity as Member of the State Board of Education; Laura M. Fleming, In Official Capacity as Member of the State Board of Education; Frank M. Hart, In Official Capacity as Member of the State Board of Education; Beth Pinson, In Official Capacity as Member of the State Board of Education; W. Gregory Horton, In Official Capacity as Member of the State Board of Education; Ruby Matthews, In Official Capacity as Member of the State Board of Education; Robert W. Owen, In Official Capacity as Member of the State Board of Education; Celia Gettys, In Official Capaci-

1342

ty as Member of The State Board of Education; Thomas E. McInville, In Official Capacity as Member of the State Board of Education; David M. Beasley, in his Official Capacity as Governor of the State of South Carolina and as Chairman of the State Budget and Control Board; Barbara S. Nielsen, in her Official Capacity as State Superintendent of Education for the State of South Carolina; The State Budget and Control Board; Grady L. Patterson, Jr.; Earle E. Morris; James M. Waddell, Jr.; William D. Boan; In Their Official Capacities as Members of the State Budget and Control Board for the State of South Carolina, Cross–Defendants.

Civ. A. No. 4:62–7749–22.

United States District Court,
D. South Carolina,
Florence Division.

March 1, 1995.

Gary Haugen, Michael S. Maurer, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, for U.S.

Dennis D. Parker, N.A.A.C.P. Legal Defense and Educational Fund, Inc., New York City, Arthur C. McFarland, Charleston, SC, for class plaintiffs.

State of S.C., J. Emory Smith, Jr., Office of Atty. Gen., Columbia, SC, for State of S.C. and all State defendants except State Dept. of Educ.

George C. Leventis, Office of General Counsel, Columbia, SC, for State of S.C. Dept. of Educ.

John M. Milling, Darlington, SC, Alfred A. Lindseth, Sutherland, Asbill and Brennan, Atlanta, GA, for defendant, Darlington County School Dist.

I. BACKGROUND ................................................................. 1351
 A. CASE HISTORY PRIOR TO 1970 ......................................... 1351
 B. THE 1970 DESEGREGATION ORDER ...................................... 1352
 C. CASE HISTORY SINCE THE 1970 ORDER ................................ 1353
 D. INTERVENTION BY THE UNITED STATES ................................ 1355

II. MOTION TO DISMISS BY STATE DEFENDANTS .............................. 1356
 A. GENERALLY ......................................................... 1356
 B. STANDING .......................................................... 1356
 1. GENERALLY ..................................................... 1356
 2. DISTRICT'S STANDING TO SUE ON ITS OWN BEHALF .................. 1356
 3. DISTRICT'S STANDING TO SUE ON BEHALF OF CHILDREN IN
 DISTRICT ...................................................... 1358
 4. DISTRICT'S STANDING TO SUE UNDER FEDERAL STATUTES AND
 CONSTITUTIONAL PROVISIONS ..................................... 1359
 C. ELEVENTH AMENDMENT IMMUNITY ISSUES ............................... 1360
 1. GENERALLY ..................................................... 1360

2. EX PARTE YOUNG EXCEPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1360
3. CONGRESSIONAL ABROGATION EXCEPTION . . . . . . . . . . . . . . . . . . . . .1363
 a. Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1363
 b. Title VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1364
 c. EEOA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1365
D. RES JUDICATA, COLLATERAL ESTOPPEL, LAW OF THE CASE AND
 JUDICIAL ESTOPPEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1367
 1. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1367

III. PROPOSED CONSENT ORDER AND TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1368
 A. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1368

IV. ISSUES FOR TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1369
 A. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1369

V. EVIDENTIARY ISSUES DURING TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1370
 A. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1370

VI. APPROVAL OF THE CONSENT ORDER AND ISSUANCE OF INTERIM JUNE
 23, 1994, ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1370
 A. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1370
 B. PROCEDURES AND CONSIDERATIONS GOVERNING CONSENT ORDER . . . .1370
 C. REASONABLENESS OF THE CONSENT ORDER . . . . . . . . . . . . . . . . . . . . . . . .1371
 D. NOTICE TO CLASS MEMBERS AND FAIRNESS HEARING . . . . . . . . . . . . . . .1372
 E. MOTION FOR NEW TRIAL/ALTER OR AMEND THE JUDGMENT . . . . . . . . . .1373
 F. INTERIM JUNE 23, 1994, ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1374

VII. MAYO HIGH SCHOOL AS A MAGNET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1375
 A. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1375
 B. RETENTION OF RACIAL IDENTIFIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . .1375
 1. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1375
 C. DISTRICT'S FAILURE TO ENFORCE SCHOOL ATTENDANCE ZONE
 LINES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :. .1376
 1. 1988–1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1376
 2. 1991–1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1377
 D. SCHOOL RESOURCES AND FACILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1377
 1. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1377
 2. FACILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1377
 3. RESOURCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1379
 4. CURRICULUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1379
 5. INSTRUCTIONAL QUALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1381
 E. ASSIGNMENT OF PERSONNEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1381
 1. PRINCIPALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1381
 2. FACULTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1381
 3. CLASSIFIED STAFF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1382
 F. CLOSING OF MAYO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1382
 1. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1382
 2. BURDEN ON BLACK COMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1382
 3. FAILURE OF DISTRICT TO SEEK PRIOR APPROVAL FOR
 PREVIOUS CLOSINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1383
 4. CLOSING OF BUTLER HIGH SCHOOL . . . . . . . . . . . . . . . . . . . . . . . . . . .1383
 5. APPROPRIATENESS OF MAYO MAGNET . . . . . . . . . . . . . . . . . . . . . . . . .1384
 G. CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1386
 1. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1386
 2. LEGAL AUTHORITY FOR ORDERING OF MAGNET AND
 APPROPRIATENESS OF DEDICATED MAGNET AT MAYO . . . . . . . . . . . .1387

VIII. PROCEDURES FOR IMPLEMENTING A DEDICATED MAGNET AT MAYO . . . . . .1389
 A. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1389

IX. LIABILITY OF STATE DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1390
 A. DISCRIMINATORY ACTIONS OF STATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1390
 1. GENERALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1390
 2. STATE–MANDATED SCHOOL SEGREGATION PRIOR TO 1954 . . . . . . . . . .1390
 3. RESISTANCE FROM 1954–1970 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1392
 a. Generally . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1392
 b. Legislative Action and Political Activity . . . . . . . . . . . . . . . . . . . . . . . . . . .1392
 c. The Activities of the Gressette Committee . . . . . . . . . . . . . . . . . . . . . . . . .1397

 d. The State School Building Program ..................................1398
 4. POST–1970 ERA AND DISCHARGE OF AFFIRMATIVE DUTY ..........1400
 a. Generally..........................................................1400
 b. Education Finance Act .............................................1401
 c. Education Improvement Act .........................................1401
 d. State Board of Education and State Department of Education...........1401
 B. MITIGATING FACTORS AFFECTING STATE LIABILITY ....................1402
 1. ACTIVE SEGREGATIVE PRACTICES OF DISTRICT PRIOR TO 1970....1402
 2. DISTRICT'S ABILITY TO DESEGREGATE ............................1403
 3. PRIMARY CAUSAL RESPONSIBILITY OF DISTRICT FOR
 "VESTIGES" .....................................................1403
 4. POST–1970 DISCRIMINATION BY DISTRICT ..........................1404
 5. DISTRICT'S DISCRIMINATION IN STUDENT ASSIGNMENTS..........1404
 6. DISTRICT'S DISCRIMINATION IN PRINCIPAL ASSIGNMENTS ........1405
 7. DISTRICT'S FAILURE TO COMPLY WITH 1970 ORDER.................1405
 8. DISTRICT'S DISCRIMINATION IN CURRICULUM .....................1406
 9. DISTRICT'S DISCRIMINATION IN FACILITIES.......................1406
 10. DISTRICT'S PRIMARY RESPONSIBILITY FOR STIGMATIZING
 EFFECT.........................................................1407
 11. DISTRICT'S HISTORICAL RESISTANCE TO EFFORTS TO
 DESEGREGATE...................................................1408
 C. CONCLUSIONS OF LAW ON STATE LIABILITY............................1408

 D. CONCLUSIONS OF LAW ON MITIGATING CIRCUMSTANCES ..............1414

X. APPORTIONMENT OF COSTS BETWEEN SCHOOL DISTRICT AND STATE....1415
 A. GENERALLY .......................................................1415
 1. TRANSPORTATION COSTS .........................................1417
 2. CAPITAL COSTS AND OPERATING EXPENSES........................1418

XI. CONCLUSION .......................................................1419

---

CURRIE, District Judge.

## I. BACKGROUND

### A. CASE HISTORY PRIOR TO 1970

On May 29, 1962, black students in the Darlington County School District (hereinafter the "District") sued the District for "operating the public school system ... on a racially segregated basis," and for "refus[ing] to present a plan for desegregating the public schools." Complaint at 2, 5 (5/29/62). On July 13, 1964, the court found that the District was violating the Constitution by its operation of a dual system of education. *See* Order at 6–7 (7/13/64). Accordingly, the court enjoined the District from discriminating on the basis of race, and ordered the District to desegregate its school system.

The first plan proposed by the District was a "Free Transfer" plan, which was approved by the court on July 13, 1964. Order (7/13/64). Two years later, however, on August 25, 1966, the court vacated the order implementing the plan because it found that the plan failed to effectively desegregate the school system.[1] The court ordered the District to submit another plan. The District submitted plans on January 27, 1967, and March 10, 1967, each of which was found by the court to be constitutionally defective. *See* Order at 2 (3/10/67). Finally, on March 10, 1967, the court ordered the District to implement a "Freedom of Choice" plan. One year later, however, the court found that the "Freedom of Choice" plan, though once considered constitutionally valid, did not in practice achieve the desegregation requirements articulated by the Supreme Court in *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Order at 1–2 (9/13/68).

---

1. "It is beyond question that the plan in its present form does not, as a matter of law, conform to the directives and decisions handed down after the plan was imposed.... The Court finds as a fact that in two years of operation the plan has not accomplished orderly, significant desegregation of public schools." Memorandum Order at 3 (8/25/66).

The District responded by resubmitting its old "Freedom of Choice" plan. On March 31, 1969, the court again declined to find that plan constitutional. Order at 9–10 (3/31/69). The court then ordered the District to work with the Department of Health, Education and Welfare (HEW) to come up with a new plan. *Id.* If the District and HEW could not agree on a plan, the court directed that HEW submit a plan for the District. *Id.* In fact, the District refused to accept HEW's recommendations, and HEW submitted its report on June 2, 1969.[2]

At a hearing on July 14, 1969, the District rejected the HEW report and submitted yet another "Freedom of Choice" Plan. The court, per Judge Martin, approved the District's plan and stated that "the School District is operating in good faith to fulfill its primary responsibility for abolishing the system of segregated schools as required by *Brown.*" Order at 4 (7/28/69). On appeal, the Fourth Circuit vacated Judge Martin's order, and on January 19, 1970, the Court of Appeals ordered the District to implement a desegregation plan based upon HEW Plan B, or any other plan that would create a unitary school system. *See Stanley v. Darlington County Sch. Dist., et al.,* 424 F.2d 195, 196–97 (4th Cir.), *reh'g denied,* 424 F.2d 198 (per curiam), *cert. denied,* 398 U.S. 909, 90 S.Ct. 1690, 26 L.Ed.2d 67 (1970).

### B. THE 1970 DESEGREGATION ORDER

In response to the Fourth Circuit's order, Judge Martin held a hearing on February 3, 1970. At the hearing, Judge Martin considered three plans submitted by the parties: (1) a freedom of choice plan favored by the District; (2) "Plan A" favored by Plaintiffs, and (3) a plan based on HEW's "Proposal B," the District's alternate submission to its freedom of choice plan.[3]

The original, unmodified HEW Plan B was contained in pages 48a through 49j of the HEW report. Plan B contained zone maps delineating new attendance zones which HEW believed might desegregate the schools. Plan B also projected the number of black and white students that would attend each school as a result of the new zoning.

At the hearing on February 3, 1970, Judge Martin rejected the District's plea for another "Freedom of Choice" plan, and indicated his preference for the original HEW Plan B. Hearing Tr. at 43, 61. Accordingly, Judge Martin asked the District why it had changed HEW Plan B. *Id.* at 61.

In response, the District asserted that it had "not changed the HEW plan B"; rather, the District claimed that the maps submitted to the court by the District simply superimposed Plan B's general lines upon specific streets. *See Id.* at 62–64. Moreover, the District claimed that the "corrected" projections were simply a more accurate head count of the students within each attendance zone. *Id.* at 62. Plaintiffs, on the other hand, pointed out changes to the original Plan B zone lines, and indicated that the effect of these changes on desegregation could not be assessed because the District had not provided spot maps to indicate the race of the children in various school zones. *Id.* at 32–34.

At the conclusion of the hearing, Judge Martin, relying upon representations of the District's attorneys, ordered implementation of "Proposal B submitted by HEW with the specifications and details as provided by the Darlington School Board and such plans and specifications are hereby incorporated into, attached to and made a part of this order." *See Id.* at 64–69. Judge Martin emphasized,

---

2. The HEW report was entitled "A Desegregation Plan For Darlington County Public School District," and contained two plans, later referred to as "HEW Plan A" and "HEW Plan B."

3. Two weeks prior to the February 3, 1970, hearing, the District's attorney had sent a revised set of pupil projections and maps to the court and to Plaintiffs' attorneys. Plaintiffs' attorney, Mordecai Johnson, acknowledged receipt of the revised

projections and maps in Plaintiffs' Response to the School District's Proposed Plan filed with the court on January 30, 1970, in which he stated: "Defendants, by letter to the clerk dated January 23, 1970, pointed out that it has previously, . . . transmitted a corrected projected statistics relating to HEW Plan B, consisting of completed building information form *and maps* of the three areas of the School District." (emphasis added).

however, that the zone lines submitted by the District were only provisionally approved depending on what kind of results the lines produced: "I just don't want to give the impression that this is the finality regardless of what might arise, because it's a continuing situation." *Id.* at 70.

Examination of the District's maps, attached to the 1970 order, reveals that the revisions submitted by the District were in fact quite different from the HEW Plan B zone lines.

In addition to containing provisions regarding student assignment, the 1970 desegregation order also contained provisions relating to faculty assignment, transportation, curriculum, student activities, services, and vocational programs. Order at 2–3 (2/5/70). In regard to faculty assignment, the order required that the faculty race ratio at each school be "approximately the same as the ratio throughout the system." *Id.* at 3.

The court-ordered plan was promptly implemented. When the District reported back to the court on April 30, 1970, with the results of the "modified" Plan B, the District's data revealed the following:

1. Every historically black elementary school remained between 80% and 100% black in its student enrollment.

2. Every historically black secondary school remained between 92% and 99% black in its student enrollment.

3. Nine of the seventeen historically white schools remained racially identifiable in student assignment (*i.e.*, departing from the district-wide average by more than 20%).

4. Fifteen of the District's twenty-eight schools were out of compliance with the order's requirement that their faculty race ratios be approximately the same as the district-wide average (*i.e.*, departing from the district-wide average by 10% or more).

## C. CASE HISTORY SINCE THE 1970 ORDER

One year after the court issued its 1970 desegregation order for Darlington County, the Supreme Court decided *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In *Swann*, the Supreme Court addressed "the problem of defining with more particularity the responsibilities of school authorities in desegregating a state-enforced dual school system." *Id.* at 18, 91 S.Ct. at 1277. The Court recognized that, up to that time, district courts "had to improvise and experiment [with desegregation remedies] without detailed or specific guidelines." *Id.* at 6, 91 S.Ct. at 1271.

After the Supreme Court articulated the new standard for what constituted a constitutionally effective plan in *Swann* and *Davis v. Board of Sch. Comm'rs.*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971), the Fourth Circuit ordered all school districts awaiting approval of desegregation plans to rewrite their plans in accordance with the two decisions.[4] Specifically, the Court of Appeals sought to insure implementation of the following principles:

1. " 'The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation.' " *Adams*, 444 F.2d at 100 (*quoting Davis*, 402 U.S. at 37, 91 S.Ct. at 1292).

2. "The school authorities and the district court should consider the use of all techniques for desegregation, including pairing or grouping schools, noncontiguous attendance zones, restructuring of grade levels, and the transportation of pupils." *Id.* at 101.

3. "If the district court approves a plan achieving less actual desegregation than would be achieved under an alternate proposed plan, it should find facts that are thought to make impracticable the achievement of a greater degree of integration,

---

4. "We are now convinced that all of these judgments must be vacated, ... and we must remand to the respective district courts with instructions to receive from the respective school boards new plans which will give effect to *Swann* and *Davis*." *Adams v. School Dist. No. 5*, 444 F.2d 99 (4th Cir.), *cert denied*, 404 U.S. 912, 92 S.Ct. 230, 30 L.Ed.2d 186 (1971).

especially if there remain any schools all or predominantly of one race." *Id.*

Shortly after *Swann* and *Davis* were decided, Plaintiffs filed a motion for further relief on July 31, 1971, contending that the 1970 order needed to be examined against the standards of effectiveness set forth by the Supreme Court in those two cases. By order of April 23, 1973, Judge Simons, to whom the case had been reassigned, stated that, subject to the addition of a Majority–To–Minority Transfer provision, "the Order of this court of February 5, 1970, .... ordering the implementation of HEW Plan B as directed by the Fourth Circuit Court of Appeals, is not constitutionally defective on its face." Order at 3. The 1970 Order however, had not ordered "implementation of HEW Plan B as directed by the Fourth Circuit"; rather, it ordered implementation of HEW Plan B *as modified by the District.* It does not appear that Judge Simons was aware of the discrepancy between HEW Plan B lines and the modified plan approved by Judge Martin.

The court also denied Plaintiffs' motion for partial summary judgment. Judge Simons indicated that "many of the basic facts ... are not in dispute. However, the inferences to be drawn from them are disputed. The plaintiffs will be given an evidentiary hearing to prove, if they can, any failure to comply with the 1970 Order of this court." Order at 3 (4/23/73).

Plaintiffs' application to the Fourth Circuit for an interlocutory appeal on the denial of the motion for summary judgment was denied. In denying permission for an interlocutory appeal, the Court of Appeals expressed no opinion regarding the constitutional effectiveness of the 1970 Order. Order (7/1/73).

When the matter came before him again on February 22, 1974, Judge Simons found HEW Plan B, with the addition of the Majority–to–Minority Transfer provision, constitutionally adequate. He then ordered full discovery, to be completed within 30 days, on the principal issue remaining for trial, the District's compliance with the Plan. Order (2/22/74).

On October 2, 1974, the parties again appeared before Judge Simons who considered another request by Plaintiffs for a new plan. After reviewing the case history, Judge Simons reiterated his prior findings:

> So the Court still stands by its position. I don't know on what basis you went to the trouble and the expense to have experts prepare a new desegregation plan which you proposed to be implemented by the Court, because the Court has already found unequivocally, definitely and positively that the previous plan as amended is constitutionally sound.

Hearing Tr. at 5. He then informed Plaintiffs:

> I have issued the final order rejecting your motion to implement the new plan. You can go to the appellate court on that, or your alternative request asked for this court for the opportunity of presenting evidence to see if you can establish that the previous plan is not being properly implemented. That's the two alternatives that are open to you now. You'll have to make a decision. I would give you, if you would like, thirty days to consider it.

*Id.,* at 7–8.

When Plaintiffs neither appealed the finding of constitutionality nor pursued the issue of non-compliance, Judge Simons ordered the case placed on the inactive docket in 1976 with both parties having the option of moving to reopen the case. Minute Order (4/29/76).

The case remained inactive until 1983, when Plaintiffs filed another motion challenging the validity of the plan and alleging that the District had failed to comply with the court-ordered plan. In a hearing on February 7, 1984, Judge Houck, the third judge to preside over the case, stated that Judge Simons had found the plan constitutional and given Plaintiffs 30 days to contest its implementation, but that Plaintiffs had not done so. Thus, Judge Houck held that the decision that the plan was constitutional was final, and had become the law of the case. Hearing Tr. at 10–12 (2/7/84). With respect to the compliance issues, Judge Houck gave Plaintiffs another opportunity to prove their allegations of non-compliance.

On or about April 5, 1984, Plaintiffs submitted an Offer of Proof regarding their non-compliance claim, which specifically alleged non-compliance with the 1970 court-ordered desegregation plan in the following areas:

1) Construction and closing of school facilities, including specifically the construction of St. John's High School, the construction of the career center in Darlington, the construction of several elementary schools in the Hartsville area, and the closing of Butler High School;

2) Inconsistencies in attendance zone lines between HEW Plan B and the attendance zones used by the District including the attendance zone boundaries between the Carolina and Washington Street Elementary Schools;

3) The assignment of residents in the Country Club Estates area to the school zone containing St. John's High School, Brunson–Dargan Junior High School and Spring Elementary School;

4) The boundary lines between St. John's Elementary School, St. John's High School and Brunson–Dargan Junior High School, and Brockington Elementary School, Pine Middle School and Mayo High School;

5) The system-wide assignment of principals;

6) The system-wide assignment of teachers; and

7) The locations of the program for the gifted and talented in the elementary grades.

(Plaintiff's Offer of Proof, April 5, 1984).

After discovery, Judge Houck held a hearing on February 17, 1985, in which Plaintiffs abandoned their claims of non-compliance and moved to withdraw their Motion for Relief. After further exchanges between the court and counsel, the court entered an order dated September 27, 1985, which stated that Plaintiffs advised "the court that Defendants had produced for inspection the various records sought and that counsel had spent numerous hours reviewing these records." Based on the "entire record in the case," the court held:

> [T]his Court is firmly convinced that Plaintiffs should be permitted to withdraw the

Motion for further relief since it appears that the Defendants are not out of compliance of the existing Orders of this Court up to the present date.

This matter is, therefore, dismissed as to any claim of non-compliance up to the date of this Order.

Order at 3 (9/17/85).

Plaintiffs did not challenge or appeal Judge Houck's order.

## D. INTERVENTION BY THE UNITED STATES

In 1990 the United States moved for leave to intervene. In its Complaint–In–Intervention, the United States requested, among other things, that the court order Defendants "to adopt and implement a plan that will eliminate the aforementioned discriminatory practices and fully desegregate the public schools of Darlington County." Complaint–In–Intervention at 7 (8/15/91). At a hearing on August 15,. 1992, the court granted the United States' Motion for Leave to Intervene. *See* Hearing Tr. at 46–47 (8/15/91).

At this same hearing, Judge Houck made clear that he never conducted an evidentiary hearing to determine the District's compliance with the Order or the Order's constitutional effectiveness. Hearing Tr. at 43 (8/11/92). Referring to the 1985 order, the court stated: "I did not have an evidentiary hearing at that time, and made my ruling primarily, if not all together, upon the basis that the plaintiffs stated in open court that they could not prove that non-compliance of Judge Martin's 1970 order existed." *Id.* at 16, 43.

By order of May 14, 1993, the court also granted the District's motion to join the State of South Carolina as a defendant, pursuant to Rule 19, Fed.R.Civ.P., Order (5/14/93).

At a hearing on September 24, 1993, the court denied various motions and scheduled the case for trial. In so doing, the court addressed the District's assertions that the court had previously found the District in compliance with the February 5, 1970, desegregation plan:

.... Let's seize on that statement so there won't be any misunderstanding. Nobody has ever found that this plan has been complied with. Nobody. I haven't. Judge Simons hasn't. Judge Martin hasn't. Nobody has. Nobody has ever asked to do that. The plaintiffs have raised that issue on several occasions, and defaulted, withdrawn the issue, whatever, but no court that I've been able to find has ever factually determined that the plan has been complied with, and I don't think you can show me where they have.... There's never been any finding of fact made, period, since the order was signed.

Hearing Tr. at 34–35 (9/24/93).

■ In March 1994 the case was reassigned to the undersigned. Pretrial-trial hearings were held on April 12 and April 29, 1994. At the latter hearing, this court, *inter alia:* (1) ordered that the liability and remedial issues be consolidated into a single trial; (2) granted the United States' motion to preclude the District from introducing evidence and testimony, including results of a public opinion survey commissioned by the District, purporting to show that further desegregation measures at racially identifiable schools would be impractical or infeasible because of resulting "white flight" from the District;[5] and (3) ruled that the prior rulings of the court did not preclude a full evidentiary hearing on the District's activities from 1970 through the present.

## II. MOTION TO DISMISS BY STATE DEFENDANTS

### A. GENERALLY

The State Defendants (hereinafter "The State") contend that (1) the District lacks standing to sue in its own right or on behalf

of its residents; (2) the State is immune from suit under the Eleventh Amendment; and (3) the doctrines of law of the case, *res judicata,* collateral estoppel, and judicial estoppel bar the claims of the District. The State filed a Motion to Dismiss that the court denied except as to State Budget and Control Board and its members.

### B. STANDING

#### 1. GENERALLY

The State contends that the District lacks standing to assert the cross-claims. However, the court concludes that the District has standing to sue on its own behalf and on behalf of children in its District. *See, e.g., School Bd. v. Baliles,* 829 F.2d 1308, 1310–11 (4th Cir.1987); *Akron Bd. of Educ. v. State Bd. of Educ.,* 490 F.2d 1285, 1289–91 (6th Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Brewer v. Hoxie Sch. Dist. No. 46,* 238 F.2d 91, 104–5 (8th Cir.1956); *Board of Sch. Directors v. Wisconsin,* 649 F.Supp. 82, 94–97 (E.D.Wis. 1985); *Bradley v. School Bd.,* 338 F.Supp. 67, 229 (E.D.Va.), *rev'd on other grounds,* 462 F.2d 1058 (4th Cir.1972), *aff'd by an equally divided court,* 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973). *See also Board of Educ. v. Allen,* 392 U.S. 236, 241 n. 5, 88 S.Ct. 1923, 1925 n. 5, 20 L.Ed.2d 1060 (1968) (local school board assumed to have standing to challenge constitutional validity of state statute).

#### 2. DISTRICT'S STANDING TO SUE ON ITS OWN BEHALF

■ In *School Board of the City of Richmond v. Baliles,* 829 F.2d 1308 (4th Cir. 1987), the Richmond school board asserted claims against the Governor of Virginia, the state board of education and others alleging

---

5. Evidence purporting to show "white flight" can be considered by a school district, not under a desegregation order, that is trying to voluntarily maximize racial balance, *see Riddick v. School Bd. of Norfolk,* 784 F.2d 521, 539–40 (4th Cir.), *cert. denied,* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986); and it can be considered by a court when choosing between *constitutionally permissible* desegregation plans where each plan would desegregate every racially identifiable school to the extent practicable. *See Stell v. Savannah–Chatham County Bd. of Educ.,* 888

F.2d 82, 84–85, *reh'g and reh'g en banc denied,* 891 F.2d 907 (11th Cir.1989). However the Supreme Court and the Fourth Circuit have made clear that evidence purporting to show "white flight" is not relevant to the question whether further desegregation measures are practicable or feasible at schools that remain racially identifiable in a former *de jure* system. *See United States v. Scotland Neck City Bd. of Educ.,* 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1971); *Riddick,* 784 F.2d at 539.

(1) that the state defendants' failure to discharge their affirmative obligation to eliminate the vestiges of state-imposed segregation had impeded the local school board's ability to carry out its own constitutional duty to redress the effects of segregation; and (2) that the state defendants' unconstitutional conduct had caused direct economic injury to the local school board, requiring large expenditures for compensatory education and other educational services. 829 F.2d at 1311. The Fourth Circuit found standing for the school board on several grounds. One basis for standing was the school board's allegation that state defendants' actions had impeded its ability to carry out its own constitutional duty. Thus, the school board had standing to sue based on the direct violation of its own rights. *Id.* Similarly, in this case, the District alleged and proved state actions that impeded its ability to desegregate. Therefore, under *Baliles* the District has standing to sue the State in its own right.

The Fourth Circuit's analysis in *Baliles* is consistent with Supreme Court standing cases. In order to determine whether a party has the requisite standing to sue, the Supreme Court uses a three-pronged test to ensure the existence of a case or controversy under Article III of the Constitution. The test requires that the local school district have "[1] suffered some actual or threatened injury ... [2] [that] fairly can be traced to the challenged action and [3] [that] is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), *quoted in Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.,* 714 F.2d 946, 948 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984). Here, the District has satisfied all three elements of this test.

First, the School District has allegedly suffered a "distinct and palpable" injury. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). In this case, the State's actions have made it more difficult and expensive to desegregate the Darlington County schools. These are precisely the types of injuries that furnished standing under *Baliles.* Other courts have also found that local school districts have standing to sue state defendants in furtherance of their affirmative duty to eliminate segregation. *See, e.g., Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.,* 584 F.Supp. 328, 352 (E.D.Ark.), *rev'd, remanded,* 738 F.2d 82 (8th Cir.1984); *Board of Sch. Directors v. Wisconsin,* 649 F.Supp. 82 (E.D.Wis.1985).

Second, the alleged injury for which the District seeks redress was caused by the intentional conduct of the State in creating the dual school system initially, in actively resisting and thwarting prior attempts to desegregate the public schools, in failing to discharge its affirmative duty to erase all vestiges of state-imposed segregation, and in implementing discriminatory statutes, regulations and policies. Thus, the District's injury is traceable to the challenged action. *See, e.g., Los Angeles Branch NAACP,* 714 F.2d at 948.

Third, the District's injuries are redressable, as required. The State does not specifically challenge the court's power to fashion an appropriate remedy for the injuries allegedly suffered by the District. Innumerable cases have demonstrated a court's equitable and legal powers to remedy precisely the type of injury alleged here. Given the role of each of the state defendants in the governance of South Carolina, their presence in this case is essential to enable the court to fashion an effective remedy.

A second ground for standing articulated in *Baliles* was the school board's incurring of additional expenses arising from the state defendants' conduct. *Baliles,* 829 F.2d at 1311. Thus, although the rights violated in *Baliles* were those of the school children, the school board also sustained injury from the state defendants' unconstitutional conduct, which gave the school board standing to sue. *Id.* Here, the court finds that the State has violated the constitutional rights of children residing in the District, and that the District has standing to sue for additional sums it will be required to expend because of the State's violations. The court thus finds that the District has standing to sue under this theory as well.

### 3. DISTRICT'S STANDING TO SUE ON BEHALF OF CHILDREN IN DISTRICT

■ When a party seeks to advance the constitutional rights of others, sometimes called the *jus tertii* doctrine, two inquiries must be made: (1) whether the party has suffered some injury in fact so the claim meets the constitutional case-or-controversy requirement; and (2) whether prudential considerations permit the litigant to advance the claim. *Caplin & Drysdale v. United States,* 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989); *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

■ Here, the District has suffered injury in fact because of the State's actions and omissions, thus meeting the constitutional requirement. With respect to the second inquiry, the Supreme Court has identified three prudential factors that must be considered: (1) the relationship of the litigant to the person whose rights are being asserted; (2) the ability of the person to advance his own rights; and (3) the impact of the litigation on third-party interests. *Caplin & Drysdale,* 491 U.S. at 623–24, n. 3, 109 S.Ct. at 2651, n. 3; *Singleton,* 428 U.S. at 113–18, 96 S.Ct. at 2873–76. These factors are discussed below.

The key aspects of the relationship factor are "a common link to the right asserted, consistency of the parties' interests, and effective advocacy—not the intimacy of the relationship per se." *Amato v. Wilentz,* 952 F.2d 742, 752 (3d Cir.1991). Here, the duties of the District are interwoven with the rights of the school children and their parents.[6] All have an interest in providing the school children an excellent education in desegregated schools. Further, they have an interest in ensuring that the costs of desegregation are equitably distributed between the District and the State. Because of this identity of interests, the District has ample incentive to forcefully advocate the rights of the parents and students. The relationship between the District and the parents and students therefore supports *jus tertii* standing.

The second factor, the ability of the parents and children to advance their own rights, also weighs in favor of permitting third-party standing. Courts applying this factor have held that the obstacle to suit by the third party need not be insurmountable; a practical disincentive to sue may suffice. *See Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Here, the obstacles to suit are substantial, and the children and parents could well decline to litigate because the amount at stake for any one household would not justify the time and expense involved in joining this litigation. *See Akron Bd. of Educ. v. State Bd. of Educ.,* 490 F.2d 1285, 1289 (6th Cir.) (parents' concern unlikely to be aroused because of the small size of area to be transferred from district and minimal present impact), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Bradley v. School Bd.,* 338 F.Supp. 67, 230 (E.D.Va.) ("were school boards not to be accorded standing, serious deprivations to constitutional rights might occur, especially in situations wherein individual plaintiffs might well lack the resources to bring and maintain the type of mammoth law suit involved"), *rev'd on other grounds,* 462 F.2d 1058 (4th Cir.1972), *aff'd by an equally divided Court,* 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973).

Indeed, neither the NAACP Legal Defense Fund nor the Justice Department, which otherwise represent the children's interests in this litigation, have shown any willingness to represent the children in their claims against the State. In fact, they have expressly declined to do so. Therefore, as a practical

---

**6.** *See Brewer v. Hoxie Sch. Dist. No. 46,* 238 F.2d 91, 104–05 (8th Cir.1956) (school board had standing to assert students' Fourteenth Amendment rights); *Akron Bd. of Educ. v. State Bd. of Educ.,* 490 F.2d 1285 (6th Cir.) (school board had standing to assert Fourteenth Amendment rights of students and parents), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (corporations owning private schools had standing to assert Fourteenth Amendment rights of parents and guardians of school children). *See also Regents of the University of Minnesota v. National Collegiate Athletic Ass'n,* 560 F.2d 352, 363–64 (8th Cir.1977) (regents of public university had standing to assert rights of student athletes).

matter, unless the District is allowed to pursue the claims against the State, it is likely that no one will.

■ The third factor, the impact of the litigation on third-party interests, is closely linked to the relationship factor. *Amato,* 952 F.2d at 749, n. 7. Because the District is in a position to be an effective advocate for the parents and children, and because the parents and children are unlikely to assert their rights for themselves, the court concludes they will benefit from the District's assertion of third-party standing.

All three of the prudential factors identified by the Supreme Court support third-party standing in this case. The court therefore concludes that the District has standing to sue for the injuries sustained by the children residing in the district.

In *Baliles,* the Fourth Circuit also held that a school board may sue on behalf of its students. The court noted that it had implicitly ruled in *Bradley v. School Bd.,* 462 F.2d 1058 (4th Cir.1972), *aff'd,* 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 771 (1973), that the school board had standing to bring claims against the state on behalf of Richmond's white and black students. *School Bd. v. Baliles,* 829 F.2d 1308, 1310 (4th Cir.1987). In *Bradley,* the Fourth Circuit left undisturbed the district court's holding that the defendant school board had standing to file a cross-claim against the state and county defendants. *See Bradley v. School Bd.,* 338 F.Supp. 67, 229–30 (E.D.Va.), *rev'd on other grounds,* 462 F.2d 1058 (4th Cir.1972), *aff'd by an equally divided Court,* 412 U.S. 92, 93 S.Ct. 1952, 36 L.Ed.2d 171 (1973). In *Bradley,* the district court noted that the school board's cross-claim was "brought in the capacity of the Board as guardian, as it were, for the pupils in the Richmond city schools, and as such its action is brought on behalf of the white and the black students." *Id.* at 230. The Fourth Circuit in *Baliles* affirmed this reasoning. 829 F.2d at 1311. Therefore, under the authority of *Baliles,* the court concludes that the District can assert claims on behalf of the children residing in the district.

■ The State contends that because the District is a political subdivision, it may not make claims as *parens patriae* on behalf of its residents. This argument has been rejected by *Baliles* and *Bradley,* which permitted the school board to represent students' interests. To the extent the *parens patriae* decisions cited by the State purport to state a rule of third-party standing, it is a rule of practice only and may be outweighed by the need to protect fundamental rights. *See Barrows v. Jackson,* 346 U.S. 249, 257, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953).

## 4. DISTRICT'S STANDING TO SUE UNDER FEDERAL STATUTES AND CONSTITUTIONAL PROVISIONS

■ The District's claims for relief are based upon the Fourteenth Amendment (U.S. Const.Amend. XIV), Title VI (42 U.S.C. § 2000d), and the Equal Education Opportunity Act (EEOA, 20 U.S.C. 1703). Federal courts have inherent authority to compel compliance with constitutional provisions. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 392, 91 S.Ct. 1999, 2002–2003, 29 L.Ed.2d 619 (1971); *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). The District, as shown above, is clearly entitled to assert claims for injunctive relief to remedy the State's alleged violations of the Fourteenth Amendment.

■ The District, as an entity, has standing to sue on its own behalf under Title VI for the reasons stated in *Hudson Valley Freedom Theater, Inc. v. Heimbach,* 671 F.2d 702 (2d Cir.), *cert. denied,* 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982). In *Hudson Valley* a not-for-profit theater company that sought to reach and involve the black and Hispanic communities had standing to sue under Title VI based on alleged racially-motivated discrimination in the provision of government funding for the company. The court reasoned that Title VI does *not* say that "[n]o person in the United States shall, on the ground of *his* race, color, or national origin" be subjected to discrimination under a program receiving federal financial assistance. *Id.* at 705. Thus, an

entity may sue under Title VI when it sustains injury as the result of racial discrimination in program funding. The District therefore may sue under Title VI based on the injuries it has sustained here.[7]

## C. ELEVENTH AMENDMENT IMMUNITY ISSUES

### 1. GENERALLY

■ The State also contends that the District's claims are barred by the Eleventh Amendment. The impetus for Eleventh Amendment was the prevention of federal court judgments that must be paid out of a state's treasury. *Hess v. Port Authority Trans–Hudson Corp.,* — U.S. ——, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). However, the Eleventh Amendment does not bar *all* actions against a state or its agencies and officials in federal court. Two well-established exceptions apply in this case. The *Ex parte Young* exception authorizes this suit to proceed against the individual state officials named in the cross-claim (*i.e.,* the Governor, the State Board of Education members, and the State Department of Education Superintendent (the "Superintendent"). Moreover, the congressional abrogation exception authorizes this suit to proceed against the state entities (*i.e.,* the State of South Carolina, the State Board of Education (the "State Board"), the State Budget and Control Board, and the State Department of Education (the "Department of Education").

### 2. EX PARTE YOUNG EXCEPTION

■ When a state official is sued in his official capacity in a suit that seeks the recovery of money from the state, the state will be deemed to be the real and substantial party in interest and may invoke its Eleventh Amendment immunity as a defense even

though individual officials are the named defendants. *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350–51, 89 L.Ed. 389 (1945).[8] However, that principle provides no immunity for officials here because the District is seeking primarily prospective injunctive relief against the State to end an alleged continuing violation of constitutional and federal law.

Prospective compliance suits of this sort are specifically authorized under a long line of cases extending back to the Supreme Court's landmark decision in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). There, the Supreme Court carved out an important exception to Eleventh Amendment immunity by holding that a suit to enjoin the unconstitutional acts of a state official is not a suit against the state and is, therefore, not barred by the Eleventh Amendment. 209 U.S. at 159–60, 28 S.Ct. at 453–54. This holding rested on the theory that an unconstitutional statute is void and, therefore, does not "impart to [the official] any immunity from responsibility to the supreme authority of the United States." 209 U.S. at 160, 28 S.Ct. at 454.

In repeatedly reaffirming *Young*'s prospective compliance exception, the Supreme Court has established that the Eleventh Amendment does not prevent federal courts from entertaining suits that seek prospective injunctive relief against state officials who are sued in their official capacity to prevent a continuing violation of federal law. *E.g., Papasan v. Allain,* 478 U.S. 265, 282, 106 S.Ct. 2932, 2942–43, 92 L.Ed.2d 209 (1986); *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985); *see also Wu v. Thomas,* 863 F.2d 1543, 1550 (11th Cir. 1989). Indeed, the Supreme Court has recognized that "[r]emedies designed to end a

---

7. The one case cited by the State with respect to Title VI, *United States v. Alabama,* 791 F.2d 1450 (11th Cir.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987), presented the question whether a State university, as a creature of the State, had standing to sue another state entity and is therefore inapplicable. Moreover, in light of *Hudson Valley,* there is no reason a school district cannot be considered a "person" under Title VI.

8. Although numerous cases recite the proposition that a suit against a state official in his or her official capacity is in essence a suit against the state, these same cases go on to observe that an official-capacity suit for prospective injunctive relief is not barred by the Eleventh Amendment and provides the vehicle through which the *Ex parte Young* exception, described in the text above, is effectuated. *E.g., Kentucky v. Graham,* 473 U.S. 159, 169 n. 18, 105 S.Ct. 3099, 3107 n. 18, 87 L.Ed.2d 114 (1985).

continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." 474 U.S. at 68, 106 S.Ct. at 426 (citation omitted).

The State contends that the District's claims are in essence claims for money damages, and that the *Ex parte Young* exception does not apply. However, "relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment *even though accompanied by a substantial ancillary effect on the state treasury.*" *Papasan*, 478 U.S. at 278, 106 S.Ct. at 2940 (emphasis added). Thus, in *Edelman v. Jordan*, 415 U.S. 651, 664, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974), the court recognized that injunctive relief may have serious fiscal impact on a state because it prevents the collection of substantial monetary penalties that otherwise would have enriched the state treasury. 415 U.S. at 667, 94 S.Ct. at 1357-58. *Edelman* found, however, such impact permissible:

> But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. *Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young.*

415 U.S. at 667-68, 94 S.Ct. at 1357-58 (emphasis added).

The Supreme Court has expressly held that relief identical to that sought in this case fits within the *Ex parte Young* exception to the Eleventh Amendment. In *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*hereinafter "Milliken II"*), the Supreme Court held that the state defendants (including the governor of Michigan, the attorney general, the state board of education, and the state superintendent) could be required to pay half the cost of the various educational components that were part of a local school desegregation plan imposed by the district court. Even though the state would be required to expend substantial sums of money, the Supreme Court found that the Eleventh Amendment was not violated because:

> The decree to share the future costs of educational components in this case fits squarely within the prospective-compliance exception reaffirmed by *Edelman*. That exception, which had its genesis in *Ex parte Young*, permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury. The order challenged here does no more than that. The decree requires state officials, held responsible for unconstitutional conduct, in findings which are not challenged, to eliminate a *de jure* segregated school system. More precisely, the burden on state officials is that set forth in *Swann*—to take necessary steps to "eliminate from the public schools all vestiges of state-imposed segregation."

*Milliken II*, 433 U.S. at 289-90, 97 S.Ct. at 2761-62 (citations omitted).

Likewise, in *Papasan v. Allain*, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), a case addressing a disparity in the distribution of educational funds in Mississippi arising out of actions that occurred a century earlier, the Court underscored the continuing strength of *Milliken II* and *Ex parte Young*. In *Papasan*, the Supreme Court held that the alleged constitutional violation—the state's unequal distribution of benefits—was precisely the type of continuing violation for which a remedy could be fashioned under *Ex parte Young*. The Court stated:

> [T]he essence of the equal protection allegation is the present disparity in the distribution of the benefits of state-held assets and not the past actions of the State. A remedy to eliminate this current disparity, *even a remedy that might require the expenditure of state funds*, would ensure "'compliance in the future with a substantive federal-question determination'" rather than bestow an award for accrued monetary liability. This claim is, in fact, in all essential respects the same as the equal protection claim for which relief was approved in *Milliken*.

*Papasan,* 478 U.S. at 282, 106 S.Ct. at 2942 (citation omitted; emphasis altered).

The State also argues that the *Ex parte Young* exception does not apply because the state officials either lack personal involvement as to the matters alleged in the cross-claim or lack authority over these matters. It asserts that the Governor has "no personal or individual involvement, or any powers as to matters alleged in the Cross–Claim." (State Memorandum in Support of Motion to Dismiss, at 12–13.) As to the Superintendent and State Board members, the State does not allege lack of personal involvement on their behalf, but instead asserts that they "have no enforcement authority as to future matters such as pupil assignments and school consolidations to make them subject to an injunction for future conduct." (*Id.,* at 13.)

■ The State's argument that the Governor lacks personal involvement in the constitutional wrongs alleged misconceives the scope of the *Ex parte Young* exception. *Ex parte Young* does not require that a state official have personal involvement in the alleged constitutional violation to fall within the exception to immunity under the Eleventh Amendment. *Ex parte Young* requires only that the state official who is sued must "by virtue of his office ha[ve] some connection" with the unconstitutional act or conduct complained of. *Ex parte Young,* 209 U.S. 123, 157, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908). As explained in *Luckey v. Harris,*

860 F.2d 1012, 1015–16 (11th Cir.1988), *reh. denied,* 896 F.2d 479 (11th Cir.1989), *cert. denied,* 495 U.S. 957, 110 S.Ct. 2562, 109 L.Ed.2d 744 (1990), "All that is required is that the official be responsible for the challenged action." In *Luckey,* indigent plaintiffs sued the governor and other state officials to compel them to provide adequate legal representation. The Eleventh Circuit held that the *Ex parte Young* "connection" requirement was satisfied as to the governor because he is responsible for law enforcement, is charged with executing the laws faithfully, has residual power to commence criminal prosecutions, and has final authority to direct the attorney general to prosecute on behalf of the state. *Luckey,* 860 F.2d at 1016. *See also Board of Pub. Educ. v. Georgia,* No. CV 490–101, slip op. at 11–12, 1990 WL 608208 (S.D.Ga. Sept. 24, 1990) (connection requirement met with respect to governor, comptroller and fiscal division director, in part because of their fiscal responsibilities concerning education); *Dekalb County Sch. Dist. v. Rogers,* No. 1:90–cv–1769–WCO, slip op. at 15–17 (N.D.Ga. March 27, 1991) (same).[9]

In the present action, most of the state officials named as defendants have an adequate connection to the unlawful acts alleged in the Cross–Claim to establish the "connection" required by *Ex parte Young.* The Constitution and statutes of the State of South Carolina place substantial responsibilities upon the Governor in the area of education.

9. *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.,* 714 F.2d 946 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984), provides further guidance on the proper application of the *Ex parte Young* "connection" requirement. In that case, the State School Superintendent was retained as a defendant over an objection that he did not have a sufficient connection with the alleged unconstitutional acts to meet the requirements of *Ex parte Young.* The Ninth Circuit rejected this argument on the basis that "past superintendents helped to authorize and maintain a racially segregated school system in Los Angeles ... and the [present] Superintendent allegedly has not attempted to remedy this segregation." 714 F.2d at 952. Significantly, the court accepted the argument as to the governor—but only because there was *no* evidence that present or former governors, as contrasted to state school superintendents, had done anything to promote segregation. In the absence of any such evidence, the court conclud-

ed that the governor's general duty to enforce state law alone did not establish the necessary connection with the unconstitutional acts alleged by the plaintiff.

In the present case, however, there is evidence that Governors of South Carolina had the same type of connection with the unconstitutional acts alleged here as proved sufficient to deny the state superintendent's motion to dismiss in *Los Angeles Branch NAACP.* Unlike the school district in *Los Angeles Branch NAACP,* the District here does not rely simply upon the Governor's general obligation to enforce the laws of the state, but instead relies upon evidence of discriminatory acts by the Governor's predecessors as well a continuing failure to remedy the effects of the past acts. In summary, the Governor of South Carolina has more than sufficient connection with the subject matter of this lawsuit to make him a proper party under the *Ex parte Young* exception.

The South Carolina Constitution provides that the Governor is the chief magistrate of the State of South Carolina with the duty to faithfully execute the laws of the State. S.C. Const. Art. IV, §§ 1, 15. The State Board has the power to approve, alter, or deny annual education budgets. The State Board also oversees all federal and state aid to local school districts and reviews the annual per-weighted-pupil budget estimates as submitted by the State Board. S.C.Code Ann. § 1–11–25 (Law.Co-op.1976); Cross–Claim, § 7.

The Superintendent and State Board members also are closely tied to the constitutional violations alleged by the District. The Superintendent is charged with the responsibility of administering, through the Department of Education, all policies and procedures adopted by the State Board. S.C.Code Ann. § 59–3–30 (Law.Co-op.1976). The Superintendent also is directed to supervise and manage all public school funds provided by the state and federal governments. *Id.* The State Board has the broad power to adopt policies, rules and regulations for the state's public schools. S.C.Code Ann. § 59–5–60 (Law.Co-op.1976). The State Board approves the Department of Education's budget before its submission to the Budget and Control Board and the General Assembly. *Id.* The State Board also is charged with responsibility for making plans for construction of public school buildings and seeking more efficient operation of the pupil transportation system. S.C.Code Ann. § 59–5–100 (Law.Co-op.1976). Its responsibilities with respect to transportation are quite broad. South Carolina law provides that "[t]he control and management of all school bus transportation in the State shall be vested in the State Board of Education." S.C.Code Ann. § 59–67–410 (Law Co-op.1976).

■ However, with respect to the State Budget and Control Board for the State of South Carolina and its members, the court concludes the *Ex Parte Young* exception does not apply and therefore, the claims against the Board and its members must be dismissed. The State Budget and Control Board and its members have no authority over education matters, nor do they have any authority to appropriate money. Under Act No. 132, 1993 S.C. Acts 246, authority of the State Budget and Control Board over budgetary matters was given to the Governor. Accordingly, because the court finds no close connection between the matters at issue in this case and the responsibilities of the State Budget and Control Board and its members, all cross-claims against those parties are dismissed.

### 3. CONGRESSIONAL ABROGATION EXCEPTION

#### a. Generally

■ Just as the *Ex parte Young* exception removes any Eleventh Amendment immunity of the state officials, the court concludes that the congressional abrogation exception overcomes the Eleventh Amendment defenses asserted by the state defendant entities. The abrogation doctrine recognizes that a state's Eleventh Amendment immunity may be nullified when Congress acts pursuant to its enforcement power under § 5 of the Fourteenth Amendment. As the Supreme Court stated in *Fitzpatrick v. Bitzer*:

> [W]e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority.... We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts.

427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976) (citations omitted).

In the present action, the two federal statutes upon which the District relies, Title VI and the Equal Educational Opportunity Act (EEOA), represent instances in which Congress has exercised its authority under § 5 of the Fourteenth Amendment to abrogate the

Eleventh Amendment. These statutes thus permit the District's assertion of cross-claims against the State of South Carolina, the State Board and the Department of Education as defendants, notwithstanding the immunity ordinarily·afforded to states and state entities under the Eleventh Amendment.

■ The State contends that Title VI's abrogation of Eleventh Amendment immunity does not apply to those defendants because they allegedly are not currently engaged in unconstitutional conduct and because the cross-claim does not allege discrimination "under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. As to the District's EEOA cross-claim, the State contends that the EEOA fails to meet the test for implied abrogation of the Eleventh Amendment and that the District's allegations fail to state a claim against the Superintendent and State Board under the EEOA. For the following reasons, the court rejects each of these arguments.

### b. Title VI

Title VI contains a broad prohibition against race discrimination under any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d. Because state and local governments receive federal funding for education, Title VI is frequently invoked by plaintiffs in school desegregation cases. See, e.g., Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); Reed v. Rhodes, 500 F.Supp. 404, 416 (N.D.Ohio 1980), aff'd, 662 F.2d 1219 (1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). Eleventh Amendment immunity is not a defense to a Title VI action because Congress expressly abrogated Eleventh Amendment immunity for suits brought under Title VI as to any violations that occur in whole or in part after October 21, 1986. See Civil Rights Remedies Equalization Act, 42 U.S.C. § 2000d–7.[10]

Because the State of South Carolina and its educational agencies are recipients [11] of federal funds for educational purposes, they are subject to suit under Title VI. Furthermore, their continuing failure to take affirmative actions to dismantle the former dual school system constitutes an ongoing violation of Title VI occurring in whole or in part after October 21, 1986. See Parents for Quality Educ. with Integration, Inc. v. Fort Wayne Community Schs. Corp., 662 F.Supp. 1475 (N.D.Ind.1987), dismissed, 728 F.Supp. 1373 (N.D.Ind.1990). Because Congress expressly abrogated Eleventh Amendment immunity for such violations, this action can be brought directly against the State of South Carolina and its educational agencies, the State Board, and the Department of Education.

The State argues that Title VI does not apply to them because the District's allegations of discrimination do not relate to a program or activity receiving federal financial assistance. This argument ignores the Civil Rights Restoration Act of 1987, 42 U.S.C. § 2000d–4a, which overturned Grove City College v. Bell, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), and significantly broadened the scope of Title VI. In Grove City, the Supreme Court narrowly construed the phrase "program or activity," giving it a

---

10. The Civil Rights Remedies Equalization Act expressly abrogates Eleventh Amendment immunity for suits brought under Title VI, stating in relevant part:

(a)(1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . Title VI of the Civil Rights Act of 1964 [42 U.S.C. §§ 2000d et seq.].

(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

(b) The provisions of subsection (a) of this section shall take effect with respect to violations that occur in whole or in part after October 21, 1986. 42 U.S.C. § 2000d–7.

11. The Title VI regulations define "recipient" to mean "any State . . . or instrumentality of any State . . . to whom Federal financial assistance is extended, directly or through another recipient, for any program, including any . . . transferee thereof. . . ." 34 C.F.R. § 100.13(i) (emphasis added). The State of South Carolina and its educational agencies receive federal funds for educational purposes.

"program-specific" interpretation that differed from the broader interpretation adopted by most lower courts. The Civil Rights Restoration Act reinstates the broader concept of "program or activity" by adding to Title VI an explicit definition for that phrase. The new definition specifies that entire entities receiving federal funds—whether governmental entities, school systems, or universities—must comply with Title VI, rather than just the particular program or activity that actually receives the funds.[12] *See Radcliff v. Landau,* 883 F.2d 1481 (9th Cir.1989); *United States v. Louisiana,* 811 F.Supp. 1151 (E.D.La.1992), *vacated on other grounds* 9 F.3d 1159 (5th Cir.1993).

■ Because the State and its educational agencies are proper Title VI defendants, they are subject to liability under the statute and its implementing regulations.[13] In addition to prohibiting specific discriminatory actions, the regulations also impose an affirmative duty upon recipients who have a history of previous discrimination. This duty is expressed as follows:

> In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, *the recipient must take affirmative action* to overcome the effects of prior discrimination.

34 C.F.R. § 100.3(b)(6) (emphasis added).[14]

In summary, the State, the State Board, and the Department of Education are clearly subject to suit under Title VI. *See Board of Pub. Educ. v. Georgia,* No. CV 490–101, slip op. at 13–16 (S.D.Ga. Sept. 24, 1990); *Dekalb County Sch. Dist. v. Rogers,* No. 1:90–cv–

1769–WCO, slip op. at 8–11 (N.D.Ga. March 27, 1991).

### c. EEOA

■ The EEOA, like Title VI, was enacted by Congress pursuant to its enforcement authority under § 5 of the Fourteenth Amendment. 20 U.S.C. § 1702(b); *Castaneda v. Pickard,* 648 F.2d 989, 1008 n. 9 (5th Cir.1981); *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.,* 714 F.2d 946, 951 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984). The EEOA expressly permits individuals who have been denied an "equal educational opportunity," as defined in the EEOA, to sue state and local educational agencies in federal court.

■ Like the employment discrimination statute interpreted by the Supreme Court in *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (Title VII), the EEOA fails to contain an express abrogation of Eleventh Amendment immunity. However, an explicit statutory reference to state sovereign immunity is not required by the abrogation doctrine. *Dellmuth v. Muth,* 491 U.S. 223, 233, 109 S.Ct. 2397, 2403, 105 L.Ed.2d 181 (1989) (Scalia, J. concurring); *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). All that is required is a statement of Congressional intent "in unmistakable language in the statute itself." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 243, 105 S.Ct. 3142, 3148, 87 L.Ed.2d 171 (1985).

The EEOA clearly manifests Congress' intent to abrogate Eleventh Amendment immunity for suits brought under the EEOA.

**12.** The Civil Rights Restoration Act states that the terms "program or activity" and "program" mean *all* of the operations of:
(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
(B) the entity of such State or local government that distributes such assistance *and* each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
42 U.S.C. § 2000d–4a (emphasis added).

**13.** Title VI regulations have the force and effect of law and a violation of the regulations constitutes a viable cause of action. *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

**14.** The State argues that Title VI does not make them accountable to the District for their own alleged discrimination (State Memorandum in Support of Motion to Dismiss, at 14–15). The court finds the State is accountable for its own misconduct in violation of Title VI. Further, the State's contention that the District does not allege discrimination in pupil and school assignments also is misguided, because of the State's affirmative obligation under 34 C.F.R. § 100.3(b)(6) to overcome the effects of its prior discrimination.

Furthermore, at least two federal circuit courts specifically have held that the EEOA abrogates Eleventh Amendment immunity; none have held otherwise. *See Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1037 (7th Cir.1987); *Los Angeles Branch NAACP*, 714 F.2d at 951 (holding that Congress has provided for desegregation suits against state educational agencies under EEOA). In both cases, motions to dismiss by the state boards of education and the state departments of education on Eleventh Amendment immunity grounds were rejected. *See also Board of Pub. Educ.* at 16–18; *Dekalb County Sch. Dist.* at 11–15.

Section 1703 of the EEOA provides, in pertinent part, as follows:

No *State* shall deny equal educational opportunity to an individual on account of his or her race, color, sex or national origin by—

(a) the deliberate segregation by an *educational agency* of students on the basis of race, color, or national origin among or within schools;

(b) the failure of an *educational agency* which has formerly practiced such deliberate segregation to take affirmative steps ... to remove the vestiges of a dual school system.

20 U.S.C. § 1703 (emphasis added). Section 1720 of the EEOA provides that, for purposes of Section 1703, the term "educational agency" means a "*state* educational agency" or a "local educational agency," as those terms are defined in Section 801 of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 1720). Section 801 of the referenced Act (20 U.S.C. § 3381) adopts the definitions found in 20 U.S.C. § 2891. The term "state educational agency" is defined in Section 2891 to mean "the officer or *agency* primarily responsible for the *State* supervision of public elementary and secondary

schools." (20 U.S.C. § 2891(23) (emphasis added)).

Finally, and of critical importance in evidencing congressional intent to abrogate, Section 1706 of the EEOA specifically provides that:

An individual denied an equal educational opportunity, as defined by [20 U.S.C. § 1703], may institute a civil action in an appropriate *district court of the United States* against *such parties,* and for such relief, as may be *appropriate.*

20 U.S.C. § 1706 (emphasis added). The "appropriate parties" against whom such a civil action may be instituted are those upon whom the statutory obligations and prohibitions are imposed—namely, the "State," [15] the "State educational agency," and the "local educational agency." Thus, like Title VII, which was held to have abrogated the Eleventh Amendment in *Fitzpatrick v. Bitzer,* the EEOA clearly ordains that suit may be brought in federal court against state entities that might ordinarily be immune under the Eleventh Amendment. In addition, Section 1708 of the EEOA provides:

The appropriate district court of the United States *shall have and exercise* jurisdiction of proceedings instituted under Section 1706 of this Title.

20 U.S.C. § 1708 (emphasis added). Since "the proceedings instituted under Section 1706" expressly contemplate *state entities* as defendants, the court finds that this is the kind of "unmistakable" language that suffices to show Congress' intent that the Eleventh Amendment should not be viewed as an impediment to the jurisdiction of federal district courts. *See Dellmuth v. Muth,* 491 U.S. at 240, 109 S.Ct. at 2406–07 (express reference to the Eleventh Amendment not required).

The clarity of this statutory language fully satisfies the stringent test adopted in the most recent Supreme Court decisions on abrogation.[16] To hold otherwise would nullify

---

**15.** The State argues incorrectly that the District does not assert a claim against the State under the EEOA. The cross-claim should be read as asserting claims against certain named State educational agencies, their officers, *and* the State. (See Cross–Claim, §§ 42, 44.)

**16.** Unlike the provisions of the Rehabilitation Act which the Supreme Court addressed in *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), sections 1703 and 1706 of the EEOA do not simply authorize relief against a general, undefined class of defendants that may or may not include the state and

one-half of the EEOA's definition of "educational agency" and could leave the victims of EEOA violations with no alternative forum in which to press their EEOA claims against the appropriate state agencies. This is so because, unlike the Education of the Handicapped Act ("EHA") that was at issue in *Dellmuth*, the EEOA *does not* create any administrative remedy and does not provide for suit in state court.[17] Unless abrogation is recognized, the EEOA could be rendered totally meaningless as to state educational agencies—a result that Congress clearly did not intend.

In summary, the court finds that the Congressional abrogation doctrine overcomes the Eleventh Amendment defenses asserted by the State of South Carolina, the Board of Education for the State of South Carolina and the Department of Education. Title VI expressly abrogates the Eleventh Amendment and affords a clear statutory basis for holding the State liable for discriminatory acts and omissions. The EEOA also manifests Congress' intent to abrogate in unmistakably clear language. Thus, the EEOA provides an additional statutory basis for imposing liability on the State.

its agencies. In *Atascadero*, the relevant statute stated only that suit could be brought against "any recipient of federal assistance." The Supreme Court held that this language was too general to constitute congressional abrogation of Eleventh Amendment immunity. In contrast, the EEOA expressly provides that "educational agency" includes certain state agencies and officials. There can be no mistaking Congress' focused intent to provide a remedy against the State. The EEOA also has the specificity that was found lacking in 42 U.S.C. § 1983. *See Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (§ 1983 not intended to abrogate sovereign immunity); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (same).

17. The Supreme Court held in *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990), that in order to give federal courts exclusive jurisdiction over a federal cause of action, Congress must "affirmatively divest state courts of their presumptively concurrent jurisdiction." 494 U.S. at 821, 110 S.Ct. at 1567. The EEOA contains several provisions that may be construed as divesting state courts of concurrent jurisdiction. For example,

## D. RES JUDICATA, COLLATERAL ESTOPPEL, LAW OF THE CASE AND JUDICIAL ESTOPPEL

### 1. GENERALLY

The State contends that the District's cross-claim is barred by the doctrines of *res judicata*, collateral estoppel, law of the case and judicial estoppel. However, the court finds that none of these doctrines apply.

 The elements of *res judicata* are: (1) a judgment on the merits in a prior suit resolving; (2) claims by the same parties or their privies; and (3) a subsequent suit based on the same cause of action. *Aliff v. Joy Mfg. Co.*, 914 F.2d 39, 42 (4th Cir.1990). *See also Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) ("Under res judicata, a final judgment on the merits bars further claims by parties or their privies based on the same cause of action"). The most obvious flaw in the State's *res judicata* defense is that neither they nor their privies were parties to this action when the previous rulings were made. Another defect is that previous decisions in this case have not involved the same claims asserted in the cross-claim. The *res judicata* defense therefore must fail.

20 U.S.C. § 1753 provides that, "The rules of evidence required to prove that State or local authorities are practicing racial discrimination in assigning students to public schools shall be uniform throughout the United States." Such uniformity in the rules of evidence can be accomplished *only* if the federal courts have exclusive jurisdiction over EEOA cases, because Congress cannot mandate rules of evidence for state courts. In addition, the EEOA contains numerous sections referring to "courts of the United States" in contexts that suggest that state courts are not to have concurrent jurisdiction over cases brought under the EEOA. Specifically, these EEOA sections provide guidelines and limitations to be observed by "courts of the United States" in formulating remedial orders. These *restrictions make sense only in the context of an exclusive federal remedy. See, e.g.,* 20 U.S.C. §§ 1712, 1713, 1714, 1716, 1754.

Even without deciding the exclusive jurisdiction issue, this court can look to the referenced sections for additional evidence that Congress clearly intended that state educational agencies be subject to suit in federal court, notwithstanding the Eleventh Amendment. 20 U.S.C. § 1753, quoted above, is particularly persuasive evidence of that intent.

 Collateral estoppel bars re-litigation of issues of fact or law when (1) such issues were actually determined in the first action, (2) the issues in the two actions are in substance the same, (3) resolution of the issues was necessary to the decision in the first action, (4) resolution of the issues in the first action is determined to be sufficiently firm to be accorded conclusive effect, and (5) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issues in the first action. *Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332, 343–47 (4th Cir.1992), *vacated on other grounds*, 1993 WL 524680 (4th Cir.1993). However, the State does not contend, nor could it, that its liability has been actually determined by this court. Collateral estoppel thus cannot apply here.

 The law of the case doctrine provides that a court's legal determination is binding throughout the litigation unless different evidence is produced, the applicable law changes, or the decision is clearly erroneous. *White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir.1967). *See also Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Sejman v. Warner–Lambert Co.*, 845 F.2d 66, 69 (4th Cir.1988), *cert. denied*, 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990). The State correctly states that, under the law of the case doctrine, the District has responsibility for desegregating its schools. This point does not, however, support the conclusion that the State has no liability, because the court has never held that the District has *exclusive* responsibility for desegregation in the district. The District contends that the State must *share* responsibility for remedying the vestiges of segregation. Because this court has never previously determined the State's liability, the law of the case does not bar the District's claim.

 Finally, the State raises the doctrine of judicial estoppel, which in essence prevents a party from taking conflicting legal positions in the same or related litigation. *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir.1982). The State asserts that by not joining it before now, the District has conceded that the State does not share responsi-

bility for desegregation in the district. The District has, however, never taken the position before this court or elsewhere that the State was not responsible for its unconstitutional acts. In this case, the District seeks to impose on the State its fair share of the responsibility for desegregation, *going forward*. The State's judicial estoppel argument is therefore also without merit.

Accordingly, the Motion to Dismiss by the State Defendants is granted with respect to the State Budget and Control Board and its members and denied in all other respects.

## III. PROPOSED CONSENT ORDER AND TRIAL

### A. GENERALLY

The case was set for non-jury trial before the undersigned on May 23, 1994. On that date counsel for the United States, Plaintiffs and the District advised the court that a partial settlement of the case had been reached. A proposed consent order was submitted which contained a stipulation of facts and a remedial plan. Under the stipulation of facts, the parties agreed that the District had not fully complied with the 1970 desegregation order and federal law, and that vestiges of the prior dual system remained in the District. The proposed consent order further stipulated that the District had not achieved unitary status and must take further steps to achieve the maximum degree of desegregation practicable. The proposed order then set forth the specific racially identifiable schools which the parties agreed were considered vestiges of the prior dual school system and in need of remedial measures. Further, the parties stipulated that the District had not fully complied with the court's 1970 order and federal law regarding the assignment of principals, faculty and staff.

The remedial plan contained in the proposed consent order consists of consolidations and pairings of various elementary and secondary schools within the District, and well as new efforts by the District to eliminate a correlation between the historical racial identity of schools and the race of principals, faculty and staff. Compensatory curricular enhancements for minority students

are provided, as well as elimination of certain ability-grouping practices which have tended to segregate students.

The parties proposed that the plan be approved by the court, pursuant to Fed. R.Civ.P. 23(c), and ordered implemented for the opening of the 1994–1995 school year, except for those provisions relating to new school consolidations which would require construction of new facilities.

The United States and Plaintiffs however took the position that the plan did not resolve all issues in the case. They alleged that the plan did not address the racial stigma, or stigma of inferiority, that remained after 1970 at Mayo High School. These parties contended that in order for the desegregation plan to be constitutionally adequate, a county-wide magnet high school should be opened on the former site of Mayo High School.

The State of South Carolina was not a party to the consent order, and took no position on it.

The District contended that the proposed consent order provided an adequate desegregation plan, and that a magnet school was not needed at Mayo High School. The District agreed that the only issue to be tried by the court was whether the remedial plan would disproportionately burden minority school children without a magnet school at Mayo.[18] Accordingly, trial on this remaining issue and the issue of the liability of the State of South Carolina commenced on May 23, 1994, and concluded on June 3, 1994.

## IV. ISSUES FOR TRIAL

### A. GENERALLY

In the Consent Order submitted to the court on June 3, 1994, the parties stipulated that "the Darlington County School District has not fully complied with the desegregation order and federal law in this case, and that vestiges of the prior dual system remain in the Darlington County School District." Consent Order at 2 (6/3/94).

The parties further stipulated that Mayo High School is one of eleven racially identifiable schools in the District that remain as vestiges of the prior dual system and which are in need of remedial measures. Consent Order at 2 (6/3/94).

The Consent Order provides that Mayo and St. John's High Schools are to be consolidated at the present St. John's site. The new consolidated high school, to be called Darlington High School, will serve Darlington area students in grades 9–12. The parties were unable to agree on the future of the present Mayo High School facility. Plaintiffs and the United States contend that a desegregation remedy for the secondary schools in the Darlington area requires not only a consolidated high school on the St. John's High School campus, but also a district-wide magnet school on the Mayo High School campus. They submit that a desegregation remedy which closes Mayo High School would not prove to be truly effective in eliminating the vestiges of the prior dual school system in Darlington, and would disproportionately burden minority school children. The District disputes the need for a Mayo magnet, and contends that the Consent Order provides an adequate desegregation remedy. Thus, the issues to be heard and decided by this court were the following:

1. Should the proposed Consent Order be approved?

2. If the Consent Order is approved, does an effective desegregation remedy require a district-wide magnet school on the Mayo High School campus?

3. If a magnet school is to be implemented, under what standards and procedures shall it operate?

4. Are the State Defendants liable to participate in the desegregation of the District?

5. If so, what share of the desegregation costs should be borne by the State Defendants?

---

18. As counsel for the District noted, "The only issue is in order to have equity, is this required, and I think that is the limited issue before the court at this point." (TR. at 50).

## V. EVIDENTIARY ISSUES DURING TRIAL

### A. GENERALLY

■ The State objected on relevancy grounds to most of the District's exhibits relating to pretrial–1970 actions by the State. However, the court finds that evidence of the pretrial–1970 activities by the state is relevant. This includes evidence of the actions of the Gressette Committee and other state political leaders, the State building program, the State's efforts to equalize school facilities in order to avoid the impact of *Brown* and to retain separate schools, and the efforts of the State to provide tuition grants to enable children to avoid desegregated schools. This and other historical evidence is relevant to the issue of state liability.

■ The State further contends that the news articles tendered by the District are hearsay, and should be excluded. However, the Federal Rules of Evidence expressly provide that "statements in a document in existence twenty years or more the authenticity of which is established" are an exception to the hearsay rule. Fed.R.Evid. 803(16). The comments to the federal rules clearly indicate that newspaper articles fall within this exception. *See Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388 (5th Cir.1961) (58 year-old newspaper article admissible). Because newspapers are self-authenticating under Fed.R.Evid. 902(6), the court finds that the newspaper articles offered by the District are admissible. Therefore, for the reasons expressed above, the court admitted into evidence the District's Exhibits 100–430.

## VI. APPROVAL OF THE CONSENT ORDER AND ISSUANCE OF INTERIM JUNE 23, 1994, ORDER

### A. GENERALLY

To resolve the claims of the private plaintiffs and the United States against the Dis-

trict, those parties entered into good faith negotiations, which resulted in stipulations and the remedial plan set forth in the June 3, 1994, Consent Order.

The court finds those terms of the Consent Order appropriate for remedying most of the vestiges of segregation in the stipulated schools. The Consent Order desegregation plan promises to effectively desegregate the District and eliminate vestiges of segregation in faculty and staff. In addition, if provisions regarding student assignment, faculty and staff assignment, transportation, curriculum and extra curricular activities are implemented in good faith, the Consent Order promises to effectively desegregate the schools to the maximum degree practicable. (TR. III at 106, 107, 114, 117)[19] As acknowledged above, the Consent Order provides for consolidation of St. Johns and Mayo high schools at the former St. John's site. Plaintiffs and the United States contend that closure of Mayo would place a disproportionate share of the burden of desegregation on minority school children. This issue is addressed in Section VII, F.2. *infra.*

### B. PROCEDURES AND CONSIDERATIONS GOVERNING CONSENT ORDER

■ In determining whether to approve the proposed consent order, the court utilized F.R.Civ.P. 23(c). Accordingly, on May 23, 1994, the proposed consent order was received by the court, and notice and hearing procedures were immediately instituted. Pursuant to the court's orders, notice of the proposed consent order was published in three newspapers of general circulation within the District. Flyers describing the availability of copies of the proposed consent order for inspection within the District as well as notice of two hearings scheduled on the proposed consent order were distributed to all school children in the District. Pursuant to the court's direction, counsel for the Unit-

---

19. To facilitate reference to the ten volumes of trial transcript in this matter, the court adopts the following citation procedure:
 "TR. I" is 5/23/94 transcript,
 "TR. II" is 5/24/94 transcript,
 "TR. III" is 5/25/94 transcript,
 "TR. IV" is 5/26/94 transcript,
 "TR. V" is 5/27/94 transcript,
 "TR. VI" is 5/31/94 transcript,
 "TR. VII" is 6/1/94 transcript,
 "TR. VIII" is 6/2/94 transcript,
 "TR. IX" is 6/3/94 transcript.

ed States, Plaintiffs and the District conducted a public hearing in the District in which they responded to questions concerning the proposed consent order. Thereafter, this court conducted a hearing at which 18 persons addressed the court, in addition to counsel for the settling parties, concerning the appropriateness of the proposed consent order.

Based upon the stipulations of the parties, evidence heard during the trial, this court's inspection of a number of school facilities in the District, a complete review of the entire record in this case since 1962, and the information received by the court at the fairness hearing and in written submissions, the court determines that the settlement encompassed by the proposed consent order is fair, reasonable and adequate. In making this determination this court has considered the following factors:

1. The Plaintiffs' likelihood of success on the merits versus the amount and form of relief offered in the settlement;

2. The complexity, expense and likely duration of the litigation, and the stage of proceedings and amount of discovery completed;

3. The judgment of experienced trial counsel who have evaluated the strength of the case; and

4. Any objections raised by class members or the public.

*Flinn v. FMC Corp*, 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). This court also considered whether the proposed consent order was a product of arm's length rather than collusive bargaining. Finally, the court determined whether the proposed settlement was consistent with the public interest. After assessing the proposed consent order by considering all requisite factors, this court came to one conclusion. The proposed consent order is a fair, reasonable and adequate resolution of most of the allegations of Plaintiffs and United States. This conclusion was based on the court's familiarity with the issues presented in this case, the discovery conducted and the character of the negotiations. The court concluded that the proposed settlement is neither illegal nor tainted

with collusion. Moreover, based on the evidence adduced at the fairness hearing, the court concluded the proposed settlement is fair, adequate, and reasonable. Accordingly, the court adopted the proposed consent order as a Consent Decree and it was approved and filed on June 3, 1994. As provided in the Consent Order, this court shall retain jurisdiction over the Consent Order during its term.

The primary objection to the proposed consent order expressed at the hearing on June 2, 1994, and in written submissions received by the court was that Mayo High School should not be closed as a regular high school. For reasons given below, the court concludes that the only way to achieve desegregation to the maximum extent practicable at the high school level in Darlington is to consolidate the two high schools, St. John's and Mayo. All parties agree that, because of its size limitations, Mayo cannot be considered as a site for the new consolidated Darlington High School. Although closure of the Mayo High School facility (the last historically black high school remaining in Darlington County) places a disproportionate share of the burden of desegregation upon the race disfavored by the District's former dual system, the court concludes that establishment of a county-wide dedicated magnet school for grades nine through twelve at the Mayo High School site is the most appropriate manner in which to share the burdens of desegregation and remedy the racial stigma suffered by the Mayo community. Consequently, when considered in tandem with this court's conclusions regarding the Mayo High School site, the proposed consent order is fair, reasonable and adequate.

## C. REASONABLENESS OF THE CONSENT ORDER

A premise of our legal system is that settlements by agreement of the parties are favored. To approve an agreement reached by arms length negotiations, a trial court need only determine that the proposed settlement is not unconstitutional, unlawful, contrary to public policy or unreasonable. *See United States v. Miami*, 614 F.2d 1322, 1333 (5th Cir.1980). Settlements are espe-

cially preferred in discrimination cases, where the consensual nature of an approved settlement provides, in comparison with a court order, a much surer foundation for fundamental change, and fosters the chances for voluntary compliance by the parties.

Once a consent decree meets the four requirements outlined in *Miami*, it is entitled to a presumption of validity, meaning that the district court must have a "principled reason" for refusing to sign it. *Miami*, 614 F.2d at 1333. A refusal to sign a consent decree based on generalized notions of unfairness is unacceptable. Rather, the court must state specific reasons why a proposed consent decree unduly burdens one class or another. *Id.* In sum, when the remedy jointly proposed by the parties is within reasonable bounds and is not illegal, unconstitutional, or against public policy, the court should give it a chance to work. *Id.*

Where, as here, one of the plaintiffs is the department of the United States government charged with insuring that federal non-discrimination laws are enforced, the court "can safely assume that the interests of all affected have been considered." *Miami*, 614 F.2d at 1332.

In the instant case, the court notes that the Department of Justice Civil Rights Division and the NAACP Legal Defense and Educational Fund, Inc. have extensive experience in litigating school desegregation cases, and the Consent Order was entered into by attorneys who have litigated this particular matter for several years and know the issues involved.

In addition, the proposed Consent Order represents the culmination of extensive negotiations between parties who understand the strengths and weaknesses of their respective positions and embodies a comprehensive desegregation plan that "promises realistically to work." *See United States v. Louisiana*, 527 F.Supp. 509, 511 (E.D.La.1981) (*citing Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)). Indeed, by its terms, the remedial plan contained in the proposed Consent Order is designed "to achieve the maximum degree of desegregation practicable" in Darlington County, Consent Order at 3, and the plan's combination of pairings, consolidations and curriculum enhancements further that end. The stipulations preceding the plan provide a foundation for the District's liability, and a basis for the proposed remedial measures.

Under these circumstances, the court is unable to find any basis upon which to reject the Consent Order with its stipulations and remedial plan.

## D. NOTICE TO CLASS MEMBERS AND FAIRNESS HEARING

Rule 23(e), Fed.R.Civ.P., requires that a class action not be compromised without the court's approval, and that notice of the proposed compromise be given to all members of the class "in such manner as the court directs." Although Rule 23 gives wide discretion to the district court as to the form and content of the notice of proposed settlement, due process requires its constitutional adequacy. *Mendoza v. United States*, 623 F.2d 1338 (9th Cir.1980). Notice is intended to encourage those with divergent views to come forward, "helping the trial court to identify possible inadequacies in the settlement." *Mendoza*, 623 F.2d at 1351.

In *Bronson v. Board of Educ.*, 604 F.Supp. 68, 72 (S.D.Ohio 1984), the court held that a flyer sent home with students notifying parents and guardians of the proposed settlement and publication in area newspapers met this requirement. Similarly, in *Mendoza*, 623 F.2d at 1351, the court approved a notice of a proposed school desegregation class action settlement that was published in two major newspapers, aired by local broadcast media, and distributed to locations throughout the class members' community.

Here, as detailed below, the extensive notice provided to class members satisfied not only Rule 23(e), but the more rigorous standard for class notification set forth in Rule 23(c), which requires that the court direct to the members of the class "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

First, flyers to parents or guardians of students were distributed at school to each student of the Darlington County School District. The flyers notified all recipients that (1) a public hearing would be held to provide information regarding the proposed settlement of the desegregation lawsuit against the District; (2) a separate fairness hearing would be held to permit class members and citizens to address the court regarding the proposed settlement; and (3) copies of the proposed settlement were available for review at a specified location. The flyers stated that they were being provided by attorneys for the District, the United States, and the private plaintiffs.

Second, formal notices were published in the largest regional newspaper, the Florence Morning News, and two local newspapers within Darlington County, the Hartsville Messenger and the Darlington News and Press.

Finally, class members received informal notice of the proposed settlement through the daily coverage of the trial and reporting of the upcoming public hearing and fairness hearing by the Florence Morning News; through the near daily coverage by The State newspaper and regional media outlets, including WPDE–TV and WBTW–TV; and through the coverage by the Hartsville Messenger (publishing on Mondays and Wednesdays) and the Darlington News and Press (publishing on Wednesdays).

Based on the foregoing, the court concludes that the notice of the proposed settlement agreement and the scheduled fairness hearing, given to members of the class, was the "best notice practical under the circumstances," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315, 70 S.Ct. 652, 657–58, 94 L.Ed. 865 (1950), and sufficient to allow persons to frame a response. The lawyers for the United States, private plaintiffs, and the District attended the public hearing on Tuesday, May 31, 1994. The Consent Order was read aloud and explained by an attorney for the United States, and questions were taken from the audience. All interested persons were also given the opportunity to speak at the fairness hearing, which was held in open court on Thursday, June 2,

1994. By any reasonable standard, ample notice was provided to members of the class and to the community at large. Accordingly, the court finds the notice of proposed settlement was reasonably calculated to and did reach the members of the class.

### E. MOTION FOR NEW TRIAL/ALTER OR AMEND THE JUDGMENT

Following the trial of this matter, on June 17, 1994, five individuals purporting to be class members filed a "Motion for a New Trial and/or to Alter or Amend Judgment," in which they asked the court to reconsider its decision, announced at the close of the trial, that the court would accept the Consent Order terms closing Mayo High School. Following the court's Interim June 23, 1994, order indicating that Mayo High School would be reopened as a dedicated magnet school, these same individuals amended their Motion as a "Second Motion for New Trial," and urged the court to order that Mayo operate as a magnet within a high school offering traditional classes.

Accordingly, this motion poses the following question:

Have the proposed plaintiffs presented an adequate basis for reconsideration of the court's decision, and, if so, should Mayo be operated in the fashion urged by them?

The Fourth Circuit recognizes only three grounds for granting such a motion under Rule 59: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir.1993). These circumstances are absent here.

Notwithstanding the three bases enunciated by the Fourth Circuit for the grant of a Rule 59 motion, the proposed plaintiffs would have the court adopt a fourth ground, namely, the "misapprehen[sion] of the position of many members of the class." Mem. at 3. Although the court declines to establish new grounds under Rule 59, it has considered the proposed plaintiffs' motion in the context of preventing "manifest injustice."

In both their June 17 and June 24 filings, the proposed plaintiffs offer nothing more than excerpts of the evidence adduced at trial by the United States and private plaintiffs (*e.g.,* the District's operation of attendance zone lines, closing of historically black schools, and allocation of resources for Mayo). The claims raised by the proposed plaintiffs were litigated over several years, fully aired during the nine-day trial held from May 23 to June 3, 1994, and were among the matters considered by the court prior to entering the Consent Order on June 3, 1994 and its Interim Order of June 23, 1994.

The proposed plaintiffs' assertion that the court misapprehended the position of "several" members of class, Mem. at 4, highlights a flaw in their motion: What was most clear from the fairness hearing was that there was no single view among members of the plaintiff class—or among the citizens of Darlington County, for that matter—as to the appropriate remedy for 40 years of discrimination by the District. The Consent Order signed by the parties and approved by the court represents the informed judgment of the parties, including the Department of Justice and the NAACP Legal Defense and Educational Fund, Inc., as to how best to remedy the District's acknowledged liability.

In essence, the proposed plaintiffs' motion is nothing more than the expression of one dissenting viewpoint by five citizens of Darlington County. However, as the Fourth Circuit has recognized, "mere disagreement" with the court's action does not support a Rule 59 motion. *Hutchinson,* 994 F.2d at 1082. The proposed plaintiffs' failure to present any new evidence further underscores that what the proposed plaintiffs have offered is "mere disagreement" with the outcome of the settlement and trial, not with the underlying evidentiary or legal foundations.

A disagreement among class members dictates neither an amendment of judgment nor the ordering of a new trial. It also does not indicate that counsel for the private plaintiffs failed to discharge their responsibilities, since "[c]lass counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objec-tors." *Walsh v. Great Atl. & Pac. Tea Co.,* 726 F.2d 956, 964 (1983), *reh'g denied* (3d Cir.1984). Given that disagreement among class members is almost inevitable, "it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole." *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1216 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). *See also TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 462–63 (2d Cir.1982) (per curiam) (holding that majority opposition may not serve as a bar to a settlement that the district court determines is reasonable after considering the relevant circumstances).

Accordingly, the court finds that the proposed plaintiffs have not presented a basis for amending or altering the court's Interim June 23, 1994, order.

## F. INTERIM JUNE 23, 1994, ORDER

By order filed June 23, 1994, the court announced its rulings on the issues submitted for trial. The court directed all counsel to submit proposed findings of fact and conclusions of law, pursuant to Rule 52, Fed.R.Civ. P., addressing several conclusions reached by the court. Counsel submitted the proposed findings of fact and conclusions of law on or before July 25, 1994.

The interim conclusions announced by the court in the June 23, 1994, order, which are discussed more fully in the instant order, included, among others, the following:

1. that a desegregation remedy closing Mayo High School places a disproportionate share of the burden of desegregation on the black community;

2. that the most appropriate manner to remedy the Mayo stigma is to establish a dedicated magnet school there;

3. that the State of South Carolina is liable to contribute to the costs of desegregation in Darlington County to the extent of 15%, and to the extent of 100% for transportation costs historically borne by the State.

## VII. MAYO HIGH SCHOOL AS A MAGNET

### A. GENERALLY

The issue of what is to be done with Mayo High School required the court to evaluate the evidence to determine the nature and scope of the District's alleged violations regarding Mayo High School. The court heard lengthy testimony and received and reviewed numerous exhibits and stipulated deposition and other testimony. Based upon this entire record, this court finds that:

1. the District has, by action and inaction, perpetuated a vestige of the former dual school system by stigmatizing Mayo High School as an inferior black school.

2. a desegregation remedy which simply closes the Mayo High School facility, the last historically black high school remaining in Darlington County, places a disproportionate share of the burden of desegregation upon the race disfavored by the District's former dual system.

3. the most appropriate manner in which to share the burdens of desegregation and to remedy the racial stigma suffered by the Mayo community is to establish a county-wide, dedicated magnet school for grades nine through twelve at the Mayo High School site.

The United States, Plaintiffs and the District have stipulated in the Consent Order that Mayo High School remains a vestige of the former dual school system. Had HEW Plan B been implemented as proposed, Mayo High School would have remained a predominately black high school, but there would have been a significantly larger number of white students assigned for attendance there. The modifications to HEW Plan B proposed by the District and implemented, perhaps inadvertently, by the court's Order of February 5, 1970, resulted in the vast majority of white children in the City of Darlington being zoned for St. John's High School rather than Mayo. Thus, by the terms of the court's Order of February 5, 1970, Mayo was destined to remain an essentially all black high school.

Once the zone lines were set by the 1970 Order, however, the Districts' actions and inactions regarding Mayo stigmatized it as an inferior black school. For example:

—the District carved out an exception to its own attendance zone lines to allow white children in the Country Club area to avoid the Mayo attendance zone;

—the District perpetuated a racially identifiable faculty and staff at Mayo through its assignment of a disproportionate number of black principals, teachers and staff members to Mayo High School;

—the District permitted the physical plant at Mayo to deteriorate dramatically and failed to provide comparable facilities to those at St. John's;

—the District denied Mayo adequate resources, e.g., computers, text books and library material, such that the school was not comparable to other high schools in the District;

—at times the District failed to provide an academic curriculum as rigorous as that of the other high schools in the District; and

—at times basic maintenance needs were not provided at Mayo.

When the District elected to build a new St. John's High School in the 1970s, it rejected any plan to build a new consolidated high school. Thus, the contrast between the physical facilities at St. John's and the other District high schools and Mayo became even more dramatic.

### B. RETENTION OF RACIAL IDENTIFIABILITY

#### 1. GENERALLY

Mayo High School, designated as the "black school" during the *de jure* segregation period, retains its racial identifiability. Student enrollment figures for the period 1970–1994 show Mayo's racial identifiability as constant. The link between the *de jure* system and the current disparity has never been broken. Govt.Exh. 43.

The 1970 Order required that students attend school according to the "geographic zon[e]" in which their "residence" was located. *Stanley v. Darlington County Sch. Dist., et al.*, No. 7749, slip op. at 2, ¶ I (D.S.C. Feb. 5, 1970).

The Darlington County School Board has sole authority for transferring and assigning pupils. Govt.Exh. 19 at § C.4.

Examination of the District's attendance zone map shows that the "residences" of students living in the area known as the Darlington "Country Club" are located in the attendance zones of historically and identifiably black schools, i.e., Mayo, B.A. Gary and Cain.

The following streets, included in the "Country Club" area, all lie on the Mayo–B.A. Gary–Cain side of the attendance zone boundary, which separates these schools from the St. John's High–Brunson–Dargan–Spring school zones: Ervins Pasture Road, Tee Circle, Fairway Drive, Green Drive, parts of Country Club Road, Arapaho Circle, Roanoke Drive, Woodcreek Road, Wyandot Street, Shoshone Drive, Nez Perce Road, and Iroquois Street. Govt.Exh. 17, 18, 18a, 18b; TR I at 134–135. Students residing on these streets are, however, assigned to St. John's High, Brunson–Dargan and Spring schools. Govt.Exh. 18.

The residents of the "Country Club" area are white. TR I at 136–137.

On several occasions, District officials were advised of possible changes in school assignments of Country Club area students, but directed that the matter not be pursued further because of perceived political repercussions. TR I at 138–139.

If the students living in the Country Club area attended the schools that the 1970 Order required them to attend based on the location of their "residences", further desegregation at the racially identifiable black schools of Mayo, B.A. Gary and Cain would have been achieved. TR I at 139–140.

The District never sought or received from the court any special attendance zone dispensation to the "Country Club" area residents.

The District therefore undermined desegregation of the Darlington County schools and perpetuated the stigma of inferiority on Mayo High School by assigning the "Country Club" area students to the historically white schools outside the attendance zone line established by the 1970 order.

## C. DISTRICT'S FAILURE TO ENFORCE SCHOOL ATTENDANCE ZONE LINES

### 1. 1988–1991

Dr. Grier, the former District Superintendent for the period 1988–1991, testified that, based on his observations and experiences, when he arrived in the District in 1988 the District was not properly enforcing the school attendance zone lines. TR I at 116.

Enforcement of the attendance zone lines was not a priority at that time in the District. Enforcement was "loose," and no procedures were in place to monitor compliance. TR I at 123–124.

Dr. Grier personally investigated issues relating to zone line compliance, including meeting with parents and school officials, reviewing permanent records, and driving through neighborhoods and visiting alleged residences. Based on his personal investigations and observations, Dr. Grier concluded a significant problem existed with regard to students not attending schools within their proper zones. TR I at 124–125.

The predominant race of those attending schools not within their proper zones was white, and the schools these individuals sought to avoid were the historically black schools, including Mayo High School.

District officials were made aware of the zone attendance problem on several occasions. TR I at 128.

A perception existed that the schools avoided by whites, like Mayo, were inferior in terms of facilities and curriculum. TR I at 129.

In 1988 Deputy Superintendent Jimmy Newsom was made specifically responsible for enforcing attendance zone lines in the District. TR II at 90; TR V at 123. Between 1988–1991, several procedures were adopted to enforce the attendance zone lines, including requiring parents to fill out verification forms and present proof of residence (e.g., a utility bill). TR II at 91; TR V at 122; Dist.Exh. 93 at 3. Notwithstanding implementation of these procedures, signifi-

cant problems persisted with attendance zone line compliance.

### 2. 1991–1994

Dr. Cox, the District superintendent between 1991–1994, testified that, upon arriving in the District in 1991, she received a number of complaints about students attending schools outside of the attendance zones in which they resided. TR II at 125–126. Although both Dr. Cox and Jimmy Newsom, Deputy Superintendent, investigated these complaints, certain attendance zone lines, particularly Mayo, were not consistently or aggressively enforced by the District during 1991–1994. TR II at 144.

### D. SCHOOL RESOURCES AND FACILITIES

### 1. GENERALLY

A discrepancy has existed between the facilities and curriculum at Mayo and the facilities and curriculum at other schools in the county. TR I at 129. Compared with St. John's High School, Mayo was perceived in the community as an inferior school. Mitchell Dep. at 112.

The District stigmatized Mayo as an inferior black school by providing the school with inferior maintenance, a poor physical appearance, inadequate instructional materials, inferior grounds, inferior resources and substandard facilities. The Mayo High School facility is of substantially inferior quality to every other high school in the District. Until recently, Mayo was not provided with adequate instructional supplies, including current library materials, apparatuses for science instruction, and a computer lab, whereas the St. John's High School had an abundance of these resources. In addition, Mayo had certain curriculum deficiencies. For example, Mayo students who wanted to take courses offered only at St. John's High School had to be bussed to St. Johns in the middle of the school day, causing Mayo students to lose a portion of their instructional day. TR III at 183.

### 2. FACILITIES

Facilities at Mayo have not been maintained to the standard existing at other schools in the District. For example, lockers with doors ripped off and profanities scrawled on them, doors ripped off bathroom stalls, and a new science wing devoid of Bunsen burners, beakers and other laboratory materials were common shortcomings. This all contrasted starkly with the other three high schools. Several witnesses corroborated the extent of deficiencies in Mayo maintenance. TR I at 131–157; Heatley Dep. at 62–63.

Former Mayo principal Dr. Connie Hathorn testified, "I walked into that school [in 1989], and it almost brought tears to my eyes to see someone being educated like that under those conditions." Dr. Hathorn testified that:

> Sad to say in the 1960's in Mississippi it was better than it was at Mayo [in 1989]. Even though I went to an all-black school, our facilities were at least a little better than that.

Hathorn Dep. at 12–14.

Mayo had a rusted covered walkway behind it that provided no protection from rain. Inside the classrooms, ceilings had not been dropped and lacked florescent lights; no computer lab existed; the media center was "dark and bleak," and had tables in extreme disrepair; science tables that were also in disrepair and lacked gas connections; many electrical outlets were inoperable; and there was an absence of adequate paint work. TR I at 141.

Mayo's roof leaked, and the surrounding grounds were often submerged because of improper drainage. No other high school suffered similar problems. TR I at 143.

The gymnasium and locker rooms at Mayo were inadequate, and one witness compared Mayo's facilities to those of the other high schools as "like night and day." TR I at 161.

In 1988, Mayo did not have a marquee in front of the school, even though the other three high schools did. TR I at 142. A marquee was added later, however.

The neglect of facilities at Mayo was the type that had been pervasive for many years. TR II at 71.

At Dr. Grier's initiative, the District took some steps to redress some of the problems at Mayo High School. For example, the covered walkways were replaced; the ceilings were dropped; a computer lab was installed; the tables from the media center were removed and refinished; paint was provided and members of the community came in and painted the hallways and classrooms (even though historically and identifiably white Pate elementary school had been painted twice in two years by the District's staff); Mayo's then-principal, Dr. Connie Hathorn, organized Sunday clean-ups at Mayo, where members of the community came in and landscaped the grounds; a commons area with paved walkways and picnic tables was built behind the school; a marquee was erected in front of the school; and $50–60,000 was spent over a two-year period to upgrade Mayo's media center and replace old reference materials. TR I at 157.

At the same time, the curriculum at Mayo was being upgraded. TR I at 193.

The School Board has ultimate authority in the District for maintaining and upgrading the District's facilities, because no money can be spent unless approved by the Board. TR I at 114; TR II at 122, 147.

Typically, maintenance is performed at a school after the principal submits a work order to the maintenance department. It is not usually the superintendent's job to get involved in the day-to-day maintenance of schools, as that responsibility has been delegated to the Assistant Superintendent for Operations. However, because of the many complaints she received about work not being performed, Dr. Cox was involved in the maintenance of schools almost on a daily basis. TR II at 145, 155; TR VII at 35.

In general, schools with predominantly black student enrollments received less attention from the maintenance department than other schools. Often the work did not get done or, if it did, it was done in an inferior manner. TR II at 146. Of all the schools in the District, Mayo received the least attention from the maintenance department. TR II at 147.

As justification for the inadequate maintenance, the Assistant Superintendent for Operations and Maintenance expressed the opinion that significant maintenance work at Mayo was futile because vandals tore up the work and people did not take care of the facility. TR II at 147; TR V at 207.

Dr. Cox disagreed with the Assistant Superintendent for Operations's assessment of the problems at Mayo, and emphasized that the problem at Mayo was not vandalism, but poor workmanship by the District's maintenance department. TR II at 147, 165, 206.

The court finds that, in comparison with St. John's High School, the facilities at Mayo are "significantly inferior" and that Mayo has far greater facilities needs than any other high school in the District. The magnitude of the maintenance problems at Mayo is more extensive than at any other high school in the District. TR II at 148, 152, 158.

Both the District's maintenance office and school board members have been made aware of Mayo's maintenance needs on many occasions. TR II at 149, 152, 158.

Maintenance needs at Mayo went unmet for a considerable time. For example, among the needs that had gone unmet for two years were those involving health and safety of the students and staff, including the replacement of outdoor security lights; the replacement of outside gym doors; and the repairs of hazardous floor conditions in one of the buildings. TR II at 204.

Mayo was the only high school that routinely had no hot water in its gymnasium showers. This problem was eventually rectified after the matter was brought to the Board's attention in the fall of 1993. TR II at 166; TR III at 49; TR VIII at 14.

Although the District's Exhibit 86 purported to represent a list of current maintenance needs for Mayo, the court finds that list incomplete. The document did not reflect Mayo's needs for: carpeting; repairs to or replacements of inside doors, including gym doors; ventilation in the gym and agriculture facilities; painting; re-roofing, including repairs of the roof of the administrative building, which leaks; a covered walkway from the administrative building to the other part

of the campus; plastering; elimination of the flooding of Mayo's grounds; new lights in the gym and library; science equipment; and the addition of a weight room, because Mayo is the only high school in the District without one. TR II at 179, 187.

The District's failure to properly maintain and make critical repairs at Mayo has had a detrimental impact on Mayo's students. As Dr. Cox testified:

> When you're there year after year and you see a building falling apart, then it certainly makes you question, whether you're an educator or whether you're a student, what value is my education here? How good is this school? .... [T]he students and the staff there start to question if people can allow my school to get in this condition, then how good am I as a student there? I must not be very valued to be in that school.

TR II at 160.

The District's attitude of neglect of Mayo's maintenance needs had a negative effect on the schoolchildren, and contributed to their reduced self-esteem. Mitchell Dep. at 58.

### 3. RESOURCES

The Darlington County School Board has ultimate authority for the allocation of resources throughout the District. TR I at 114, 115; TR II at 122.

Mayo's library books and reference books were considerably more dated than those of the three other high schools. TR I at 130.

Although a "uniform textbooks adoption process" was adopted during Dr. Grier's tenure to insure that all schools had the same textbooks for the courses, this process is ongoing. Mayo High School still uses older textbooks. TR VIII at 85.

Dr. Grier's administration also initiated a process of allocating resources uniformly, a process that is also ongoing. Mayo still lags behind the other high schools in terms of the resources that have been allocated to it. TR VIII at 94.

When Dr. Grier arrived in the District in 1988, Mayo had no computer lab even though the other three high schools did. In 1992, when Mr. Mitchell became the Mayo princi-pal, there was still no computer lab at Mayo, and the science equipment was totally inadequate, with basic resources such as microscopes and dissecting equipment lacking. TR I at 142; Mitchell Dep. at 76.

The court finds the District neither allocated the same resources to Mayo as were provided to other high schools, nor allocated adequate resources to Mayo to redress past deficiencies at that school. TR I at 143–145.

The District previously imposed fees on students to help pay for such things as books, computers and other educational equipment. Because Mayo students are generally from lower economic backgrounds, many were unable to pay these fees. Thus, because the District was allocating money to schools on a per pupil basis, Mayo was short-changed because it was already behind the other schools in terms of facilities and resources, and because per pupil allocations failed to provide for Mayo students what other high schools were being provided through the payments of fees. This practice was changed during Dr. Grier's tenure, with greater allocations being made by the District to schools with children of lower socio-economic backgrounds.

### 4. CURRICULUM

The School Board is responsible for choosing the curriculum offered at each school in the District. The School Board has ultimate authority to insure the uniformity of curriculum throughout the District. TR I at 191–192; TR II at 122.

The Darlington County School District's Board Policy Manual ("the Manual") requires that every student be afforded "equal educational opportunities regardless of ethnic or racial background." Gov.Exh. 19 at JAA.

The Manual also states: "This concept of equal educational opportunity serves as a guide for the board and the staff in making decisions related to school facilities, employment of personnel, selection of educational materials, equipment, curriculum and regulations affecting students." Gov.Exh. 19 at JAA. The court finds that the District has, however, violated its own policies by denying equal educational opportunities to students at Mayo High School. *See* TR II at 201.

In 1988, Superintendent Grier requested and the Darlington County School Board approved the commissioning of a system-wide curriculum audit. TR I at 147. The audit was conducted by a team of five independent education professors and consultants under the auspices of the National Academy For School Executives (NASE) of the American Association of School Administrators (AASA). The auditors were selected by the NASE–AASA and were governed by such principles as expertise, independence, objectivity and consistency. Gov.Exh. 45 at 4, 6–7; TR I at 149.

The auditors examined all aspects of the District, including (1) reviewing Board policies, curriculum guides, budgets, student data, test scores and other reports and documents; (2) interviewing School Board members, District administrators and staff, and parents; and (3) visiting all schools in Darlington County. Gov.Exh. 45 at 7–8; TR I at 148.

The testimony of Dr. Grier and Dr. Cox that the curriculum offered at Mayo High School was inferior to that offered at St. John's High School was corroborated by the results of the Curriculum Audit. The Curriculum Audit found wide discrepancies among the schools in Darlington County. For example, the Audit found that, "in no way could the students at Mayo High School, an all black secondary school of approximately 450 students in grades 9–12, be receiving the same quality program as students at St. John's High School, or any other high school in the district. . . ." Gov.Exh. 45 at 13; TR I at 151; TR II at 188.

The Curriculum Audit found "many more citations of inadequate curriculum" at Mayo than at St. John's, and concluded that "the type of curriculum and program available and being pursued at Lamar and Mayo High Schools was decidedly *less academically rigorous and demanding* than that offered and being pursued at St. John's and Hartsville High Schools." These findings were corroborated by Dr. Grier and Dr. Cox. Gov.Exh. 45 at 13, 50 (emphasis in original); TR I at 153–155; TR II at 190.

The District's own witness, Ms. Harrison, acknowledged that, as of 1989, a uniform curriculum did not exist at all grade levels in the District; that teachers selected their own textbooks and resources; and that the Curriculum Audit correctly identified the absence of uniformity as a problem. TR VIII at 90.

The other three high schools in the District offered a larger number and a greater variety of courses than Mayo. TR III at 93; Mitchell Dep. at 54.

During Dr. Cox's tenure, Mayo did not offer the same number of Advanced Placement courses as St. John's High School and did not offer Mayo students the courses required to obtain A.P. credit in some disciplines. TR II at 217–218.

Although Mayo students can travel to St. John's High School to take courses that are not offered at Mayo, and can even request the school to offer a particular course, in practice some students are unwilling to travel to another school for a course and there has not been an occasion where students have requested the Board to offer a particular course. In short, students often do not enroll in a course if it is not offered at their school. Even if they do enroll in such a course, they will lose some class time commuting to the other location. TR III at 77.

A smaller student enrollment at Mayo compared to St. John's High School does not necessarily justify disparate offerings. In addition, the failure to offer such educational basics as advanced placement courses, current textbooks and a computer lab when these are provided at the other three high schools is not a function of the size of Mayo. TR I at 152.

Dr. Grier initiated a process of developing uniform curriculum guides throughout the District, a process that Dr. Cox accelerated upon her arrival. TR II at 187–188; TR VIII at 79–80, 89–90.

Although some uniformity and enhancement of the curriculum at Mayo occurred during Dr. Grier's tenure, when he left the District in 1991 Mayo's curriculum was still not comparable to that of the other three high schools. TR I at 194; TR II at 77.

Nothing prevented the Darlington County School Board, as the entity ultimately responsible for curriculum at each school in the District, from insuring that the curriculum offered at Mayo High School was comparable to that offered at St. John's High School. TR I at 191–192.

## 5. INSTRUCTIONAL QUALITY

The court finds that the School Board followed a pattern of assigning less competent or problem teachers to historically black schools, particularly Mayo High School. Mayo has been perceived as, and to some extent has been, a "dumping ground" for years for teachers, particularly white teachers, who were not performing satisfactorily elsewhere. TR I at 164–165; TR II at 7, 190.

When Mr. Ervin Mitchell arrived as the new principal at Mayo in 1992 he assessed the Mayo teaching faculty as "very poor." In his experience, "there were obvious cases of teachers not teaching, kids sitting around doing nothing." In his opinion, "warehousing kids" was "very much" a problem at Mayo. According to Mr. Mitchell, there seemed to be a pattern in which teachers who were unsuccessful at other schools in the District were transferred to teach at Mayo. In Mr. Mitchell's words, Mayo had the District's "second-hand teachers." Mitchell Dep. at 41–43, 47, 119–120.

The Board has ultimate responsibility for the assignment of personnel, and nothing prevented it from assigning quality instructors to Mayo High School. TR 190–191.

## E. ASSIGNMENT OF PERSONNEL

### 1. PRINCIPALS

The Darlington County School Board has sole authority for hiring and assigning principals in the School District. Gov.Exh. 19 at GBC/GBD; *id.* at GBC–R/GBD–R, at 3 ("[T]he final decision regarding employment in the school district shall be made by the board."); TR II at 191.

The Darlington County School District's own policies require that professional personnel, including principals, be hired "on the basis of qualifications and merit," and that "minority educators receive fair and equal treatment ... including ... employment opportunities." Gov.Exh. 19 at GBC/GBD. Furthermore, the District "is committed to providing an educational experience enhanced by the professional contributions of different races, creeds, sexes and ethnic backgrounds." Gov.Exh. 19 at GBC–R/GBD–R.

The District followed a pattern of assigning black principals to "black" schools and white principals to "white" schools. In the twenty-four years since the 1970 court order, Mayo High School never had a white principal, and St. John's High School never had a black principal. Gov.Exh. 37; TR V at 136.

Efforts by Dr. Grier to assign black principals to "white" schools and white principals to "black" schools were blocked by the Darlington County School Board, which told Dr. Grier that he could not assign a white principal to Mayo. TR I at 161–163.

Nothing prevented the Darlington County School Board from assigning principals to any school without regard to race. TR I at 198.

By assigning only black principals to Mayo High School, the District stigmatized Mayo as a school for black children. This practice of assigning only black principals to Mayo contributed to the school retaining its racial identity as a black school. Gov.Exh. 39, Nos. 4, 5; TR III at 183.

### 2. FACULTY

The 1970 court order required that the faculty of each school "shall be integrated so that the ratio of Negro and white faculty members of each school shall be approximately the same as the ratio throughout the system." *Stanley v. Darlington County Sch. Dist., et al.,* Order at 3 (2/5/70).

The Darlington County School Board has final authority to hire professional/certified teaching personnel, based on the recommendation of the superintendent. Gov.Exh. 19 at GBD.

Throughout the 1980s, the percentage of black faculty at Mayo was more than twice that of the district-wide average. Gov.Exh. 39, No. 2.

The District stigmatized Mayo by assigning a disproportionate number of black faculty and staff to the school, contrary to the terms of the 1970 order. Gov.Exh. 39, No. 2; TR III at 182; TR IV at 172–174.

Dr. Grier testified that, when he arrived in the District in 1988, the District was not even close to being in compliance with the 1970 order, and that he transferred 35 teachers to try to bring about compliance. One school board member, Edward Hursey, introduced a motion at a board meeting to try and block the transfers, and another board member, Thelma Dawson, succeeded in blocking transfers of white teachers to Mayo. Thus, Mayo remained out of compliance with the 1970 order. TR I at 194–195; Gov.Exh. 39, No. 2.

### 3. CLASSIFIED STAFF

The Darlington County School Board, based upon recommendations of the superintendent, is responsible for hiring classified personnel. Gov.Exh. 19 at GCC/GCD. Classified personnel include teacher aids, library aides, secretaries, clerks and other assistants. Gov.Exh. 19 at GC.

The personnel office is responsible for assigning classified personnel "to the various schools/departments." Gov.Exh. 19 at GCE.

Mayo has always had a disproportionately high number of black classified staff. TR V at 137.

### F. CLOSING OF MAYO

#### 1. GENERALLY

According to Dr. Gordon, a school desegregation expert, a desegregation remedy for the secondary schools in the Darlington area requires not only a consolidated high school on the St. John's High School campus, but also a district-wide magnet school on the Mayo High School campus. A desegregation remedy that simply closes Mayo High School would not prove to be truly effective in eliminating the vestiges of the prior dual school system in Darlington. A magnet at Mayo is essential for a successful desegregation remedy for Darlington because: (1) it would enhance desegregation by attracting white students back into the public schools in the Darlington area; (2) it would remedy the

stigma of racial inferiority inflicted upon the Mayo community by the District's treatment of the school; and (3) it would provide for an equitable sharing of the burdens of desegregation between the white and black communities in Darlington County. TR III at 130–131, 202.

### 2. BURDEN ON BLACK COMMUNITY

The relative distribution of the burdens of desegregation on minority children does not appear to have been one of the criteria used by the School Board for closing schools in the District. TR V at 132, 183. This conclusion is drawn from a review of the history of school closings in the District.

Historically, the District operated four secondary schools for black children: Butler Junior/Senior High (in Hartsville); Mayo High (in Darlington); Rosenwald Junior/Senior High (in Society Hill); and Spaulding Junior/Senior High (in Lamar). The District operated three secondary schools for white children: Hartsville High, Lamar High, and St. John's High (in Darlington).

Every time the District decided to consolidate high schools, it did so by closing the historically black facility. Of the four historically black secondary schools, the District closed two and downgraded one, leaving only Mayo. The District has continued to operate all three historically white secondary schools, and, in fact, constructed a new facility on a different site in 1977 for St. John's High School. Gov.Exh. 35; TR III at 192.

When Rosenwald High School was closed after the 1981–82 school year, it had a total enrollment of 283 students, of whom 87% were black. Gov.Exh. 43.

When Butler Junior/Senior High School was closed after the 1981–82 school year, it had a total enrollment of 400 students, of whom 97% were black. Gov.Exh. 43.

When Spaulding High School was consolidated with Lamar High School and downgraded to a junior high school after the 1982–83 school year, Spaulding had a total enrollment of 250 students, of whom 96% were black. Gov.Exh. 43.

The closings of Rosenwald and Butler disproportionately burdened black students,

who were displaced by the hundreds. TR VII at 51.

Neither Mr. Newsom nor Mr. Stone, both of whom were serving as administrators in the District at the time Rosenwald and Butler were closed, were able to identify any steps taken, or any funds allocated by the District, to assist the displaced black students or to preserve the heritage of Rosenwald and Butler, respectively. TR V at 130–13; TR VII at 51, 53, 63–64.

The school colors and mascots of Rosenwald and Butler were abandoned by the District when the schools were closed. The historically white high schools to which the black children were reassigned, St. John's and Hartsville, respectively, retained their pre-existing colors and mascots. TR VII at 51; TR III at 190–191, 192; Heatley Dep. at 33–35.

According to Mr. Stone, the only legacy of Rosenwald's tradition and heritage was that St. John's basketball team "improved tremendously after Rosenwald joined us." TR VII at 51–52.

### 3. FAILURE OF DISTRICT TO SEEK PRIOR APPROVAL FOR PREVIOUS CLOSINGS

The School Board did not obtain court approval for closing schools in the District. TR V at 100, 133.

The School District closed historically black Rosenwald High and Butler High, and consolidated historically black Spaulding High, all without obtaining court approval or even providing notice to the court. *See* Transcript of Motion Hearing before Judge C. Weston Houck at 38 (8/11/92) (statement by the court that no such approval has ever been given).

### 4. CLOSING OF BUTLER HIGH SCHOOL

According to Dr. Gordon, the Butler High School facility could have been used as a consolidated junior high for the Hartsville area, rather than using the historically white Hartsville Junior High, which Dr. Gordon characterized as "the least desirable site" of any that he had seen. TR III at 192; Heatley Dep. at 37–38.

Hartsville Junior High is located in a "neutral zone" between the black and white communities in downtown Hartsville, while Butler is located in a black community. TR V at 189–190.

Mr. Stone, witness for the District, conceded that the acreage at Butler and Hartsville Junior was "basically the same as far as size is concerned"; the buildings "were basically the same"; each facility had a gym, a vocational building, and a band/choral room; and Butler had a superior library. TR V at 187.

Dr. Gordon testified that, in his view, Butler was a better facility and is located on a better site than Hartsville Junior High. TR IV at 169–170.

According to the District's own figures, the Butler facility had a permanent classroom capacity of 1,080 students and the Hartsville Junior High facility had a permanent classroom capacity of 1,005 students. Thus, the total capacity at Butler was actually 75 persons higher than at Hartsville Junior High. Gov.Exh. 111 at 3; Gov.Exh. 35 at 48; TR VII at 65–66.

The undisputed student enrollment data show that from the 1982–83 school year (the first year of the consolidation of Butler and Hartsville Junior High) through the 1993–94 school year, the total student enrollment at Hartsville Junior High has been well below the total capacity of Butler. In 1982–83, for example, the combined enrollment at Hartsville Junior High was 897, or 183 students below Butler's capacity; in 1993–94, for example, the enrollment at Hartsville Junior High was 800, or 280 students below Butler's capacity. Gov.Exh. 43; TR VII at 66–68.

Even though the Butler and Hartsville Junior High facilities were comparable, the District chose to abandon Butler and spend $1.17 million beginning in June 1986 to "completely renovate" the main building of the formerly all-white Hartsville Junior High School. Gov.Exh. 39, No. 9.

In addition to the $1.17 million spent by the District to completely renovate the main building at Hartsville Junior High, the District also spent considerable additional sums there. The District spent $15,452 for roof

work; installed heat pumps as part of a four-school project costing $628,101; painted two other buildings on the campus for $7,500; and converted one building into a science department at a cost to the District of $49,-480. Gov.Exh. 39, No. 9.

Moreover, even assuming that the construction of ten more classrooms would have been needed at Butler to accommodate all the junior high school students in the Hartsville area, the cost of such construction, in Mr. Stone's estimation, would have totaled about $550,000. In contrast, the District spent over $1.4 million over the course of several years to renovate and upgrade Hartsville Junior High School. TR VII at 68, 75–76; Gov.Exh. 39, No. 9.

During the 1986–87 school year, when Hartsville Junior High was being renovated, the School District used the Butler facility to house Hartsville Junior High students. During the time the School District was using the Butler facility to house Hartsville Junior High students, the facility was called "Hartsville Junior High School Annex." Heatley Dep. at 36.

Dr. Grier made recommendations and initiated discussions with school board members about reopening the Butler facility, which he believed was suitable for regular classes and could have relieved overcrowding at other schools. Nothing came of these discussions. TR I at 159.

### 5. APPROPRIATENESS OF MAYO MAGNET

Based on his extensive experience with school desegregation plans, Dr. Gordon testified that, in order for a desegregation plan to be viable for the Darlington area, the black community must have a sense of ownership of the plan. According to Dr. Gordon, such a sense of ownership could be achieved only if the historically black Mayo High School facility was given a constructive role in the plan as a county-wide magnet school. TR III at 130–131.

A dedicated magnet high school at Mayo High School would remedy the injuries and stigma inflicted upon the Mayo community by the District by transforming the traditional black school in the Darlington area from an inferior school to a school of exemplary educational quality. TR III at 193–194.

The District's consultant, Dr. David Armor, testified that a dedicated magnet school at Mayo was unnecessary for remedial purposes. Dr. Armor testified that such a program was not necessary for remedying any alleged stigma inflicted upon the Mayo community by the District. The court, however, finds Dr. Armor's testimony unpersuasive.

First, although Dr. Armor acknowledged that the Supreme Court's desegregation mandate in *Brown* was, in part, predicated upon a belief that segregation stigmatized black schools and damaged the self-esteem of black children, he stated that he was not convinced that segregation did, in fact, harm the self-esteem of black students. Consequently, Dr. Armor simply does not accept the Supreme Court's view of the "injuries and stigma" inflicted upon "the disfavored race" by segregation. Dr. Armor is not persuaded that desegregation improves academic achievement, self-esteem, or race relations for students of the "once disfavored race." In Dr. Armor's opinion, there has been a "failure to document definitive and meaningful educational and social benefits from induced school desegregation policies." The court rejects Dr. Armor's conclusions. TR VI at 182–185, 244–245.

Second, while Dr. Armor admitted that Mayo is a vestige of the prior dual system in terms of student assignment, faculty, principals, and the quality of the facility, he does not believe that Mayo High School has been stigmatized by the District. Dr. Armor testified that a school community cannot be suffering under a stigma if that community continues to take pride in its school and wants to keep the school open. Thus, even though Dr. Armor admitted that Mayo is perceived as an inferior school by the Darlington community, he testified that the school was not suffering from stigma because the students and parents of Mayo wanted to keep the school open. The court rejects such a view. As Dr. Gordon testified, black citizens attending schools under even the harshest segregated conditions still cherished their schools and took pride in their achievements, often opposing the closing of their community schools. Such

resilience, however, does not nullify the Supreme Court's finding that the principal harm of the operation of racially segregated schools is the injury and stigma inflicted upon the black community. Finally, Dr. Armor's testimony that he did not believe that the District had stigmatized Mayo in the past is given little credence, given his admission that he "didn't know very much" about how Mayo was treated from 1970 to 1988. TR VI at 58, 62–63, 193–194, 201–204, 212, 226–227, 245–246; TR III at 210; TR VI at 194–196, 217–218.

A dedicated magnet school at Mayo is necessary to insure that the burdens of secondary school desegregation in the Darlington area are shared equitably between the white and black communities. A desegregation plan that consolidated the Darlington high schools by simply closing Mayo High School would unfairly place upon the black community the entire burden of the consolidation, eliminating from the black community its educational center, its primary social and recreational facility, and its central repository of community heritage. Nor would the loss of the community high school be compensated for by the placement of the consolidated junior high at the historically black B.A. Gary Middle School. As Dr. Gordon testified, the high school, as the terminal point of education for so many people, has a distinctive place in the community that cannot be replaced by a junior high. To close Mayo High School would simply consummate the stigma that has been inflicted upon Mayo; that is, the perception that Mayo does not have the same value as other schools. As Dr. Gordon testified: "When you shut down that school, you say to Darlington County folks, 'You're right. That school was substandard, and we got rid of it.'" TR III at 188–189; TR IV at 127–128, 188.

Dr. Armor testified, however, that keeping Mayo open as a dedicated magnet school was not necessary for the purposes of balancing the burdens of desegregation between the white and black community. According to Dr. Armor, the fact that the District would continue to operate the historically black middle school (B.A. Gary) as a consolidated junior high school obviated the need to take any further steps to equalize the burdens of the desegregation plan. The court does not agree. Both Dr. Armor and Dr. Gordon testified that a high school has a very different community standing from a junior high school. Consequently, the maintenance of a historically black junior high school cannot be assumed to compensate for the burden incurred by the closing of the community high school. Furthermore, Dr. Armor admitted that he did not know if the District had considered the balance of burdens between the white and black community when it closed all other historically black high schools in the county. TR VI at 48–49, 191, 206.

A dedicated magnet at Mayo can work and could enhance desegregation by attracting white students who currently attend private schools or schools in other counties back into the District, particularly in the predominantly black Darlington attendance area. TR III at 131–133; TR IV at 148; TR I at 174, 175, 188; TR II at 199; TR VI at 193.

Dr. Grier testified that based on his experience with magnet schools in Akron, Ohio, a magnet school could work at Mayo. TR I at 173–175; 179–180; TR II at 199.

A dedicated magnet program can be funded in a variety of ways, including federal grants and grants from local businesses and industries. TR I at 175. Federal funds can be used to cover start-up costs associated with magnet schools. TR I at 190.

During her tenure in Darlington County, Dr. Cox had submitted a proposal for a Padaiae program, to be located at St. David's Academy in Society Hill. Society Hill is about twenty minutes from Hartsville, twenty minutes from Darlington, and nearly forty minutes from Lamar. In studying the feasibility of and the interest in such a program, Dr. Cox found significant parental support in all communities of the county for the proposal notwithstanding these distances. TR II at 194–195, 196–197. Thus, it appears a dedicated Mayo magnet will attract students from all parts of the District.

Similarly, the District currently operates an alternative-type school for at-risk and expelled students, located at St. John's High

School, which attracts students from throughout the county who volunteer to attend. TR II at 198–199.

Among the types of magnets that could work at Mayo are an aeronautical engineering program in conjunction with Florence–Darlington Technical College; a program in medical sciences in conjunction with area hospitals; a performing arts program; and an international baccalaureate program. TR I at 177–178; TR II at 201–202.

## G. CONCLUSIONS OF LAW

### 1. GENERALLY

In 1954, the United States Supreme Court declared that a racially segregated school system violated the Constitution. *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*). The Court subsequently held that school district authorities "denied Negro children equal protection of the laws" by establishing a "pattern of separate 'white' and 'Negro' schools," and it made clear that more is required of the offending school district than simply putting an end to its segregative practices. *Green v. County Sch. Bd.*, 391 U.S. 430, 435–37, 88 S.Ct. 1689, 1692–94, 20 L.Ed.2d 716 (1968).

■■■ A school district that violates the Constitution must remedy its violation by eliminating the pattern of racially identifiable schools. *Id.* at 436–37, 88 S.Ct. at 1693–94 (*citing Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II* )). As the Supreme Court reiterated in *Freeman v. Pitts*, 503 U.S. 467, 485, 112 S.Ct. 1430, 1443, 118 L.Ed.2d 108 (1992), "The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system."

The Supreme Court has repeatedly emphasized that "the measure of any desegregation plan is its effectiveness." *Davis v. Board of Sch. Comm'rs*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). The Court has made equally clear that if the plan proves ineffective it must be replaced with a plan that *is* effective—"if it fails to undo segregation, other means must be used to achieve this end." *Green*, 391 U.S. at 440, 88 S.Ct. at

1695 (citation omitted). Moreover, a school district "must be required to formulate a new plan and ... fashion steps which promise realistically to convert promptly to a system without a 'white school' or a '[black]' school, but just schools." *Id.* at 442, 88 S.Ct. at 1696.

In each case, the desegregation plan submitted by the school district and approved by the district court is simply a means to an end; that is, a means by which the district hopes to achieve the required remedy. The Supreme Court has stated that "whatever plan is adopted will require evaluation in practice, and the [district] court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." *Id.* at 438, 88 S.Ct. at 1694.

The school officials are under a "continuing duty to take whatever action may be necessary to create a 'unitary, non-racial system.'" *Id.* at 439–440, 88 S.Ct. at 1695 (citations omitted).

■■■ A school district does not discharge its duty to remedy its constitutional violation by simply implementing a court-ordered plan. As the Fourth Circuit stated, "the mere implementation of a desegregation plan does not convert a dual system into a unitary one." *Riddick v. School Bd. of Norfolk*, 784 F.2d 521, 533 (4th Cir.), *cert. denied* 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986). *See also United States v. Lawrence County Sch. Dist.*, 799 F.2d 1031, 1037 (5th Cir.1986) ("It should go without saying that a system does not become unitary merely upon entry of a court order intended to transform it into a unitary system."); *Vaughns v. Board of Educ. of Prince George's County*, 758 F.2d 983, 989 (4th Cir.1985) ("[I]mplementation of the court ordered plan alone could not relieve the Board of all future responsibility to bring about a unitary system.").

The only way the district can discharge its legal duty is to actually remedy the violation; that is, to implement a plan that "proves effective" in eliminating the racial identifiability of its schools.

■■■ The school district continually bears the burden of proving that it has effec-

tively remedied its original violation. Implementation of a court ordered plan creates no presumption that the district has remedied the effects of its prior segregated system; for even after a plan has been approved by a court as one which "promises" to work, it is the district which must prove that it has actually worked in practice. The district court, therefore, "'should address itself to whether the Board ha[s] complied in good faith with the desegregation decree since it was entered, *and* whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.'" *Freeman,* 503 U.S. at 492, 112 S.Ct. at 1446 (emphasis added). In the final analysis, the school district "bears the burden of showing that any current racial imbalance is not traceable, in a proximate way, to the prior violation." *Freeman,* 503 U.S. at 494, 112 S.Ct. at 1447.

■ Moreover, the mere passage of time does not absolve the school district of its affirmative obligations. The "lingering effects" of segregation do not "magically dissolve" without affirmative efforts by the school district, and the Constitution "does not permit the courts to ignore today's reality because it is temporally distant from the initial finding that the school system was operated in violation of the constitutional rights of its students." *Brown v. Board of Educ.,* 978 F.2d 585, 590 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993).

■ The school district is also obligated to properly implement and monitor the attendance zone lines ordered by the court. *Davis v. Board of Sch. Comm'rs,* 430 F.2d 883, 888 (5th Cir.1970), *aff'd in part & rev'd on other grounds,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).

Having established the school district's obligation to desegregate its system and eliminate the racial identity of its schools, the Supreme Court has further defined the scope of this remedial obligation: "Having once found a violation, the district judge or school authorities should make every effort *to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation."* *Davis,* 402 U.S. at 37, 91 S.Ct. at 1292 (emphasis added).

The Fourth Circuit has instructed district courts that they may approve a plan that "achieve[s] less actual desegregation than would be achieved under an alternate proposed plan," *only* if the court "finds facts" that prove the alternate plan is "impracticable." *Adams v. School Dist. No. 5,* 444 F.2d 99, 101 (4th Cir.1971).

■ The school district's obligation to effectively eliminate the racial identifiability of schools goes beyond student assignment. As the Supreme Court explained in *Green,* schools in a segregated system acquired a racial identity that was based on more than just the race of the student enrollment. "Racial identification of the system's schools was complete, extending not just to the composition of the student bodies ..., but to every facet of school operations—faculty, staff, transportation, extracurricular activities, and facilities." *Green,* 391 U.S. at 435, 88 S.Ct. at 1693.

## 2. LEGAL AUTHORITY FOR ORDERING OF MAGNET AND APPROPRIATENESS OF DEDICATED MAGNET AT MAYO

■ It is well settled that in school desegregation cases, in which the court sits in equity, "the nature of the violation determines the scope of the remedy." *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). Once liability has been determined, the remedy must be tailored to correct "the condition that offends the Constitution." *Id.* at 16, 91 S.Ct. at 1276.

For example, in addition to the traditional *Green* factors discussed above, the Supreme Court has also held that a district court may appropriately examine the "quality of education" offered at various schools. *See Freeman,* 503 U.S. at 491–92, 112 S.Ct. at 1446. A district court may also examine any "other elements" of a school district "to determine whether minority students [are] being disadvantaged in ways that require[ ] the formulation of new and further remedies to insure full compliance with the court's decree" to desegregate its schools to the maximum degree practicable. *Id.*

**1388**

The court must, therefore, fashion a remedy that redresses the specific constitutional violations found. Here, the evidence shows that the District stigmatized Mayo as an inferior black school. If the "nature of the violation" was the District's discrimination against Mayo, then the remedy cannot be one that rewards the District by closing the school. To allow the District to close the last remaining historically black secondary school in the county would be to consummate, not remedy, the stigma and injury inflicted upon "the race disfavored by the violation." *Freeman,* 503 U.S. at 485, 112 S.Ct. at 1443.

As the Court stated in *Swann,* where, as here, the school authorities have defaulted on their affirmative obligations to eradicate all vestiges of segregation, and once a right and a violation have been shown, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann,* 402 U.S. at 15, 91 S.Ct. at 1276. *See also id.* at 16, 91 S.Ct. at 1276 (district court "has broad power to fashion a remedy that will assure a unitary school system"); *Riddick,* 784 F.2d at 535 (same); *Vaughns,* 758 F.2d at 993 (relief granted must be "reasonably related to the objective of desegregation").

In discussing the duty of a formerly segregated school district to eliminate all the vestiges of its unconstitutional system, the Supreme Court stated:

This is required in order to insure that the principal wrong of the *de jure* system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present.

*Freeman,* 503 U.S. at 485, 112 S.Ct. at 1443.

The Supreme Court has emphasized that "[e]ach instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 459, 99 S.Ct. 2941, 2947, 61 L.Ed.2d 666 (1979) (emphasis added) (citations omitted).

Accordingly, the court must fashion a remedy that redresses the injuries and stigma inflicted upon the disfavored race by the District's operation of an inferior "black school" at Mayo High School.

■ In desegregation cases, it is incumbent on the court to insure that the burdens associated with any remedial actions are allocated equitably between the black and white communities. *See Diaz v. San Jose Unified Sch. Dist.,* 861 F.2d 591, 596 (9th Cir.1988).

The law is clear that if a consolidation requires the closing of a predominantly black school and the relocation of students to a predominantly white school, the school district "bears a 'very heavy burden of justification'" to explain why the predominantly black school was chosen for closing rather than the predominantly white school. *Lee v. Macon County Bd. of Educ.,* 448 F.2d 746, 753, *reh'g and reh'g en banc denied* (5th Cir.1971) (citation omitted). The school district bears "a heavy burden to explain the closing of facilities used for the instruction of minority children." *Arvizu v. Waco Indep. Sch. Dist.,* 495 F.2d 499, 505 (5th Cir.1974).

■ When a school district that is under a court order decides to close a facility "used for the instruction of minority children," it must do more than provide post hoc justifications for its action. Rather, it must present evidence to the court showing the need for the *proposed* closing, whether other alternatives were considered, and why other alternatives were rejected. *See United States and Webb v. School Dist. of Omaha,* 575 F.Supp. 1398, 1407 (D.Neb.1983) (*citing Davis v. Board of Educ.,* 674 F.2d 684, 688 (8th Cir.1982)). *See also Fitzpatrick v. Board of Educ.,* 578 F.2d 858, 861 (10th Cir.1978) (setting forth six-part test for determining whether proposed closing violates federal law).

■ Because the closing of a school necessarily involves the alteration of attendance zone lines, school districts operating under desegregation plans must obtain court approval for such action, typically through a motion to amend the desegregation plan. *See, e.g., Harris v. Crenshaw County Bd. of Educ.,* 968 F.2d 1090, 1093, 1095 (11th Cir. 1992) (school board filed petition for approval of proposed consolidation); *Davis,* 674 F.2d at 685 (school district sought permission to

revise its desegregation plan); *Tasby v. Wright*, 585 F.Supp. 453, 454 (N.D.Tex.1984) (school district filed "Motion to Revise Feeder Patterns").

In determining whether to allow the District to close the one remaining historically black high school in the county, therefore, this court must consider the District's history regarding Mayo and the other black high schools, as well as the relative burdens of desegregation. *Cf. Valley v. Rapides Parish Sch. Bd.*, 702 F.2d 1221, 1228, *reh'g & reh'g en banc denied*, 705 F.2d 112 (per curiam), 707 F.2d 115 (per curiam) (5th Cir.1983) (the court "was impelled to seek out, within practical limitations, an equitable allocation of the burden of desegregation by declining to close a second majority black school").

■■■ In its decisions to close historically black Rosenwald and Butler High Schools and to downgrade Spaulding High School, the District neither sought nor obtained the court's approval as required by federal law, nor made any effort to preserve the traditions and heritage of these institutions. Particularly in the case of Butler, which could have served as the consolidated junior high school in the Hartsville area, the District was obligated to explain why the predominantly black school was closed rather than the predominantly white school. The District failed to meet this burden.

■■■ Magnet schools should be a supplement to a mandatory desegregation plan based to a reasonable extent on the mandatory reassignment and pairing and clustering of schools. *United States v. Pittman*, 808 F.2d 385, 390 (5th Cir.1987). Here, the proposed magnet school will be just one tool used to remove the vestiges of the dual system in Darlington County, and will supplement the other remedial measures set forth in the Consent Order, many of which involve pairing and clustering of schools, and faculty and student reassignment. Further, because of the voluntary desegregative nature of attendance at a magnet school, the establishment of a magnet school is an effective tool to promote community support for desegregation. *Morgan v. Kerrigan*, 401 F.Supp. 216 (D.Mass.1975), *aff'd*, 530 F.2d 401 (1st Cir.1976). Such voluntary techniques as

magnet schools have a place in a desegregation plan where they have the promise of aiding a school district to move towards full compliance, *Coalition to Save Our Children v. State Bd. of Educ. of Delaware*, 757 F.Supp. 328 (D.Del.1991). Here the court finds a dedicated magnet school at Mayo will assist the District in moving toward full compliance.

Accordingly, it is within the court's discretion to grant the request of the United States and Plaintiffs Stanley, *et al.*, and to order that a dedicated magnet program be implemented at the Mayo High School facility, to be named "Mayo School", to further desegregate the District, remedy past stigma and injury, and equitably distribute the burdens of desegregation.

## VIII. PROCEDURES FOR IMPLEMENTING A DEDICATED MAGNET AT MAYO

### A. GENERALLY

The dedicated magnet at Mayo School shall be implemented beginning in the 1995–96 school year.

Within sixty (60) days of the date of this order, the District shall file with the court and submit to all parties:

(a) a magnet proposal, including but not limited to (i) the type of program, (ii) projected costs, (iii) projected enrollment, by race and area of residence; (iv) projected staffing and resource needs; (v) proposed timetable for the implementation of each stage of the process, and (vi) proposed efforts to garner community interest and support;

(b) a proposed plan for upgrading Mayo's facilities and resources to accommodate a magnet program and to conform with federal and state requirements;

(c) proposed criteria for selection to the magnet program that insure that selections will not have a disparate impact on black students or on the desegregation of the county's other high schools;

(d) proposed criteria for the selection of magnet school administrators and staff; and

(e) proposed changes/additions to the Board Policy Manual, as appropriate, regarding the governance of the magnet school.

Based upon the commitment by State Superintendent of Education Nielson, the South Carolina Department of Education shall provide expert assistance in all facets of the magnet school proposal and implementation.

The Darlington County School District shall, commencing sixty (60) days after the filing of the information set forth above, and then every sixty (60) days thereafter leading up to the opening of the magnet school, file with the court and submit to the parties reports on the District's progress in implementing the magnet plan.

Beginning with the first year of the magnet school in 1995–96, the District shall file with the court and submit to the parties, at the end of each semester, and thereafter at the end of every year, relevant data on the magnet program, including but not limited to (a) race and residence area of every participating student; (b) number of applicants, by race and residence area; (c) selection criteria and results; (d) performance/progress results; (e) costs of programs and outstanding needs; and (f) racial breakdown of administrators and certified faculty in the magnet program.

## IX. LIABILITY OF STATE DEFENDANTS

### A. DISCRIMINATORY ACTIONS OF STATE

#### 1. GENERALLY

■ The court finds that the State of South Carolina created the dual school system; that the State, both before and after the decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("Brown I"), took actions to perpetuate racially dual school systems; that the

effects of the State's actions persist to the present; and that, although most active resistance had ceased by the mid 1970s, the State has done little or nothing since then to eliminate the vestiges of the dual school system created and perpetuated by them, despite an affirmative duty to do so. Accordingly, the court holds that there is ample precedent for holding the State liable to participate in the desegregation plan for the District.

The facts underlying state liability are for the most part undisputed and a matter of historical record. Based on such evidence, the State has failed to fulfill its duties in the area of school desegregation. The State has engaged in virtually every kind of conduct that the state liability cases, cumulatively, have identified as violative of the affirmative duty to desegregate. The specific actions and omissions of the State that support this finding of liability are set forth below.

#### 2. STATE–MANDATED SCHOOL SEGREGATION PRIOR TO 1954.

South Carolina was the first of seventeen states to recognize segregation as a matter of law. Dist.Exh. 253 at 6. South Carolina required all public schools in the state to be racially segregated. Article XI, § 7 of South Carolina's 1895 Constitution provided:

Separate schools shall be provided for children of the white and colored races, and no child of either race shall ever be permitted to attend a school provided for children of the other race. See Const. 1868 Art. X, § 10.[20]

Pursuant to the state constitutional provision, state statutes mandated a racially dual school system in South Carolina and imposed sanctions for defying this mandate. State law adopted the constitutional prohibition of racially mixed schools. S.C.Code Ann. § 21–751 (1952). In addition, another provision required that drivers of school buses had to

---

**20.** The 1868 South Carolina Constitution provided for desegregated schools. However, this constitutional provision was never implemented or

enforced by the state's General Assembly. *Holler v. Rock Hill Sch. Dist.*, 60 S.C. 41, 38 S.E. 220 (1901).

be the same race as the children riding in the buses. S.C.Code Ann. § 21–809 (1952).[21]

These and other statutes withdrew authority from local school districts to act contrary to the state mandate of segregated schools and facilities, and injected the state into the areas of student assignment, teacher compensation, transportation and school facilities.

Prior to 1954, the State of South Carolina maintained its racially separate schools under the "separate but equal" doctrine enunciated by the Supreme Court in *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). This doctrine permitted states to provide certain services on a racially separate basis as long as equal services were provided. Although the "separate but equal" doctrine announced in *Plessy* applied only to accommodations on public conveyances such as railroads, it was relied upon to justify widespread segregation in public schools.

Despite the Supreme Court's emphasis in *Plessy* on the equality of treatment guaranteed by the Fourteenth Amendment, the racially separate public schools in South Carolina were anything but equal. (Busbee Dep. at 17; Dist.Exh. 372). Black schools were substantially inferior to white schools in almost all respects, including their facilities, funding, transportation, curricula, and other elements crucial to education. Dist.Exh. 110 at 2; Dist.Exh. 179 at 7; Dist.Exh. 421.

The State was aware of this unequal and therefore unconstitutional situation. Dist. Exh. 105 at 5–6. In defending the system, one Governor declared to the South Carolina Education Association:

Should the Supreme Court decide this case [*Brown*] against our position, we will face a serious problem. Of only one thing can we be certain. South Carolina will not now nor for some years to come, mix white and colored children in our schools.

. . . . .

If the Court changes what is now the law of the land, we will, if it is possible, live within the law, preserve the public school system, and at the same time maintain segregation. If that is not possible, reluctantly we will abandon the public school system.

Dist.Exh. 105 at 7.

Led by high ranking officials, the State of South Carolina set out to preserve segregation in the event the State lost the *Brown* case. Afraid that the inequality of the schools would compel the abandonment of the separate but equal doctrine, the State commenced a massive program to equalize school facilities as a strategy to maintain segregated schools. Dist.Exh. 102 at 3; Dist.Exh. 109; Dist.Exh. 103 at 5–6; Dist. Exh. 114.

This massive school building program, known as the South Carolina Education Program, was financed by a statewide 3% retail sales tax. Dist.Exh. 109; Dist.Exh. 110; Dist.Exh. 114 at 9; Dist.Exh. 193 at 7. Under the auspices of the program, the state established the State Education Finance Committee ("SEFC"), and with it, state control over school facilities, teachers' salaries and school transportation. S.C.Code Ann. § 21–52 *et seq.* (1952); Dist.Exh. 101; Dist. Exh. 114 at 9. The SEFC approved and funded on a segregated basis new construction, equipment, and "such other improvements as are necessary to enable all the children of South Carolina to have adequate and equal educational advantages." It assumed control of the school transportation system for the entire state, a system previously operated locally. S.C.Code Ann. § 21–833 (1962). Thus, by 1952, the mechanism was in place to build a new generation of segregated schools. This state building program is largely responsible for many of the racially identifiable school buildings remaining in Darlington County.

As the first state to recognize legal segregation, South Carolina also was the first state to establish a legislative committee to preserve it in the event of an "adverse" decision in *Brown.* Dist.Exh. 253 at 5–6. In 1951, the State instituted the "South Carolina School Committee" to advise the legislature "on the course to be pursued by the State in

---

**21.** This latter provision was not repealed until 1978. 1978 S.C.Acts 622.

respect to its educational facilities in the event that the Federal Courts nullify the provisions of the State Constitution requiring the establishment of separate schools for the children of the white and colored races." This committee, led by Senator L. Marion Gressette, came to be known popularly as the "Gressette Committee" or the "Segregation Committee." It is credited with the "success" South Carolina had in avoiding any desegregation until 1962. Dist.Exh. 320 at 3–D.

In 1952, the State, anticipating *Brown*, repealed a section of the State Constitution requiring the General Assembly to provide a system of free public school education. 1954 S.C.Acts 653. This repeal was proposed to unfetter the General Assembly in the event the United States Supreme Court held segregation unconstitutional. Dist.Exh. 120 at 2.

In 1954, the United States Supreme Court held in *Brown I* that the "separate but equal" doctrine had no place in public education. The justices unanimously held that the equal protection clause of the Fourteenth Amendment prohibited state-sponsored segregation in public education. *Brown I*, 347 U.S. at 493, 74 S.Ct. at 691. One year after the Supreme Court declared segregated public education unconstitutional in *Brown I*, the Court directed that segregated school systems be dissolved with "all deliberate speed." *Brown v. Board of Educ.*, 349 U.S. 294, 301, 75 S.Ct. 753, 756–57, 99 L.Ed. 1083 (1955) ("*Brown II*"). The Court required a "prompt and reasonable start toward full compliance" with *Brown I* and directed "good faith compliance at the earliest practicable date." *Id.* 349 U.S. at 300, 75 S.Ct. at 756. The Court also stated that, "[a]ll provisions of federal, state, or local law requiring or permitting such discrimination must yield" to the principles enunciated in *Brown I*. *Id.* 349 U.S. at 298, 75 S.Ct. at 755. The Court made clear that "the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." *Id.* at 300, 75 S.Ct. at 756.

### 3. RESISTANCE FROM 1954–1970

#### a. Generally

Despite the *Brown* decisions, the State of South Carolina refused to desegregate its schools, and took steps for over 15 years to maintain segregated public education under the cloak of state law. Some of the principal actions are discussed below.

#### b. Legislative Action and Political Activity

In 1955, the Gressette Committee proposed six changes in state laws in response to the *Brown* decision, i.e., (1) the repeal of the compulsory attendance law; (2) the establishment of a system of "visiting teachers" in lieu of the attendance teachers; (3) a grant of authority to local school trustees to "operate or not operate" public schools, and with authority to assign and transfer students in the "best interests of education"; (4) a grant of authority to school trustees to lease as well as sell school property; (5) a grant of permission for the transfer of students to counties in which their parents did not have property; and (6) the repeal of the county board of education's authority to regulate opening and closing of school terms. Dist. Exh. 136 at 14; Dist.Exh. 192; Dist.Exh. 244. Every one of these measures was enacted into law. Dist.Exh. 145; Dist.Exh. 185. However, all were intended to preserve segregation, not dismantle it as commanded by *Brown*.

The legislature also adopted an amendment proposed by the Gressette Committee to the annual State Appropriations Bill which provided that state funds be denied to any school forced to accept students by court order. The Appropriations Bill provided:

> [S]tate aid for teachers' salaries and all other appropriations for the operation of the public school system shall cease and become inoperative for the time that any pupil or pupils shall by order of any court attend a school other than that which he or she is now attending or may be assigned by local board of trustees.

*See* S.C.Code Ann. § 21–2 (1962). This amendment was clearly aimed at preventing the implementation of *Brown*. *See* Dist.Exh. 134. It made court-ordered integration impossible, even if local school officials wanted to comply. Dist.Exh. 143. It was not repealed until 1972. 1972 S.C.Acts 1307.

These laws were enforced, and their impact was felt everywhere, including Darlington County. In 1954, immediately after *Brown,* the State Superintendent issued specific orders to the Darlington County District to continue to operate its schools on a segregated basis. The August 18, 1954, Minutes of the Darlington County Board of Trustees show that it adopted a resolution to continue to operate segregated schools under orders of the State Superintendent and the mandate of state law. Dist.Exh. 425. The minutes state:

> Mr. Martin moved, seconded by Mr. Auman, that the following resolution be submitted to the County Attorney for his approval before incorporation in these minutes, and if he says there is nothing illegal in the resolution, we proceed to incorporate it in the minutes:
>
>> That this Board instructs the Area Superintendents that in the event a Negro child applies for admission to a White school in the Darlington County School System at the beginning or during the school session 1954–55, the Area Superintendents are authorized by this Board to advise the applicant that *in keeping with instructions from the State Superintendent of Education,* our understanding of the law is that the South Carolina Schools are being operated for the year 1954–55 under South Carolina law which requires segregation of the races, and refuse admittance of the applicant. Motion carried.

Quoted below is a letter from Mr. Paul A. Sansbury, County Attorney, in connection with the above motion, dated August 24, 1954:

> Reference is made to motion by Mr. Martin to be incorporated in the minutes of your Board, if nothing is found to be illegal therein, to the effect that any negro children applying for admission to white schools during the fiscal year 1954–55 be refused admission. The original motion in question is attached hereto.
>
> *Your attention is called to Section 7 of Article XI of the Constitution of South Carolina, vis:* "Separate schools shall be provided for children of white and colored *races,* and no child of either race shall ever be permitted to attend the school provided for the other race." Your attention is also directed to the recent decisions of the United States Supreme Court which hold that segregation of public schools is invalid (Brown vs. Board of Education, 74 Sup.Ct. 686; Bolling vs. Sharpe, 74 Sup.Ct. 693). In both of these cases the Supreme Court merely laid down the principle that separate educational facilities are inherently unequal, but restored both cases to the docket for reargument on questions relative to the forming of an appropriate decree. Until this decree has been formed and a procedure outlined for the ending of segregation, it is my opinion that your Board must follow the State constitutional provision hereinabove quoted. Accordingly, I see nothing illegal in the motion of Mr. Martin attached hereto.

Dist. Exh. 425 at 3–4 (emphasis added); Dist. Exh. 156 at 1; Dist. Exh. 158; Dist. Exh. 164 at 6.

The efforts of the State to preserve and maintain segregated schools did not cease in 1955. Instead, the segregation laws were strengthened in subsequent years.

In 1956, the State gave definite legal status to the Gressette Committee, and extended its life indefinitely. Dist. Exh. 187. It enacted a joint resolution drafted by the Gressette Committee "condemning and protesting the usurpation and encroachment on the reserved powers of the states." 1956 S.C.Acts 914 (R.645, S. 514). This joint resolution declared "[t]he right of each of the States to maintain at its own expense racially separate public schools." Dist. Exh. 184. The resolution, adopted unanimously by both the House and the Senate, declared that the General Assembly had never surrendered the right to maintain segregated public facilities, and would "exercise the powers reserved to it under the Constitution to judge for itself of the infractions and to take such other legal measures as it may deem appropriate to protect its sovereignty and the rights of its people." Dist. Exh. 188.

The general appropriations bill was also amended to provide for automatic closings of institutions of higher learning threatened by

the court-ordered admissions of any student. In addition to requiring the closing of any institution to which a court might order admission of a student, the bill required the closing of South Carolina State College, a black college. 1956 S.C.Acts 813 at 1948 (H–1896). Dist. Exh. 190.

Bills were also passed prohibiting membership in the NAACP by any state, school district or other public employee, Dist. Exh. 182; Dist. Exh. 183; Dist. Exh. 190; empowering school officials to remove and transfer students if they had reason to believe that the enrollment of students in a particular school might present a danger of riot or breach of peace, 1956 S.C.Acts 1715; and authorizing a committee to investigate the activities of the NAACP, Dist. Exh. 190; Dist. Exh. 192. The latter law is still in effect. S.C.Code Ann. § 59–63–480 (Law.Co-op.1976).

The 1957 legislative session saw the passing of additional bills aimed at preserving segregation. These included the retention of the segregation requirements in the State Appropriations Bill, 1957 S.C.Acts 347, Dist. Exh. 213; an anti-barratry law aimed at suppressing the NAACP, 1957 S.C.Acts 25 at 23, Dist. Exh. 208 at 6; and a bill giving the governor plenary authority to control violence or threatened violence, 1957 S.C.Acts 349; S.C.Code Ann. § 1–128 (1957), Dist. Exh. 209, Dist. Exh. 218.

In 1958, sentiment in the legislature against desegregation continued to run strong. In a letter to Senator Gressette, a senior House member urged the Gressette Committee to propose an insertion to the State Appropriation Bill that would provide for the closing of *all* black schools in the state in the event a black enrolled in a white college on court order. The letter stated:

A large group of negro teachers would like to see negro students admitted to our white colleges. They believe in integration. They do not believe in it to the extent that they would want all of the negro schools closed and that they would lose their jobs.... These negro teachers cannot do without their salaries.... They would lose their cars and the other property that they have purchased if they lose their jobs.

Dist. Exh. 224. The Gressette Committee considered this proposal, as it did all similar proposals, but did not recommend it. Dist. Exh. 224. However, the General Assembly enacted a law authorizing the Attorney General to investigate the records of all foreign and domestic non-profit corporations. Dist. Exh. 231. This law was aimed at the NAACP, which was pressing for school desegregation.

In April 1960 a desegregation lawsuit was filed in Summerton, Clarendon County. Dist. Exh. 267. In response, the Gressette Committee recommended two changes to that year's State Appropriations Bill: (1) that the clauses providing that the educational appropriations be for segregated facilities be grouped in one section only; and (2) that the State Budget and Control Board be authorized to supervise the expenditure of funds appropriated for public education.

The first change regarding the grouping of clauses was designed to thwart any attempt to bypass the state courts and allow school desegregation suits directly into federal courts. It did this by strengthening a 1956 law which required that applicants for school reassignments pursue administrative and state court remedies before entering federal court, and thus forced individual desegregation suits into state courts and forestalled class actions.

The second recommendation transferred the legislative authority to cut off school appropriations to the State Budget and Control Board, and thus retained to the State the power to cut off appropriations where desegregation was threatened. Dist. Exh. 266; Dist. Exh. 268 at 10. The General Assembly approved both changes. Dist. Exh. 264. The legislative session ended with the remainder of the school segregation laws unaltered. Dist. Exh. 275 at 15.

Thus, South Carolina's laws passed after *Brown I* were enacted to enable schools to continue on a segregated basis. If a federal court ordered the transfer of a child to a school for children of another race, both the school transferred from, and the school transferred to, would have their appropria-

tions terminated. They would cease to operate as public institutions, and the property could be sold or leased to segregated private schools. This would continue until the state withdrew completely from public education. It was acknowledged by some that South Carolina was a "pioneer" among Southern states in taking action to forestall integration. Dist. Exh. 170.

As a result of these actions, South Carolina was the last of the states to desegregate in any fashion whatsoever. Dist. Exh. 297. Schools in South Carolina opened for the 1962–63 school year on a completely segregated basis. Dist. Exh. 290 at 9.[22] On January 28, 1963, Harvey Gantt, a black transfer student from Iowa State College, was admitted to Clemson College under court order. It was the first school desegregation in South Carolina since Reconstruction. Dist. Exh. 297. Nevertheless, the vice chairman of the Gressette Committee assured legislators that Gantt's admission into Clemson did not change the state's policy in favor of segregated schools. Dist. Exh. 297 at 9.

On January 30, 1963, two days after Harvey Gantt entered Clemson, the House introduced a bill to provide scholarship grants to students wishing to attend private schools, H. 1155; Dist. Exh. 295. This proposal had been under study by the Gressette Committee for some time. *See* Dist. Exh. 232 at 14; Dist. Exh. 292 at 8; Dist. Exh. 296; Dist. Exh. 297 at 8; Dist. Exh. 298 at 14. The General Assembly approved the bill in May, 1963. 1963 S.C.Acts 297; S.C.Code Ann. 21–297 (1962); S.C.Code § 59–41–10 et seq. (Law Co-op.1976). Although the law made no mention of race, it was perceived as a "safety valve" in the event of public school desegregation. Dist. Exh. 299 at 14.

When the Charleston School District admitted 11 black students into its white schools in September 1963 under federal court order, it became the first school district to desegregate in South Carolina. Dist. Exh. 301 at 1, 22. The plaintiffs there reached federal court only after finally exhausting the administrative remedies and barriers provided for in the South Carolina Pupil Assignment Law, which mandated that students challenging pupil assignments seek administrative review in the county boards of education and state courts before seeking relief in federal court, S.C.Code § Ann. 21–247 (1956). Dist. Exh. 302 at 16.

In response, the school districts in Charleston County and other counties made application to the State Department of Education to operate under the tuition grant program. Dist. Exh. 301, at 22–23; Dist. Exh. 371. The 1964 General Assembly appropriated $250,000 for the tuition grants program. Dist. Exh. 313. By September of that year, over one hundred applications for such grants had been forwarded to the State Department of Education. Dist. Exh. 315; Dist. Exh. 317; Dist. Exh. 319.

The State Superintendent of Education announced that the Department of Education had approved state tuition grants for three schools that had opened the previous fall. Dist. Exh. 321. Thus, on March 3, 1965, South Carolina paid its first tuition grants to private school students. As the school boards rushed to distribute the checks, the NAACP sought injunctions in federal court to prevent payment of the funds, and federal marshals attempted to serve school officials with restraining orders. However, the NAACP's efforts were too late to prevent some parents from cashing the checks. On March 9, when Judge Martin issued the temporary injunctions sought by the NAACP, money had already been disbursed in Orangeburg and Sumter school districts. Dist. Exh. 325.

Even after Judge Martin had issued the injunctions against Orangeburg and Sumter school districts, however, the State Department of Education defiantly continued processing applications for tuition grants, and on March 12, mailed to the Charleston Treasurer a total of $15,383.88 in grants for 151 students in three Charleston school districts. However, the NAACP sought and obtained an injunction against the Charleston districts

---

**22.** Although there were also no blacks in Alabama's white schools that school year, the University of Alabama was under court order to admit blacks, and a black woman had attended in 1956 before leaving in the middle of riots. Dist. Exh. 297.

involved and the State Superintendent. Dist. Exh. 325.[23]

No new segregation laws were passed from 1967 to 1969. However, the schools remained largely segregated, except for the limited desegregation brought about under "freedom of choice" plans.

In March 1967, Senator Gressette, then Chairman of the Senate Judiciary Committee, proposed and defended bills that would allow local school districts to delay implementation of desegregation until 1974. Dist. Exh. 333. In the same year, South Carolina's Attorney General criticized federal officials for denying federal education funds to South Carolina schools, and defended the freedom of choice plan. Dist. Exh. 334. Also in 1967, the nation's top school desegregation official, the Director of the Equal Education Opportunity Division of the United States Office of Education, described South Carolina as "one of a small group of states in serious trouble" in school desegregation. Dist. Exh. 335. He blamed the tardy response on the lack of educational leadership in the State. *Id.* He further described that there was "little assumption of responsibility within the state for bringing about change." *Id.* The desegregation official noted that South Carolina was the only state in the South that had failed to develop training programs for school personnel faced with the problems of desegregation. *Id.*

In 1970, the General Assembly created the State Board of Education ("SBE"). 1970 S.C.Acts 2503; S.C.Code Ann. §§ 59–5–90 et seq. (Law Co-op.1976). The General Assembly also enacted laws prohibiting all pupil assignments based on race, except with the "express approval of a board having jurisdiction." S.C.Code Ann. § 59–63–50 (Law Co-op.1976). Although on the surface the law appeared to be a desegregation measure, in reality it was designed to discourage "busing" desegregation remedies. The law, still in effect today, prohibits assigning students on the basis of their race "for the purpose of

achieving equality in attendance or increased attendance or reduced attendance, at any school, of persons of one or more particular races." It also prohibits the establishment of school districts or attendance areas for the purpose of achieving racial equality.

High ranking state officials, including South Carolina governors, resisted desegregation. Some of South Carolina's governors publicly advocated the maintenance of segregated schools and resisted desegregation of the state's public schools. Thus, in 1959 South Carolina's Governor was able to say that, because of sound state government, state-provided transportation and the school building program, school segregation persisted in South Carolina. Dist. Exh. 242, at 4–5, 8.

Despite contentions by the State during the trial that the District should have gone beyond the requirements of the court's 1970 order to attain more desegregation in later years, State officials did not begin actively promoting desegregation. Although one governor acknowledged that school districts had to comply with the Civil Rights Act, he urged that the school districts proceed cautiously and refrain from adopting overly ambitious desegregation plans, and he "urged school districts not to adopt plans that go beyond those ordered by the courts". Dist. Exh. 327 at 18.

The court finds that during this unfortunate period of history the State, which had previously led the movement resisting desegregation, did not actually disavow its prior stance and encourage local schools to desegregate to the extent they could. Accordingly, the court finds the State's actions and inactions a significant factor in delaying desegregation in the District.

One State Attorney General opined that the State could continue funding local school districts even though the school districts were not eligible for funds under federal law because of their failure to desegregate their schools. Dist. Exh. 374. He advised the

---

**23.** The law enabling these tuition grants, 1963 S.C.Acts 297, codified as S.C.Code Ann. § 21–297 *et seq.* (1962), was held unconstitutional in *Brown v. South Carolina State Board of Education,* 296 F.Supp. 199 (D.S.C.), *aff'd,* 393 U.S. 222, 89 S.Ct. 449, 21 L.Ed.2d 391 (1968). However, it remains a part of the South Carolina Code. S.C.Code Ann. §§ 59–41–10 *et seq.* (Law Co-op.Supp.1994).

Governor that "the failure of a school district to receive federal assistance does not jeopardize the receipt by that school district of State-appropriated funds." Dist. Exh. 374. Thus, a school district could continue to discriminate with the assurance it would not lose state funding. This law and the interpretation accorded it, delayed desegregation.

When the Fourth Circuit Court of Appeals ordered the Darlington County schools desegregated in January 1970, the General Assembly passed a resolution attacking court decisions requiring students to be bused between communities to obtain racial balance. Dist. Exh. 336. Although state officials acceded to the court's order, they continued to express preference for freedom of choice plans, expressly rejected for Darlington County by the Fourth Circuit. Dist. Exh. 337. Parents of white children in Darlington County were assured by the highest ranking state officers that the State would not enforce its compulsory attendance law, and that enforcement of the law would be left up to the local school district. Dist. Exh. 339.

When violence erupted at Lamar High School in Darlington County, leading to the overturning of two school buses and national attention, the Governor closed the school until peace could be restored and ordered protection for persons and property in the area. Dist. Exh. 341 at 1. Despite these efforts by state officials to maintain peace, substantial federal law enforcement assistance was necessary.

The tide of desegregation resistance began to turn in 1971. South Carolina's new Governor called for an end to segregation. However, the State did little to bring about that result. Dist. Exh. 342; Dist. Exh. 343; Dist. Exh. 344; Dist. Exh. 346.

In summary, the court finds that beginning even before *Brown I* was decided, and continuing through the early 1970s, the State of South Carolina and its officials and departments deliberately defied their obligations to desegregate South Carolina's public schools, and instead took many actions to thwart desegregation.

### c. The Activities of the Gressette Committee.

The court finds that the Gressette Committee was perhaps the most important element of South Carolina's resistance to desegregation. After *Brown*, the Gressette Committee lead the state's fight against desegregation. It worked closely with the Attorney General. Dist. Exh. 116; Dist. Exh. 117, It also worked with governors and state education officers. Dist. Exh. 126. It considered suggestions and proposals from individuals and groups within and outside the state, worked closely with school boards, and directed studies. Dist. Exh. 148; Dist. Exh. 149. It hired the services of educational consultants and a legal staff. As a consequence, every legislative recommendation it made was adopted into law. Dist. Exh. 167; Dist. Exh. 245.

In addition to its legislative activity, the Gressette Committee hired a six-lawyer legal staff to provide legal services to school boards to assist them in their efforts to preserve segregation. Dist. Exh. 150; Dist. Exh. 152; Dist. Exh. 161 at 20–A; Dist. Exh. 200. The Gressette Committee's legal staff represented school districts, including Darlington County, and state universities in the most significant desegregation cases of the era. Dist. Exh. 347; Dist. Exh. 355. When this action was filed in May 1962, Dist. Exh. 286, the Gressette Committee assigned an attorney from its legal staff to assist the District in its defense, without cost to the District. Dist. Exh. 349; Dist. Exh. 350; Dist. Exh. 351.

The Gressette Committee acted as a voice of the state. In a series of interim reports issued from 1954 until it was dissolved in 1966, the Committee chronicled the State's resistance to desegregation and counseled segregationists' future actions. Dist. Exh. 127; Dist. Exh. 176 at 8; Dist. Exh. 177; Dist. Exh. 178; Dist. Exh. 226; Dist. Exh. 246; Dist. Exh. 247 at 9.

The Gressette Committee met often with white citizens councils and other groups from other states. It was supported by the South Carolina Citizen's Council, which had as its objective the "peaceful preservation of segre-

gated society." Dist. Exh. 194; Dist. Exh. 287.

In February 1961, Senator Gressette summarized the Committee's achievements to date, and reiterated South Carolina's stance against integration. In a speech, he stated that South Carolina was in an exceptionally strong position to resist integration in the public schools. He cited the elimination of the compulsory attendance provisions in the constitution and law, the broad powers of the school boards, and the law requiring closure of any schools forced to integrate. Dist. Exh. 273; Dist. Exh. 282; Dist. Exh. 294.

In 1966, the Gressette Committee was dissolved. Dist. Exh. 330, Dist. Exh. 353. However, in its final report, the Committee urged the continuing fight for state autonomy and against federal control. Dist. Exh. 331. South Carolina's schools continued to be largely segregated.

### d. The State School Building Program.

The School Building program was South Carolina's main hope to preserve segregation. One official stated, "I believe the vast majority of Negroes in South Carolina would prefer to send their children to the splendid schools now being constructed for them. My hope is that the final decision of the Court will be such that our people will be able to find a way to live within the law of the land and still preserve our separate school system." Dist. Exh. 123 at 14. A chairman of the Gressette Committee wrote:

> I think it is essential that the school building program go forward immediately so that these Trustees will have adequate school buildings with which to work. If we decline funds for a negro high school in a school district, the Trustees will have no alternative but to mix the children. If we provide the high school, the chances are that most of the negroes will prefer their children to go to this new school.

Dist. Exh. 348. Some saw the school equalization program as South Carolina's "only hope" to continue segregation. Dist. Exh. 169.

The State continued administering the school building and expansion program after *Brown.* In fact, after *Brown,* it modified its policies to more carefully locate proposed schools where they would logically serve a racially homogeneous community. Dist. Exh. 124 at 13. Thus, the State, over *Brown's* mandate condemning state-sponsored segregation of schools, deliberately continued to build new *and segregated* schools in racially segregated communities. Dist. Exh. 256 at 16. The court finds that the School Building program fostered the construction of school buildings *intended* to serve segregated communities, and thus spawned many of the "vestiges" existing today.

Millions of dollars were spent to build segregated schools after *Brown.* Such spending continued until at least 1964, and appropriations were made each year from 1954 to 1963 for the construction of segregated schools. Dist. Exh. 128 at 14; Dist. Exh. 154; Dist. Exh. 160; Dist. Exh. 162; Dist. Exh. 166; Dist. Exh. 173; Dist. Exh. 175; Dist. Exh. 181 at 7–8; Dist. Exh. 198; Dist. Exh. 199; Dist. Exh. 204; Dist. Exh. 217; Dist. Exh. 219; Dist. Exh. 228; Dist. Exh. 217; Dist. Exh. 235 at 5; Dist. Exh. 242 at 4; Dist. Exh. 256 at 16; Dist. Exh. 269 at 10; Dist. Exh. 277 at 13; Dist. Exh. 288; Dist. Exh. 300; Dist. Exh. 305 at 8–A; Dist. Exh. 311; Dist. Exh. 316; Dist. Exh. 318.

Because of this massive infusion of state funds into the educational system, no federal funds were sought or desired. In fact, the State did not qualify for the program of federal aid for school construction. Dist. Exh. 165. This served to entrench the pattern of building schools on a racially segregated basis, rather than on a desegregated basis, as would have been required under federal funding laws.

The impact of the state building program on Darlington County was dramatic. The following segregated schools were either built or significantly expanded from 1951 to 1963:

| Schools in the Darlington and Society Hill Area | Dates of Major Construction (From 1951–1963) | Page of DCSD Survey, Volume II |
|---|---|---|
| Brockington Elementary | 1953, 1956 | p. 5, Dist. Exh. 359 |
| Cain Elementary | 1953 | p. 5 |
| Pate Elementary | 1956 | p. 5 |
| Rosenwald Elementary | 1952, 1954, 1967 | p. 6 |
| Spring Elementary | 1962 | p. 6 |
| St. David | 1957 | p. 6 |
| Pine (B.A. Gary) Middle School | 1963 | p. 7 |
| Brunson–Dargan (Expansion) | 1958 | p. 8 |
| Mayo High School (Expansion only) | 1954, 1956 | p. 8 |
| Rosenwald High School | 1957 | Dist. Exh. 219 |
| Schools in the Hartsville Area | | |
| Antioch Elementary | 1953 | p. 10 |
| Sonavista | 1952 | p. 12 |
| Southside Elementary | 1959, 1960 | p. 12 |
| Washington Street Elementary | 1962 | p. 13 |
| West Hartsville Elementary | 1956 | p. 14 |
| Hartsville Senior High | 1962 | p. 16 |
| Schools in the Lamar Area | | |
| Lamar Elementary | 1952 | p. 17 |
| Spaulding Elementary | 1953 | p. 18 |
| Spaulding High | 1954 | p. 19 |

Most of the schools built in Darlington County under the program were segregated black schools. Dist. Exh. 228.[24]

Several of these schools, namely, Brockington, North Hartsville, Washington Street, and West Hartsville Elementary Schools, B.A. Gary Middle School, and Mayo High School have proved difficult to desegregate, and are vestiges of the former dual school system. The vestiges of the dual school system that remain in these schools are directly traceable, in whole or in part, to the state building program. West Hartsville, B.A. Gary and Washington Street were built as segregated schools with state funds *after* segregated schools had been declared unconstitutional in the 1954 *Brown I* decision. Although Brockington school was built prior to *Brown*, it was built under a state program specifically designed to keep the schools segregated in the event the *Brown* case was decided adverse to the State of South Carolina. Mayo was built in 1944 as a segregated school, but was significantly expanded after the *Brown* decision using state funds.

The State Education Finance Commission (SEFC) was a state commission specifically created to encourage and pay for the construction of segregated schools in racially "homogeneous," i.e., racially segregated neighborhoods in the hopes that "separate but equal" schools could be maintained. The SEFC was created in anticipation of *Brown*, and, even after *Brown*, it continued to build or expand segregated schools in segregated neighborhoods.

As outlined above, the state played an unfortunate and important role in the build-

24. A complete account of the school construction in Darlington County financed through the state school building program may be found in the composite of Darlington County School District minutes from 1951 to 1962, contained in Dist. Exh. 424.

ing of these schools as segregated schools, even after *Brown* resolved that such state-sponsored construction violated the Constitution. The court thus holds that the State's actions in funding and requiring the construction of such schools in racially segregated neighborhoods and in identifying them as "black" or "white" schools not only created the segregated schools, but impeded their effective desegregation from 1970 to date. Because of the schools' locations in racially-segregated neighborhoods and their racial designation, the burden of desegregating these schools has been rendered more difficult. Indeed, the significant white "no shows" following the 1970 order were due, at least in part, to the historical racial identity and location of these schools, as well as the encouragement received from state officials. Accordingly the court finds that the failure of white students to enroll, and the continuing racial identity and locations of the schools, have had a significant impact on both the type and expense of the remedial action necessary today.

The court finds that the impact of state actions until 1970 was clear. From 1954 to 1963, no desegregation whatsoever occurred in South Carolina's schools. From 1963 to 1970, little desegregation took place. The court further finds that even after the February 1970 desegregation order was implemented in Darlington County, many schools remained racially identifiable because of their construction and location in racially-segregated neighborhoods under the auspices of the SEFC. In addition to the State's actions and laws to thwart desegregation, the District took its own actions to defer desegregation in Darlington County. The court finds that although officials actively resisted desegregation, the State's active encouragement reinforced the local resistance. As a result, it is appropriate that the State participate in the elimination of the dual school system created and perpetuated by it.

## 4. POST–1970 ERA AND DISCHARGE OF AFFIRMATIVE DUTY

### a. Generally

Active forms of state resistance to school desegregation had largely ceased by the early 1970s.[25] However, the court finds that the State and its officials did little after 1970 to eliminate the remaining vestiges of the former dual school system, as was their duty. The evidence shows that the State has never promoted desegregation with anything approaching the degree of energy and involvement it brought to the mission of preserving segregation. For example, a South Carolina statute enacted to provide state funds for schools forced to desegregate, S.C.Code Ann. § 21–2 (1962), was not repealed until 1972. 1972 S.C.Acts 1307. A law authorizing the investigation of the activities of the NAACP is still in effect today. S.C.Code Ann. § 59–63–480 (Law Co-op.1976). Another law, currently in effect, which was designed to discourage "busing" desegregation remedies, prohibits the assignment of students on the basis of race "for the purpose of achieving equality in attendance or increased attendance or reduced attendance, at any school, of persons of one or more particular races." S.C.Code Ann. § 59–63–50 (Law Co-op.1976). It also prohibits establishing school districts or attendance areas to achieve racial equality.

There is no evidence of any significant efforts by the State to encourage local districts, including Darlington County, to desegregate. Since 1954, there have been several major educational initiatives by the governors and the General Assembly to improve or restructure education in South Carolina. However, none of these programs provided any funding for desegregation programs or any incentives or directives for local districts to desegregate. TR VIII at 113, 120–123.

Accordingly, the State has not fulfilled its affirmative duty to encourage or promote desegregation or to encourage or assist local school districts in their efforts to eliminate the vestiges of the dual school system.

25. In the spring of 1970, one prominent state official, who urged citizens to comply peacefully with the Fourth Circuit Order to desegregate immediately, nevertheless telegraphed President Nixon urging a postponement to the desegregation mandate. Dist. Exhs. 336 & 337.

### b. Education Finance Act

The Education Finance Act of 1977, S.C.Code Ann. § 59–2–10 *et seq.* ("EFA"), is the primary vehicle for state funding of local school districts. Sweatman Dep. at 5–6. Funds under this program average 70% of the local school districts' total funds. Dist. Exh. 418 at 2; Nielsen Dep. at 19; Sweatman Dep. at 6. The EFA is an equalization program, or one that allots funds according to the wealth of the local school districts, with wealthier districts receiving less than 70% of their funding from the program, and poorer districts receiving more. *See* S.C.Code Ann. 59–20–30; Dist. Exh. 418 at 2–4; Sweatman Dep. at 6–7. Darlington County receives close to the average funding for the state.

The state funding formulas under EFA do not take into account needs relating to desegregation. Nielsen Dep. at 25. No funds are provided for magnet or other types of programs designed to encourage desegregation at the local or state level. Sweatman Dep. at 11–12, 16, 18. Therefore, the EFA will provide no additional funding for the Mayo magnet school or the other measures approved by the court.

### c. Education Improvement Act

The other state finance law for school districts is the Education Improvement Act of 1984 ("EIA"). Regulations administering the EIA are established by the State Department of Education. State Regs. 43–202.1; Dist. Exh. 430. Under the EIA, funds are available to the school districts under about 24 sub-funds or strategies, allocated differently. *See generally* Dist. Exh. 418 at 5–32; Sweatman Dep. at 19–20. These funds are granted for specific programs. Sweatman Dep. at 20.

EIA funds go to the schools regardless of the desegregation status or efforts of the schools. Grier Dep. at 25; TR VIII 119. No EIA funds are specified for desegregation purposes. Nielsen Dep. at 25–26, 33. The only funds potentially available for desegregation purposes are grants from federal and specialty programs already available to the schools. Nielsen Dep. at 33–34, 36–38. A court-ordered magnet will not be eligible for *additional* funds from such existing programs. Nielsen Dep. at 38–39; see also Sweatman Dep. at 24–25.

### d. State Board of Education and State Department of Education

The State Board of Education ("SBE") has authority to establish and enforce minimum standards for the operation of all phases of public school operations. Its powers and duties are set forth in S.C.Code Ann. § 59–5–60 (Law Co-op.1976) and SBE Policy ABB, State Board of Education Powers and Duties, Dist. Exh. 388; Dist. Exh. 391. The powers and duties of the State Superintendent are set out in SBE Policy CEB, State Superintendent of Education—Powers and Duties, Dist. Exh. 383. The SBE can enforce its standards by withholding state funds. Grier Dep. at 30–31; Nielsen Dep. at 19.

Neither the SBE nor the SDE it governs has a written policy on desegregation. Nunnery Dep. at 18; Coles Dep. at 21, 40; Nielsen Dep. at 20. In fact, during the mid-sixties, ten years after the *Brown* decisions, the SDE was segregated, and accredited schools on the basis of race. See, e.g., Dist. Exh. 373. Although a policy articulating a passive stance on desegregation was proposed in 1969, it was never adopted. Dist. Exh. 400. SBE Policy JAA, Equal Education Opportunity, Dist. Exh. 390, which is the only SBE policy concerning racial discrimination, does not articulate that the SBE encourages desegregation, or that it forbids or discourages discrimination. Rather, the policy is simply a description of existing federal law against discrimination.

Although the SBE and the SDE regulate local school districts in almost every area of their operations, they do not require the local school districts to have a policy against segregation. Nielsen Dep. at 23. Neither the SBE nor SDE has ever adopted any minimum standards for local school districts regarding desegregation. Dist. Exh. 384. In the SBE's Defined Minimum Program, there are no policies encouraging integration. Dist. Exh. 414. Although it has the power, the SBE has never adopted a policy forbidding local districts from discriminating on the basis of race as a condition for receiving state funds. Grier Dep. at 17. Nor do any

provisions in the EFA or EIA predicate state funding on meeting minimum desegregation requirements. Indeed, the failure of a local district to desegregate does not appear to violate SBE policy. Grier Dep. at 26–27.

The SBE has not assumed any responsibility for desegregation. Grier Dep. at 32–33; Dist. Exh. 361; Dist. Exh. 362; Dist. Exh. 364. It considers desegregation a matter solely between the federal government and the local district with its role as an observer and facilitator only. Coles Dep. at 24; Nielsen Dep. at 14–16. Through the years, SBE has received various reports on desegregation from the local school districts. See Dist. Exh. 364; Dist. Exh. 365; Dist. Exh. 366; Dist. Exh. 367; Dist. Exh. 401–409; Dist. Exh. 412. However, it never acted on those reports. Busbee Dep. at 41–42; Dist. Exh. 405.

The SBE has provided no funds to assist a school district in desegregating. Grier Dep. at 24. No SDE employees are responsible for implementing or assisting desegregation in the school districts. Nielsen Dep. at 13–14. Moreover, despite heavy resistance and many years of delay by local school districts, no evidence exists that the SBE ever withheld funds from any local district for refusing to desegregate. See Coles Dep. at 26.

The SBE must approve all land acquisitions by school districts. Tudor Dep. at 7; Dist. Exh. 382. It has full authority to approve or veto the sites on which new schools are built. Tudor Dep. at 5–6; Stone Dep. of August 31, 1993 at 67. However, it does not consider desegregation a factor in the approval of new school sites. Tudor Dep. at 8–9; Dist. Exh. 382 at 2–3. Thus, when the District built a new St. John's High School in the mid–1970s and made additions to Mayo High School instead of consolidating the schools as a desegregation measure, the state did not consider the segregation impact and approved such building plans.

The SBE also provides incentive grants to local districts to encourage school consolidations, but does not consider, or condition receipt of state funds on, the segregative or desegregative impact of the consolidation.

See Grier Dep. at 24, 26–27; Coles Dep. at 26; Dist. Exh. 410.

An Office of Technical Assistance ("OTA") within SBE was established in 1967 through a federal grant. It sponsored workshops and seminars throughout the state. The OTA, established in 1967, was the *only* state program on desegregation.[26] Busbee Dep. at 21–23; Richardson Dep. at 17–19. Busbee Dep. at 23; Nunnery Dep. at 9, 14, 25–27; Coles Dep. at 20–21, 26–28, 30–35; Richardson Dep. at 14–16. SDE budgets showing allocations for the OTA reflect that no state appropriations were ever made for "Special Items," the appropriations category "to provide technical assistance to local educational agencies for the implementation of desegregation plans." Dist. Exh. 358; Dist. Exh. 375–381.

Except for a few seminars and workshops, no evidence exists that the OTA did anything to encourage desegregation. Rather, the OTA may have existed to "soothe feelings." Busbee Dep. at 14. Further, OTA assistance was rendered only upon local district initiative. Nunnery Dep. at 11, 15. The OTA took the position that it was not its responsibility to encourage districts to comply with the law. Nunnery Dep. at 18, 23.

In summary, the court finds ample evidence that the State first created and then maintained a system of segregated schools for many years, even though state-sponsored segregation in education had been ruled unconstitutional in 1954. The court further finds that State has not fulfilled its affirmative duty to eliminate vestiges of the dual school system. This obligation remains unsatisfied with respect to a number of schools in Darlington County, and therefore, the State must participate with the District in remedying the vestiges of segregation.

### B. MITIGATING FACTORS AFFECTING STATE LIABILITY

#### 1. ACTIVE SEGREGATIVE PRACTICES OF DISTRICT PRIOR TO 1970

■ Although the court has found that the State is liable to participate with the

---

**26.** The South Carolina School Desegregation Consulting Center is not associated with the State, and is federally funded. Winecoff Dep. at 9, 12.

District in remedying the vestiges of segregation, this liability is mitigated and reduced by significant acts and omissions of the District that have had a causative effect on segregated conditions in the District. Many of these acts and omissions occurred during a time in which the District had responsibility for desegregation of the formerly de jure school system, and an affirmative obligation to desegregate. Complaint on Cross–Claim at 7, §§ 7 and 9; Consent Order (6/3/94).

The District operated completely segregated white and black schools in the 1950's and early 60's, until restrained from refusing to admit students on the basis of race by order of this court. State's Exh. 3–18 A; Order (7/13/64). Although the State approved the sites of those segregated schools and contributed money for their building, the District determined their sites, made the plans for the buildings and approved the construction contracts. State's Exh. 27 A; Busbee Dep. at 20; Stipulated Testimony as to Office of School Planning and Building.

One such building plan was the "new elementary negro school," Washington Street, in 1961–1962. State's Exh. 29 A. This school was discussed at the same Board meeting at which the Board voted to hire a lawyer regarding the unsuccessful attempt of plaintiffs in this case to transfer their children to the white elementary school, St. Johns. State's Exh. 29 A. During and following the 1950's and early 1960's the District built additions to historically-segregated schools, and renovated them repeatedly, particularly since 1970. State's Exhs. 27 B and 60.

Although this court ordered a plan for the desegregation of the District in 1970, the District admits that it did not fully comply with that Order. Consent Order (6/3/94). The District's continued resistance to desegregation after 1970 is discussed below.

## 2. DISTRICT'S ABILITY TO DESEGREGATE

Under South Carolina law, and according to testimony of the witnesses, the District has the power to assign students and faculty members, determine the sites of its schools, construct and maintain its buildings, determine how curriculum and instruction are delivered, determine its budget and set the necessary tax millage and otherwise operate its schools without review by another governmental body. S.C.Code Ann. § 21–230 (1952); State's Exh. 21; S.C.Code Ann. § 59–19–90 (Law Co-op.1976); Act No. 588, § 5, 1992 S.C.Acts 3603. The District, after 1896, had power over students, faculty and buildings. 1896 S.C.Acts 150, State's Exh. 1 B. The 1964 Order in this case found that the County Board of Education had "the ultimate authority and responsibility to operate and maintain schools in Darlington." Order (7/13/64). The District's authority to assign students and faculty is exclusive. TR V at 151. The District is fiscally autonomous. Act No. 588, 1992 S.C.Acts 3603. It also has the authority to hold a bond referendum to raise its debt limit, or to enter a lease purchase arrangement without a referendum. TR. at 160. *See also Caddell v. Lexington County School District No. 1,* 296 S.C. 397, 373 S.E.2d 598 (1988).

Until 1993, the District never requested state assistance with desegregation. TR. I at 38, 40, 232; State's Exh. 47; Horsey Dep. at 11; Howell Dep. at 5. In 1993, after trial appeared imminent, assistance was sought. State's Exh. 48; TR. I at 97–99.

## 3. PRIMARY CAUSAL RESPONSIBILITY OF DISTRICT FOR "VESTIGES"

Dr. David Armor, the District's expert, considered Pate Elementary, Brockington Elementary, B.A. Gary Middle School, Mayo High, North Hartsville/Sonovista Elementary, Washington Street Elementary, West Hartsville, and Spaulding Elementary vestiges. TR. VI at 156–160. Thus, even under Dr. Armor's analysis, the District contributed causally to each of these vestiges.

Dr. Armor's conclusions were based on his opinion that these schools were either not designed to be integrated by the original desegregation order of 1970, or they became segregated immediately thereafter. TR. VI at 131. Clearly, he looked to what desegregation was projected under the 1970 order. TR. VI at 157; Dist. Exh. 75 A–O. The racial character of the student body was affected by the 1970 order and by demographic

change afterward. TR. VI at 230–231. Therefore, if the plan did not attempt desegregation of a school, the school is a vestige.

As noted, Dr. Armor found Brockington, Gary, Mayo, Washington Street, West Hartsville, Pate, North Hartsville, and Spaulding to be vestiges. TR. VI at 162–163. *See also* Dist. Exhs. 75o, p, q, s, t and v. Dr. Armor used a plus or minus 20% variance standard from the district-wide proportions of black and white students TR. VI at 152. All of these schools would have been above that range.

The court finds that HEW Plan B would have desegregated Brockington and Gary, and would have had a greater desegregative effect at Mayo. Dist. Exhs. 68 and 75o, p & q. However, the District's plan, which modified HEW Plan B, used a system of historically white elementary schools as feeders for the historically white junior high and high school in the Town of Darlington whereas HEW Plan B used a mix of the historically one race schools as feeders. Although HEW Plan B would have had a more desegregative effect, no plan was proposed by the District that attempted to desegregate all of the schools, despite the order to desegregate. The court has weighed the fact that the State did not participate in the formulation of the 1970 Order, and that it is largely because of the 1970 Order that these schools remain vestiges.

The court finds that reasonable alternatives existed before now for the District to desegregate these schools, yet the District has failed to do so. For example, according to Dr. Armor's testimony, the reason that Pate is a vestige is that more whites showed up at the school after the 1970 order than had been anticipated, and the District could have rectified the error then but failed to do so. TR VI at 162–163.

According to Dr. Armor, Mayo was also a vestige in terms of the assignment of same-race principals to that school and in terms of the poor maintenance of the facility. TR. VI at 201–204. Principal assignments and maintenance were solely within the control of the District. This pattern of discrimination also affected other schools that were poorly maintained, such as Washington Street, and extends to other schools that always had principals of the same race as the race of the majority of the student body, such as St. Johns High, B.A. Gary, Southside, Brockington, Pate, West Hartsville, and Washington Street.

### 4. POST–1970 DISCRIMINATION BY DISTRICT

Until recently the District perpetuated a segregated system. Heatley Dep. at 6–8, 62–64, 66–68. Connie Hathorn, a principal of Mayo in 1989, and Joanne Smith, the Washington Street principal in 1989, also corroborate this pattern of recent segregation. Hathorn Dep. at 7, 12, 14, 57–59, 70–71; Smith Dep. at 8–9. Vance Kimbrell, the Personnel Director, testified about discriminatory hiring practices from 1980 to 1988. *See* Kimbrell Dep. at 59, 63, 65. The SACS Study, the Curriculum Audit, and the Strategic plan all identified desegregation needs in the late 1980's. Govt. Exh. 45 at 59–62, 103, 105 & 118; Govt. Exh. 46 at 160 & 161; Govt. Exh. 47, Part IV, Summary, and Govt. Exh. 48. Former Superintendents Grier and Cox also testified to problems related to desegregation in the District in the late 1980's and 1990's.

### 5. DISTRICT'S DISCRIMINATION IN STUDENT ASSIGNMENTS

Dr. Armor, the District's expert, testified that Brockington, Pate, Gary, Mayo, Washington Street, Spaulding Elementary, and other schools had never been desegregated. This testimony is supported by Dist. Exh. 75 A–O and by the enrollment data in Govt. Exh. 43. A comparison of the percentage black enrollment of the schools in the District in 1970–71, after the court-approved plan became effective, and in 1993–94, is shown as follows:

| | 1970–71 | 1993–94 |
|---|---|---|
| Brockington Elementary | 92% | 85% |
| Lamar Elementary | 63% | 50% |
| Pate Elementary | 32% | 30% |

| | 1970–71 | 1993–94 |
|----------------------------|---------|---------|
| Southside Elementary | 93% | 80% |
| Spaulding Elementary | 100% | 97% |
| Washington Street Elementary | 100% | 100% |
| West Hartsville Elementary | 24% | 12% |
| Brunson–Dargan Junior High | 38% | 54% |
| B.A. Gary (Pine) Middle | 88% | 84% |
| Mayo High | 95% | 89% |
| St. Johns High | 31% | 50% |
| District averages | 55% | 54% |

Many of these schools are in close proximity to each other such as: Brockington and Pate (.9 miles) and Lamar and Spaulding (.7 miles). All of the schools in the Town of Darlington are within a two mile radius of each other. TR. IV at 57–58. The court finds that redrawing attendance lines would have promoted desegregation in these schools at no appreciable cost, but the District failed to do so. TR. VII at 55–57, 88–89.

Although the Country Club area is clearly in the Mayo zone, it was assigned to the St. John's High School zone. Govt. Exhs. 14, 18. Although the explanation was based on school bus transportation needs, school buses have not run into the Country Club area for two years. Govt. Exh. 18 A; TR. I at 136–137; State's Exh. 75. Dr. Grier testified that he was told not to pursue the matter of sending Country Club students to the correct school because parents would not tolerate their children being sent to Mayo. TR. I at 139. The District did not seek court approval to deviate from the 1970 Order in this regard.

Dr. Grier found a significant problem of white students attending schools out of their assigned zone in order to avoid attendance at predominantly black schools. TR. I at 116, 124–126; TR. II at 19–21. Dr. Cox's investigations corroborated out of zone violations and loose enforcement of zone lines. TR. II at 129, 144. Dr. Cox also believed that out of zone attendance was such a significant problem she undertook a personal investigation of the matter. TR. II at 125, 127.

## 6. DISTRICT'S DISCRIMINATION IN PRINCIPAL ASSIGNMENTS

Numerous schools in the District that are predominately or historically one race have never had a principal of another race. These schools include: Brockington, Brunson–Dargan, Cain, Gary, Lamar Elementary, Mayo, Pate, Southside, Spaulding Elementary, Springs, St. John's High, Washington Street, West Hartsville. Govt. Exh. 37. No reason exists why principals could not have been assigned without regard to race, but the District chose not do so. TR. IV at 32. The reason the District did not assign principals of different races to these schools was because of the concern of public reaction. TR. I at 199. Blacks were replaced with blacks and whites were replaced with whites because of community demands. Kimbrell Dep. at 59–60. In particular, Dr. Grier was told that he could not place a white principal at Mayo. TR. I at 162.

## 7. DISTRICT'S FAILURE TO COMPLY WITH 1970 ORDER

Faculty discrimination existed for years in Darlington County. Alvin Heatley testified about discrimination in the 1960's after the District was involved in this litigation. Heatley Dep. at 16. The District refused to adopt an affirmative action plan for faculty in the 1980's. Kimbrell Dep. at 63–65. When Dr. Grier came to the District in 1988, the District was not in compliance with the 1970 order as to faculty assignment. TR. I at 194–195. When he transferred teachers to try to bring the District into compliance, it "evoked the anger and discomfort of many Board members." TR. I at 195.

Mayo was above a 15% deviation in faculty from 1982–83 through 1991–92, although it had been in compliance in 1971–72. TR. IV at 37, 38; Govt. Exh. 39. Therefore, the District allowed Mayo to resegregate at least as far as the percentage of black faculty at

the school. In 1986, Mayo had a 63% black faculty whereas St. Johns had a 29% black faculty. Govt. Ex. 39. Nevertheless, Dr. Grier and Dr. Hathorn were threatened with their jobs if more black faculty were moved out of Mayo. TR. II at 88–89.

When Dr. Grier came in 1988, B.A. Gary, Cain, Mayo, Rosenwald, and Spaulding Junior High were over 15% out of compliance with the 1970 Order. Govt. Exh. 39. In addition, using the 10% standard of the 1970 Order, Brockington, Carolina, Hartsville Career Center and Hartsville Junior High were also out of compliance. Govt. Exh. 39. Other than specialization considerations, no obstacle prevented the District from bringing faculty figures into compliance. TR. IV at 39–40. The District produced no evidence that specialization concerns justified the deviations in faculty ratios. Because the District bore sole responsibility for hiring of faculty and administration, it bears the responsibility for these violations. TR. VII at 89.

In addition to the problem of ratios in assignment of faculty, the quality of personnel was perceived as inferior at predominately black schools. Mayo, Washington Elementary, Cain and Spaulding Elementary were regarded as schools to which inferior or problem faculty were transferred. TR. I at 164; TR. II at 7; *see also* Curriculum Audit, Govt. Exh. 53 at 54. The Mayo faculty was not considered as good as that of other schools. Mitchell Dep. at 12, 41–43; Hathorn Dep. at 38–39, 44; TR. II at 190; TR. III at 82. Dr. Grier found teachers idle. TR. I at 156–157. Washington Elementary teachers were also considered deficient in quality between 1989–1991. Smith Dep. at 28–29. Nothing prevented the District from assigning higher quality personnel to these schools. TR. II at 191.

### 8. DISTRICT'S DISCRIMINATION IN CURRICULUM

The School Board had responsibility for determining how curriculum and instruction were delivered in the District. TR. I at 191, TR. VII at 89–90. Dr. Gordon testified that the curriculum enhancement in the Consent order was needed because of deficiencies in the past and stigmatization of predominately black schools. TR. IV at 74–75, 77. Before

Dr. Grier came in 1988, black students did not receive the same educational opportunities as white students as far as books, supplies and expectations. *See also* TR. I at 155; Heatley Dep. at 51–54. Dr. Grier found that the curriculum was at an inadequate level for learning. TR. II at 17–18.

Problems in the predominantly black schools were significant. The Curriculum Audit found Mayo's curriculum to be inferior and found discrepancies in other schools as well. TR. I at 151; Govt. Exh. 45 at 13–14. Carolina had better programs than Washington Street when Joanne Smith was principal at Washington, which caused black students to transfer from Washington Street to Carolina. Smith Dep. at 30, 82. Instruction was poor at Washington Street, Cain and Spaulding Elementary when Dr. Grier came to the District. TR. II at 7. The B.A. Gary library and science areas were inferior to those at Brunson–Dargan, but Brunson–Dargan had poor physical education facilities. TR. IV at 40. St. Davids and Rosenwald did not have comparable equipment and materials to other schools. TR. at 76–77. Although remedial work was needed in some schools, it was not provided. TR. at 18. No reason was proffered why the District could not have addressed these deficiencies. TR. at 18.

Problems were especially acute at Mayo. Teachers were idle, and students were allowed to roam out of class. TR. I at 156, 164. Although Dr. Grier took some steps to improve the school's conditions, Dr. Cox, who arrived later, still found Mayo inferior with fewer course offerings. TR. I at 156–159; TR. II at 118–189. If quality programs had been provided at Mayo, some of the students might have followed and enrolled in those programs. TR. IV at 84.

These problems should not have existed. The curriculum and instruction should have been relatively uniform. TR. IV at 43. Nothing prevented the District from correcting or at least attempting to correct these disparities. *Id.*

### 9. DISTRICT'S DISCRIMINATION IN FACILITIES

Mayo had been neglected long before Dr. Grier came in 1988. *See* Heatley Dep. at 54–

55. Dr. Grier found it to be an inferior facility with old books, lab and computer equipment lacking, and terrible facility conditions including doors ripped off lockers and bathroom stalls. TR. I at 130–131. Mr. Hathorn described his sad arrival at Mayo in 1989. Hathorn Dep. at 12–13.

Although Pate was painted twice by professionals, the citizens of black community painted Mayo. TR. I at 157–158.

Although Dr. Grier instituted some improvements, more was needed when he left. Dr. Cox found the predominately black schools to be significantly inferior. TR. II at 148. She described Mayo as being significantly inferior to St. Johns with "many, many needs that have either not been addressed by the District, or, if they were, the work was … inferior…." TR. II at 148. Mayo remained substantially inferior in 1991–92, with the District's own expert, Dr. Armor, finding it not up to par and a "vestige." TR. III at 184–187; TR IV at 203–204; Mitchell Dep. at 40.

Dr. Cox made the maintenance department aware of Mayo's problems many times. TR. II at 149. Nevertheless, predominately black schools received less maintenance attention. *Id.* at 146. In addition to Mayo, Washington Street Elementary had poor conditions in 1989. Smith Dep. at 59–61. Nothing prevented equal maintenance of Mayo and other facilities. TR I at 143, 192; TR. II at 150–152.

In addition to allowing maintenance problems to persist, the District misused the capacity at the schools. Portable classrooms were used at predominantly white schools even though excess capacity existed at nearby predominantly black schools. Govt. Exh. 81; TR. IV at 43, 46–51, 57. Great disparities in capacity existed between historically black and historically white schools. Govt. Exh. 81. Adjustments in attendance lines could have been made to eliminate those situations. TR. IV at 51. Brockington, for example, had empty classes, and a one million dollar addition to nearby Pate, in 1993 would have been unnecessary if lines had been adjusted or a pairing had been made with Brockington. TR. II at 35, 220; State's Exh. 60. The District did not consider alternatives to the Pate construction. Deloach Dep. at 23. Similarly, Washington Street had vacant rooms in 1989 even though it had undergone a $755,000 addition in 1988. Smith Dep. at 31; State's Exh. 60.

Deputy Superintendent Stone could not explain the discrepancies between the schools in terms of undercapacities at predominantly black schools and overcapacities at predominantly white schools. Dr. Gordon testified that most principals prefer to operate at 90% capacity. Six of the seven predominantly black elementary schools were at less than 90% capacity. TR. IV at 48; Govt. Exh. 81.

## 10. DISTRICT'S PRIMARY RESPONSIBILITY FOR STIGMATIZING EFFECT

The effect of these acts and omissions of the District as to students, faculty, principals, curriculum and facilities was to stigmatize the predominantly black schools as inferior. Dr. Gordon testified that Mayo had been systematically stigmatized as an inferior black school. TR. III at 130. Stigmatization occurred through the proposal of the modified HEW Plan B line which indicated that Mayo was a black school for black children, by the assignment of black principals, black staff and black faculty to Mayo, by the assignment of Country Club students residing in the Mayo zone to St. Johns, and by the poor maintenance of the school. TR. III at 181–187; *see also* TR II at 191–193. Further stigmatization resulted from not assigning students to utilize excess capacity at predominantly black schools, thus indicating that those schools were not schools for whites. TR. IV at 51. Differences in curriculum and instruction also had a stigmatizing effect. TR. IV at 42–43. The assignment of principals to schools where the majority of the student body was of the same race as the principal also stigmatized black schools. TR. IV at 31–32.

The condition of the schools had an adverse impact upon the students. TR. II at 160–161. No reason was offered why the District could not have made improvements earlier. The perception in the community was that the white schools were better. Heatley Dep. at 89.

## 11. DISTRICT'S HISTORICAL RESISTANCE TO EFFORTS TO DESEGREGATE

In 1976, the District was asked by black citizens to build a consolidated high school in a centrally located area in the Town of Darlington, which would serve the entire town. The school was to be named Darlington High School. State's Exh. 27–B, 60 and 71. Even though this measure would have had a desegregative effect, the Board did not implement it. Id.; TR. IV at 53. Instead, the Board spent high school construction money on building a new St. Johns High School near the campus of Spring Elementary on the North side of town and spent over a million dollars on additions or renovations at Mayo in 1976 and 1987. Govt. Exh. 14; State's Exh. 60. Had the Board implemented the proposal of the black citizens in 1976, the Mayo and St. John's relief being approved and ordered would not be necessary today.

In 1977, the Survey Section of the Department of Education performed a study of the school facilities in the District at the District's request. Richardson Dep. at 32, State's Exh. 78; State's Exh. 43. The Survey Section was told that the District was satisfied with the desegregation order and that it did not want to make any changes. Id. Had the District wanted such advice, the Survey Section could have told it how it could have used its schools for desegregative purposes. Id. In fact, the Survey Section had advised another District how it could combine its two high schools into a single facility with a desegregative effect. Id.

The SACS Study (Southern Association of Colleges and Schools) in 1989 found that ethnic composition of the District's schools impeded the District's educational objectives and that the student population in each school was not representative of the entire District. Govt.Exh. 48, Part IV; TR. I at 202. The Board rejected those comments in the report. TR. I at 203. The 1988 Curriculum Audit made similar findings regarding segregation in the District, but the Board did nothing. Government Exh. 45; TR. I at 204. The Board did not adopt the measures in the audit's Strategic Plan for 1990–95, which called for pairings of numerous schools.

State's Exh. 54; TR. II at 22–23. The reason that the Board did not adopt those measures was because it did not want to upset the community. Id.

The Board also rejected a number of additional desegregation measures, including the pairing of Carolina and Washington Street, suggested pairings and consolidations by Board member Stanton, and the Lamar/Spaulding pairing suggested by a Board member. TR. II at 42–43, 222–223. The District took no action on a proposed "Padaiae" magnet, and told Dr. Cox that the "choice" schools proposed by her that would have had a desegregative effect could not be discussed. TR. II at 225–227. Dr. Grier was directed not to do any further work regarding pairings.

The court finds no reason why the District could not have desegregated or consolidated the schools earlier to have achieved a better student population balance. TR. II at 231. No reason exists why faculty and principals could not have been assigned without regard to race. TR. II at 231. No reason exists why the District could not have improved curriculum and facilities at Mayo. TR. II at 214–215. Because of the District's failure to undertake these measures, and its systematic discriminatory assignment of students, faculty and principals, with poor maintenance of facilities and curriculum, the court finds that the District was the chief actor responsible for perpetuating and maintaining segregation in the District following the 1970 Order.

## C. CONCLUSIONS OF LAW ON STATE LIABILITY

As stated above, until 1954 and for many years thereafter, the State of South Carolina required local school districts to segregate their students by race. Prior to 1954, the State purported to justify its dual system under the "separate but equal" doctrine enunciated in *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), even though the State knew that the educational opportunities afforded to black children in South Carolina were grossly inferior to those of white children.

In 1954, the Supreme Court held in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("*Brown I* "), that state-sponsored segregation in public schools violated the Equal Protection Clause of the Fourteenth Amendment, even if the physical facilities and all other tangible factors were equal (which they were not in South Carolina). *Id.* at 493, 74 S.Ct. at 691. The following year the Supreme Court held that segregated school systems must be converted to nondiscriminatory school systems "with all deliberate speed" and "at the earliest practicable date." *Brown v. Board of Educ.,* 349 U.S. 294, 300–301, 75 S.Ct. 753, 756–57, 99 L.Ed. 1083 (1955) ("*Brown II* ").

Since that time, school desegregation litigation has passed through various stages or phases. The first concern was eliminating the physical separation of the races in public schools. *See Georgia State Conference of Branches of NAACP v. Georgia,* 570 F.Supp. 314, 318 (S.D.Ga.1983). It was thought that effective school desegregation could be accomplished simply by ordering local school systems to stop operating separate schools.

In 1968, however, the duty to desegregate broadened considerably when the Supreme Court held in *Green v. County School Board,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968), that school officials were "charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green* required school officials not only to stop current discrimination, but also to eliminate all "vestiges" of the dual school system. *Id.* at 439, 88 S.Ct. at 1694–95. Three years later, in *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971), the Supreme Court again stressed the affirmative duty to eliminate "vestiges" and authorized courts to impose a wide range of remedies, including busing, pairing and clustering, in order to ensure that complete desegregation would be accomplished. At the time of *Green,* South Carolina's public schools, including Darlington County, were still largely segregated.

*Green* and *Swann* ushered in the next generation of school desegregation cases. During this phase, courts began imposing more sophisticated remedies designed to eliminate the pervasive and deep-seated effects of past segregation. The efforts to eliminate "vestiges" led courts to examine state policies and conduct, which often played a significant role in perpetuating segregated schools even after *Brown,* and to hold states liable to share in the task of desegregating local school districts.

In one of the first state liability cases, *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) ("*Milliken II* "), the Supreme Court upheld a remedial order requiring Michigan officials to pay one-half the costs of the "Milliken II" desegregation measures implemented in the Detroit School System. Since that time, numerous courts have required states to participate with local school districts in eliminating the vestiges of *de jure* segregation. These cases represent a "third generation" of school desegregation litigation in which states have been required to contribute substantial resources to local desegregation remedies.

Thus, in *Jenkins v. Missouri,* 639 F.Supp. 19, 23–24 (W.D.Mo.1985), *aff'd in relevant part,* 807 F.2d 657 (8th Cir.1986), *cert. denied,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987), the court held the State of Missouri liable for extensive remedial measures, holding:

> Since the minority students in the KCMSD are the victims of racial discrimination which was mandated by the Constitution and statutes of the State of Missouri, it is only equitable to place the burden of removing the vestiges of such discrimination and the continuing effects on the State rather than on those who are the victims.

In an earlier case, the State of Missouri had been held liable and ordered to share in the costs of desegregation remedies in St. Louis. In *Liddell v. Board of Education,* 491 F.Supp. 351, 359 (E.D.Mo.1980), *aff'd,* 667 F.2d 643 (8th Cir.), *cert. denied,* 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 629 (1981), the court held that the affirmative duty enunciated in *Green* applied with equal force against states that formerly imposed a dual

system of racially segregated education on local school systems. The court held:

> A state, ..., which has in the past operated a racially dual system of public education, pursuant to state constitutional and statutory requirements, is and has been since 1954, under an additional constitutional obligation to take such affirmative measures as are necessary to disestablish that dual system and eliminate the continuing vestiges of that system.

491 F.Supp. at 359.[27]

The State of Ohio was also held liable to fund local desegregation costs, even though Ohio never mandated a dual school system. Nevertheless, in both Columbus and Cleveland, the state was held liable based on its conscious tolerance of local school segregation in the face of a constitutional duty to eliminate racial discrimination in Ohio's schools. *Penick v. Columbus Bd. of Educ.*, 663 F.2d 24 (6th Cir.1981), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); *Reed v. Rhodes*, 500 F.Supp. 404, 425 (N.D.Ohio 1980), *aff'd*, 662 F.2d 1219 (6th Cir.1981), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982).

More recently, the States of Arkansas and Georgia have been held liable to participate in local desegregation remedies in Little Rock and Savannah on the basis of state actions similar to those found by the court in this case. *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 778 F.2d 404, 435–436 (8th Cir.1985), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986); *Board of Educ. for City of Savannah and County of Chatham v. Georgia*, No. 490–101, 1992 WL 699499 (S.D.Ga.Order dated August 11, 1992, *appeal docketed*, No. 93–9201 (11th Cir. Oct. 7, 1993).

These cases are consistent with precedent in this circuit. Although the states of Virgi-

nia and South Carolina were dismissed as defendants in two prior cases, they were dismissed only after a finding that the local school district had achieved unitary status. *See School Bd. v. Baliles*, 829 F.2d 1308 (4th Cir.1987) (Virginia); *United States v. Charleston County Sch. Dist.*, 960 F.2d 1227 (4th Cir.1992) (South Carolina). In *Baliles* the court, based on its earlier 1972 ruling affirming state liability, found though that by 1987 the state had "adequately discharged its constitutional obligation." 829 F.2d at 1303.

The cases on which the State relies to avoid liability are instructive. *United States v. Texas Educ. Agency*, 790 F.2d 1262 (5th Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987), involved a local system's attempt to recoup from the State of Texas monies expended between 1977 and 1984 for school desegregation measures that the local district had been ordered to implement in a long-standing desegregation case. Although the state had been a nominal defendant in the school desegregation case since 1970, no court had ever ruled upon its liability. Therefore, when the local school district in 1984 filed a "Motion to Divide Costs" between it and the state, the district court properly denied the motion and the Fifth Circuit affirmed on the ground that the state's liability had never been established. Distinguishing *Milliken II*, the Fifth Circuit noted that the state's liability in *Milliken II* had already been resolved adversely to the state at an earlier stage in the proceedings. 790 F.2d at 1264.

In the present action, the District has taken the crucial step of joining the state defendants and seeking to have the State's liability determined during this litigation. In addition, the District does not seek recoupment of any past costs.

---

**27.** In *Keyes v. School Dist. No. 1,* the Supreme Court stated:

> Where plaintiffs prove that a current condition of segregated schooling exists within a school district where a dual system was compelled or authorized by statute at the time·of our decision in *Brown I,* the State automatically assumes an affirmative duty "to effectuate a transition to a racially nondiscriminatory school system." ...

413 U.S. 189, 200, 93 S.Ct. 2686, 2693, 37 L.Ed.2d 548 (1973), *quoting Brown II,* 349 U.S. at 301, 75 S.Ct. at 756–57. *See also United States v. Scotland Neck City Bd. of Educ.*, 407 U.S. 484, 488, 92 S.Ct. 2214, 2216–17, 33 L.Ed.2d 75 (1972) (actions of state legislatures are not on any different footing than actions of school boards in matters of school desegregation).

*Kelley v. Metropolitan County . Board of Education,* 836 F.2d 986 (6th Cir.1987), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988), *rev'g* 615 F.Supp. 1139 (M.D.Tenn.1985), is also distinguishable because the District here seeks no past costs, the primary issue in *Kelley.* To the extent *Kelley* purports to preclude state liability for prospective remedial measures, the court concludes that it was wrongly decided, a conclusion reached by several other courts. *See, e.g., Board of Pub. Educ. v. Georgia,* No. CV 490–101, slip op. at 8 (S.D.Ga. Sept. 24, 1990) ("This Court does not find the Sixth Circuit's reasoning persuasive"); *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 695 F.Supp. 1033, 1043 (N.D.Cal.) ("The legal reasoning in *Kelley* is not persuasive"), *rev'd on other grounds,* 896 F.2d 412 (9th Cir.1990). The Sixth Circuit in *Kelley* erred by ignoring the state's separate and independent affirmative duty to eliminate the vestiges of state-imposed segregation and by improperly viewing the state's unfulfilled obligations as merely a past violation with no current or continuing significance. In this case, however, the court finds that the State is itself under an affirmative duty, separate and apart from the duty of the District, and that its past actions have continuing significance in the form of vestiges of the former dual school system caused, at least in part, by such state actions.

■ As with local school officials, the affirmative duty imposed on states that previously practiced *de jure* school segregation is derived from the Equal Protection Clause of the Fourteenth Amendment, as well as two federal statutes, EEOA and Title VI. The EEOA prohibits educational agencies from denying an equal educational opportunity to any individual on account of race. 20 U.S.C. §§ 1701 *et seq.* The denial of equal edu-

cational opportunity is expressly defined to include:

> the *failure* of an educational agency which has formerly practiced ... deliberate segregation *to take affirmative steps ... to remove the vestiges of a dual school system.*

20 U.S.C. § 1703(b) (emphasis added).[28] The State, the State Board of Education, the State Department of Education, and the State Superintendent of Education all fall within the definition of "educational agencies" subject to the affirmative duty mandated by the EEOA. 20 U.S.C. § 1720(a); 20 U.S.C. § 2891(23).

■ Title VI, which prohibits discrimination on the basis of race under any program or activity receiving federal financial assistance, also imposes an affirmative duty upon recipients of federal funds who have a history of *de jure* discrimination.[29] 42 U.S.C. § 2000d *et seq.* The Title VI regulations, which have the force and effect of law, require affirmative action, as follows:

> In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin, *the recipient must take affirmative action to overcome the effects of prior discrimination.*

34 C.F.R. § 100.3(b)(6) (emphasis added). Because the State of South Carolina, the State Board of Education and the State Department of Education are all recipients of federal funds for educational purposes and have a history of *de jure* discrimination, they are all subject to the affirmative duty imposed under Title VI.

■ A state cannot satisfy its constitutional obligations by merely ceasing its discriminatory activities. *Dayton Bd. of Educ.*

---

**28.** Section 1703 of the EEOA provides, in pertinent part, as follows:

> No state shall deny equal educational opportunity to an individual on account of his or her race, color, sex or national origin by—
> (A) The deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;
> (B) The failure of an educational agency which has formerly practiced such deliberate

segregation to take affirmative steps ... to remove the vestiges of a dual school system. 20 U.S.C. § 1703.

**29.** Because state and local governments receive federal funding for education, Title VI is frequently invoked by plaintiffs in school desegregation cases. *See, e.g., Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Reed,* 500 F.Supp. at 416; *Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1416–17 (11th Cir.1985).

*v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) ("*Dayton II*"). In the face of an affirmative duty to desegregate, the state must "actively set out to dismantle the dual system." *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 461, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979).

■ Where state officials have "abdicated their affirmative remedial duty," that failure to act, in and of itself, is a constitutional violation. *Liddell v. Board of Educ.,* 491 F.Supp. at 359; *accord Penick,* 443 U.S. at 459, 99 S.Ct. at 2947. In other words, inaction in the face of an affirmative duty to act violates the Fourteenth Amendment. *Milliken II,* 433 U.S. at 267, 97 S.Ct. at 2750–51; *see also Geier v. University of Tennessee,* 597 F.2d 1056, 1067 (6th Cir.) ("The Constitution can be violated by inaction as well as by deeds."), *cert. denied,* 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117 (1979); *Reed v. Rhodes,* 500 F.Supp. 404, 424 (N.D.Ohio 1980) (failure to demand compliance with state law prohibiting discrimination violated Fourteenth Amendment), *aff'd,* 662 F.2d 1219 (6th Cir. 1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). Furthermore, "[e]ach instance of a failure or refusal to fulfill this affirmative duty continues the violation of the Fourteenth Amendment." *Penick,* 443 U.S. at 459, 99 S.Ct. at 2947.

■ Part of the affirmative duty imposed on state officials includes the obligation not to take any action that impedes local efforts to disestablish the dual system. *Dayton II,* 443 U.S. at 538, 99 S.Ct. at 2979. State conduct that impedes local efforts to desegregate or which otherwise makes desegregation more difficult constitutes an additional basis for finding a constitutional violation, even if that conduct is undertaken for nondiscriminatory reasons. *Penick,* 443 U.S. at 464, 99 S.Ct. at 2950. Where officials have previously operated a dual school system, their actions must be judged according to whether they hinder or further desegregation; the test is the effectiveness, not the

purpose, of their actions. *Wright v. Council of Emporia,* 407 U.S. 451, 462, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972). Thus, post-*Brown* actions that have the effect of increasing or perpetuating segregation constitute a violation of the affirmative duty. *Id.*

■ To make out a *prima facie* case of State liability for the vestiges, the District was required to prove that South Carolina's public schools were racially segregated by law at the time of *Brown I* (which requires little proof because that is a matter of undisputed historical fact) and that current conditions within the District continue to require desegregation remedies. Once this required showing is made, a presumption arises that these present conditions are causally related to the former dual school system. The State then has the burden of proving that those conditions are not the result of the former state-imposed dual system or other state-level discrimination. *Dayton II,* 443 U.S. at 537, 99 S.Ct. at 2979; *Brown v. Board of Educ.,* 892 F.2d 851 (10th Cir.1989). To meet this burden, the State must "show that the current segregation is in no way the result of [the state's] past segregative actions." *Keyes v. School Dist. No. 1,* 413 U.S. 189, 211 n. 17, 93 S.Ct. 2686, 2699 n. 17, 37 L.Ed.2d 548 (1973). If the causal connection does exist, then "[t]he remoteness in time of the school authorities' intentionally discriminatory actions is irrelevant." *Jacksonville Branch, NAACP v. Duval County Sch. Bd.,* 883 F.2d 945, 951 (11th Cir.1989).

■ If the conditions that are "vestiges" are causally related to the state's former dual school system or other past intentional discrimination by the State, then the District need not prove that the State presently intends to discriminate.[30] *Id.; Georgia State Conference of Branches of NAACP v. Georgia,* 570 F.Supp. 314, 317 (S.D.Ga.1983); *Anderson v. Banks,* 520 F.Supp. 472, 500 (S.D.Ga.1981). When present conditions are causally related to past intentional discrimi-

---

**30.** The Supreme Court consistently has held that plaintiffs must prove the existence of some discriminatory intent or purpose in order to establish a federal constitutional violation that will support a court-ordered desegregation remedy. *See, e.g., Crawford v. Board of Educ.,* 458 U.S.

527, 544, 102 S.Ct. 3211, 3221, 73 L.Ed.2d 948 (1982). However, it is well settled that creating and maintaining a dual school system fulfills that requirement because it is discriminatory as a matter of law. *See, e.g., Price v. Denison Indep. Sch. Dist.,* 694 F.2d 334, 378 (5th Cir.1982).

nation, "a present constitutional violation is established without proof or finding that the former *de jure* segregation was intentional, for it is so as a matter of law, and the fact that the school authorities may more recently have acted in good faith and had no segregative or discriminatory intent is not dispositive of whether an existing constitutional violation is present." *Price v. Denison Indep. Sch. Dist.,* 694 F.2d 334, 378 (5th Cir.1982). "[I]n the presence of an unsatisfied duty to abolish a dual system, the test is the effectiveness, not the purpose of actions in increasing or decreasing the segregation caused by the dual system." *Anderson,* 520 F.Supp. at 500. Thus, "if present facially neutral actions serve to perpetuate past intentional discrimination, there is no requirement that intent be proved again." *Id.*

 In the present case, the existence of the former *de jure* dual school system supplies the necessary element of intentional discrimination and gives rise to the affirmative duty to eliminate all vestiges of the dual system. That duty remains in effect as long as any of the current segregative conditions in the District can be shown to be causally related to the former dual school system. *Georgia Branches,* 570 F.Supp. at 326. In establishing this causal connection, the state's inaction in the face of its affirmative duty to assist with desegregation may be used "to trace the current, system-wide segregation back to the purposefully dual system of the 1950's." *Dayton II,* 443 U.S. at 541, 99 S.Ct. at 2981.

 In this case, the court has found that vestiges of the former dual school system created and maintained by the State remain in Darlington County. However, the State denies responsibility for the current vestiges in Darlington County, contending that (1) the District had the means itself to desegregate without state assistance; and (2) the effects of any pretrial–1970 state actions were superseded by the post–1970 discriminatory acts of the District, which effectively severed

any "causal link" to segregation caused by the State.

With respect to Mayo, the court has found post–1970 actions and inactions by the District which served to "stigmatize" Mayo. However, the court is unconvinced that, absent such District actions and inactions, Mayo would now be a desegregated school. The State argues that the link to pretrial–1970 segregation would have been broken, but for the post–1970 actions and inactions of the District. However, the State introduced no evidence to support this argument. In fact, the evidence was just the opposite and was unchallenged by anyone. Dr. David Armor, an expert in desegregation matters called by the District, testified that in his opinion the instances of non-compliance by the District alleged by the State would not have significantly changed the racial makeup of the school. TR. VI at 116–120. Dr. Armor testified that under the 1970 plan proposed by the District, Mayo was left a predominantly black school. *Id.* at 116–134; Dist. Exh. 75.[31] Proper assignment of the children from the Country Club area would have increased the white enrollment at Mayo by only about three percent, assuming they all showed up, which still would have left Mayo a predominantly black school. TR. VI at 120–121. Even if the District had pursued a more racially balanced faculty at Mayo after 1970, it was Dr. Armor's opinion, and this court agrees, that this would not have changed the essential racial makeup of the school. *Id.* at 128–134. Thus, while the court finds that the District's actions and inactions had significant negative impact on Mayo's status, the court rejects the State's argument that Mayo would have ceased to be a vestige but for the District's actions. Even if such actions had not taken place and HEW Plan B had been faithfully followed in every respect, this court concludes that Mayo would still be a vestige of the former dual school system and in need of a remedy today.[32] Therefore, the causal link to the pre-

---

31. Dr. Armor also testified that, in his opinion, it would not have made any difference which plan, HEW Plan B or the modified HEW Plan B approved by the 1970 Order, had been implemented because Mayo was projected to be a majority

black school under both plans. TR. VI at 111–120; Dist. Exh. 68.

32. If the District had constructed a consolidated high school in 1976, Mayo would have been

trial–1970 dual school system created and fostered by the State has not been broken. TR. VI at 161–163.

## D. CONCLUSIONS OF LAW ON MITIGATING CIRCUMSTANCES

 Although the court has concluded above that the State has liability, school districts have the primary responsibility for school desegregation. *Brown v. Board of Education (Brown II),* 349 U.S. 294, 299, 75 S.Ct. 753, 755–56, 99 L.Ed. 1083 (1955). In South Carolina, school districts were recognized as "one of our most important political subdivisions." *Patrick v. Maybank,* 198 S.C. 262, 17 S.E.2d 530 (1941). School districts have had power over pupils, faculty and buildings since at least the Nineteenth Century, as indicated by the provisions of Act No. 63, 1896 S.C.Acts 150 (State's Exh. 1–B). Under these powers, the school districts built the schools, assigned the students, and hired the teachers. These powers were not curtailed before *Brown v. Board of Education (Brown I),* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *See e.g.* S.C.Ann.Code § 21–230, (1952) (State's Exh. 21); *see also* State's Exh. 3–21 e. Although the court has found that the State School Building Program, *see* Section IX.A.3.d., *infra,* further entrenched the *de jure* system into South Carolina public education, the State's efforts were substantially aided and promoted by local District cooperation. One witness, Cyril Busbee, a District superintendent from the 1930's until 1967 and State Superintendent from 1967 to 1979, testified that school districts were "totally independent" from the state and determined the sites for school buildings long before *Brown.* The court does not agree totally with Busbee's characterization of the State's non-involvement based on the evidence of joint State–District cooperation in the School Building Program.

Such testimony does, however, emphasize that the District had primary responsibility for site selection.

The school districts "that existed at the time of *Brown I* and *Brown II* were the primary units for pupil and teacher assignment...." *United States v. Charleston County School District,* 738 F.Supp. 1513, 1536 (D.S.C.1990); *aff'd in part,* 960 F.2d 1227 (4th Cir.1992). The District continued to choose school sites throughout the 1950's, 1960's and 1970's. The State exercised some control as to site selection, purportedly on the grounds of safety, size and later convenience of the school. State's Exhs. 3–21 e, Minutes, Darlington County Board of Education; *see* State's Exhs. 24–27; Stipulated Testimony as to Office of School Planning and Building. The court thus finds, based on all of the evidence in this case, that the State and the District jointly exercised responsibility as to site selection.

The District possesses the power to operate the schools. Where students actually attend school within the District is generally a matter to be determined by that school district. *See* Section IX.A.3.b., *infra.* Section 59–19–90(9) of the South Carolina Code states that "the Board of Trustees shall ... (9) ... transfer any pupil from one school to another so as to promote the best interest of education, and *determine* the school within its district in which any pupil shall enroll;" (emphasis added).[33] The District has exclusive control over principals and faculty. S.C.Code Ann. § 59–19–90(2). The District also has the authority to provide for school buildings, and the authority to issue bonds for that purpose. S.C.Code Ann. § 59–19–90(1); S.C. Const. art. X, § 15 and Act No. 588, 1992 S.C.Acts 3603. The District has the power to acquire supplies and equipment, which it is to maintain in good repair.

closed as a high school. While closing Mayo would have required court approval and may have been found to unfairly burden the Black community, it cannot be disputed that students attending the consolidated high school would have benefitted from equal educational opportunities. Instead, those who attended Mayo from 1976 to the present received grossly disparate educational opportunities. This convinces the court that the District is primarily responsible for

Mayo continuing to exist as a vestige. The fact that the District failed to pursue consolidation in 1976, however, does not absolve the State of liability, but rather mitigates that liability.

**33.** The Darlington County Board of Education has the authority of a school district board of trustees under Act No. 588, § 5, 1992 S.C.Acts 3603. *See* Act No. 748, 1978, S.C.Acts 2413.

S.C.Code Ann. §§ 59–19–130 and 59–19–150. The District is fiscally autonomous and has full authority to provide for its operating expenses. S.C.Code Ann. §§ 59–19–10, 59–19–90(5) and (7), and Act No. 588, S.C.Acts 3603, § 5. See discussion of state funding at IX.A.4.b., *infra.*

The District has, by entering into the Consent Order, admitted continuing liability. In the earlier order of July 11, 1964, Judge Martin found that the District was "completely segregated." The court further found that the District had denied the applications to transfer of five plaintiffs from "negro schools" to white schools. In a 1970 order, Judge Martin ordered that pupil assignments be based "upon proposal B submitted by HEW with the specifications and details as provided by the Darlington County School Board ..." and that the faculty be integrated so as to approximate the ratio of black and white faculty members throughout the system. Segregation or discrimination was barred in academic curricula or in a school facility or program. The school board was given responsibility for administrative problems arising from implementation of the plan. Therefore, the District, as well as the State, has had historic responsibility for segregation in the District.

The District failed to comply with the 1970 order in terms of pupil assignments, faculty and other programs. Although the 1970 order was inadequate to desegregate the student bodies of the schools included in the proposed Consent Order under the plus or minus 20% standard, the District exacerbated the situation by moving the Country Club students out of the Mayo zone and not enforcing proper attendance of out of zone students. Faculty ratios were out of balance on a number of occasions. Principal assignments were made on a racial basis so as to have student bodies and principals of the same race. These problems are all violations of the 1970 order and were matters entirely within District's control. In addition, the predominantly black schools, particularly Mayo, had inferior facilities, curriculum and instruction.

The District has repeatedly taken steps to thwart further desegregation in the District despite notice of the need to do so and requests to do so in numerous reports from officials and community members. Although this court does not find that the acts and omissions of the District completely vitiate the State's liability, the court concludes that the actions and inaction of the District contributed most significantly as a cause of the continuing vestiges of the dual system in the District. In other words, the District's acts and omissions have had the most significant causal association with the current segregation existing in the District. *See Dayton,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979 (1979); *Brown v. Board of Education of Topeka,* 892 F.2d 851, 877 (10th Cir.1989). This conduct of the District thus mitigates the extent of the State's liability for segregation now existing. As stated in *Board of Public Education for City of Savannah and County of Chatham v. State of Georgia,* Op. No. CV 490–101, 1992 WL 322299 (N.D.Ga. October 16, 1992):

> [t]he State could have used its influence to encourage desegregation after *Brown,* but real change would have had to come from the School Board, elected by the local community. Without local action, change could come only by Court Order. Accordingly, the Court holds that the responsibility for the vestiges of the dual system rests primarily with the School Board.

Order at 4.

Therefore, this court finds that the primary responsibility for the present vestiges rests with the District. As in *Savannah,* this court will require the State to contribute 15% of the cost of the desegregation plan contained in the Consent Order and this court's order, with the exception of 100% of the transportation costs which have historically been the responsibility of the State.

## X. APPORTIONMENT OF COSTS BETWEEN SCHOOL DISTRICT AND STATE

### A. GENERALLY

The court has found that vestiges exist of the former dual school system. These vestiges are traceable to the State's creation of the dual school system and its failure to

discharge its affirmative duty to eradicate those vestiges in Darlington County. Given these factors, the court concludes it is appropriate for the State to participate financially and otherwise in certain desegregation measures. Although the District's actions in failing to pursue and promote desegregation, and in failing to seek approval for deviation from the 1970 Order are substantial, those actions do not exonerate the State from liability for its own unlawful actions and inactions. *Liddell v. Board of Educ.*, 667 F.2d 643 (8th Cir.) (state and local boards jointly and severally liable), *cert. denied* 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 629 (1981).

Because the State actively participated in creating, maintaining, and perpetuating a dual school system, the District and its taxpayers should not alone be obligated to bear the entire burden of remedying the effects of state-imposed segregation. The State is jointly responsible for the problem, and is jointly liable for the remedy.

Apportionment of liability on the State has been effected in several cases. *See, e.g., Milliken II*, 433 U.S. at 289, 97 S.Ct. at 2761–62; *Jenkins v. Missouri*, 639 F.Supp. 19 (W.D.Mo.1985), *aff'd in relevant part*, 807 F.2d 657 (8th Cir.1986), *cert. denied*, 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 778 F.2d 404, 435–36 (8th Cir. 1985), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986); *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 839 F.2d 1296, 1307 (8th Cir.), *cert. denied*, 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988); *Liddell v. Missouri*, 731 F.2d 1294 (8th Cir.), *cert. denied*, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984); *United States v. Board of Sch. Comm'rs*, 677 F.2d 1185 (7th Cir.), *cert. denied*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982).

The key factor applied in apportioning liability on the State is its prominence in education in the state. *See Brown v. Board of Educ.*, 892 F.2d 851, 888 n. 102 (10th Cir.1989), *vacated*, 503 U.S. 978, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992); *Liddell v.*

*Board of Educ.*, 667 F.2d 643 (8th Cir.1981). As noted above in section IX. A., South Carolina exerts significant control over the local school systems.[34] In fact, in several important respects, South Carolina's role has been more prominent than that in other states which have been held liable for desegregation costs. In South Carolina, for example, the State owns and operates the bus system which transports students to and from school. The State owns the buses and maintenance facilities; state employees maintain the buses, and the State pays bus driver salaries, the costs of fuel and other operational costs.

The State was jointly responsible for building most of the schools which today represent vestiges of the dual school system. The State's efforts in the School Building Program were described fully in section IX.A.3. The State embarked upon a massive building program in the 1950's and 1960's to build segregated schools specifically designated for black or white students. If it had not been for this effort by the State and the District to build segregated schools, even many years after such schools had been declared illegal, Darlington County would not be facing the problems it faces today. Of the schools which the court has found to be vestiges, most were either built or significantly expanded through the auspices of the SEFC.

The relief sought is entirely consistent with the State's customary role in local educational matters and will not turn student assignments into a State function. The State already provides all transportation for regular school programs and a substantial portion of the funding for other programs. There is no reason why it should not bear the same burden for desegregation related programs. By enforcing the dual system, the State injected itself into local educational affairs. The remedy ordered by the court is certainly no more intrusive.

The District contends that the State should pay 100% of the transportation costs, 75% of the annual magnet operating costs, and 50%

---

**34.** With respect to transportation, South Carolina exercises primary control through its ownership and maintenance of the bus system, and

payment of drivers and other transportation related employees.

of the capital costs incurred in connection with the desegregation plan, and argues that in all but one case in which a state has been held liable for desegregation costs, the state has been ordered to pay between 50% and 100% of the costs of desegregation. The District's argument is not without support. In Southern states, where State officials and government played a major role in resisting desegregation, the courts have, with the one exception noted below, held those states liable for more than fifty percent of the costs of desegregation. *Little Rock,* 778 F.2d 404; *Liddell v. Missouri,* 822 F.2d 1446 (8th Cir. 1987); *Jenkins v. Missouri,* 855 F.2d 1295, 1308 (8th Cir.1988); *Milliken II,* 433 U.S. at 289, 97 S.Ct. at 2761–62; *Brinkman v. Gilligan,* 610 F.Supp. 1288 (S.D.Ohio 1985); *Penick v. Columbus Bd. of Educ.,* 519 F.Supp. 925 (S.D.Ohio), *aff'd,* 663 F.2d 24 (6th Cir. 1981); *Reed v. Rhodes,* 500 F.Supp. 404 (N.D.Ohio 1980), *aff'd,* 662 F.2d 1219 (1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982).

After carefully examining the authorities cited by the District and the State, the court concludes that none of the cases except *Board of Educ. for City of Savannah and County of Chatham v. Georgia,* C.A. No. CV–490–101 (S.D.Ga.) (Order 10/11/92), is analogous to the situation here and relevant to this court's calculation of the percentage share of state liability. *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.,* 778 F.2d 404 (8th Cir.1985), involved an interdistrict violation, and *Liddell v. Missouri,* 822 F.2d 1446 (8th Cir.1987), presented a consent order settlement of most issues. Other cases from Ohio and Michigan involved states which possessed significantly more current control over education than does South Carolina. To the extent that the foregoing cases suggest that the degree of state involvement in the constitutional violation and educational processes is a relevant factor in determining a state's share of liability, the court has followed their example, factoring this into the assessment of mitigating circumstances, addressed fully in Section IX.B.

In *Board of Educ. for City of Savannah and County of Chatham v. Georgia,* Civil Action No. CV–490–101 (S.D.Ga.) (Order 10/11/92), the court ordered the State of Georgia to pay 15% of certain desegregation costs. For reasons set forth below, the court finds that order persuasive.

### 1. TRANSPORTATION COSTS

As in South Carolina, Georgia officials in *Savannah* created the dual system with local support, and then encouraged local districts to continue to operate in segregated fashion even after *Brown. See Savannah,* 10/11/92 Order at 7. Also as in South Carolina, local districts are primarily responsible for operation of the schools on a daily basis. *Id.* at 9–10.

In South Carolina the State is primarily responsible for provision of student transportation. Several current and former employees of the SDE, including Ralph Hendrix, the State's Director of Transportation during most of the period in issue, testified that it has been the State's policy to provide desegregation-related transportation, if part of a court-ordered plan. Tudor Dep. at 14–15; Hendrix Dep. at 11, 16–17, 20, 22; Bookout Dep. at 22, 47.

At trial, Frank Alford, the Route Coordinator for School Bus Routes for the SDE, testified that the State provides transportation for paired schools in other districts and that he did not know of any instances where such transportation was not being provided. TR. VIII at 112, 123–24. Barbara Nielsen, the State Superintendent, refused to concede that the State should provide such transportation, but acknowledged that she had never known the State not to provide transportation for court ordered desegregation. TR. VII at 188. Because the transportation relating to the pairings and consolidations, as well as the Mayo magnet, are all part of a court-ordered plan, the State's policy would appear to require that such transportation be provided. For the State to change its policy as applied to Darlington County would impede desegregation in the District.

The State first acquired control of the school transportation system under the SEFC "Separate But Equal Program," and maintained a dual transportation system until the late 1960's. Hendrix Dep. at 8–9. Today, the State remains primarily responsible for school transportation. Bookout Dep.

at 48. It owns and maintains the approximately 6000 school buses in the State, pays and trains the bus drivers, furnishes liability insurance and a student injury policy, and assists school districts in drawing the routes for the buses. It also contracts for transportation if school buses are not available. The only responsibilities of the local school district are to hire the bus drivers, supervise students and employees, and maintain the school grounds where the buses load and unload. Bookout Dep. at 8–10. Although bus drivers are considered school district employees, they are supervised, paid, and trained by the SDE. Brigman Dep. at 6–7. All employees in the Transportation Office are State employees. *Id.* at 5. Accordingly, given this deep involvement by the State in student transportation and its policy of providing transportation to support court-ordered desegregation plans, the court finds it entirely appropriate that the State provide 100% of all necessary transportation to support the District's desegregation plan. Accordingly, the State Defendants are ordered to provide all transportation services necessary to support the desegregation measures set forth in the Consent Order and this Order.

## 2. CAPITAL COSTS AND OPERATING EXPENSES

After careful consideration of the mitigating circumstances detailed in section IX.B., the court concludes that the appropriate level of State liability for capital costs and operating expenses for desegregation measures in the Consent Order and this order is 15%. In determining that the District should bear the primary responsibility for such desegregation costs, the court has recognized that the State's liability is primarily based on remote events and a failure to pursue an affirmative duty to desegregate. *Swann,* 402 U.S. at 15, 91 S.Ct. at 275–76. In contrast, the District violated the terms of the 1970 Order in numerous respects as outlined in Section VII. A–F, *infra,* and failed to seek court approval for its variances from the terms of the Order. Accordingly, the 85%–15% apportionment reflects this court's assessment of the relative culpability of the State and the District for constitutional violations based on the evidence adduced at trial.

As to capital costs and operating expenses, they may be classified as follows:

i. *Mayo Magnet Program Costs.* The State Defendants are ordered to pay 15% of the capital costs and operating expenses incurred by the District to implement and operate the Mayo magnet program. In addition, in accordance with Dr. Nielsen's offer, the State Department of Education shall make available the services of its consultants and staff, at state expense, to assist the District in the design, planning and implementation of the Mayo magnet program.

The District shall make good faith efforts to locate additional sources of funding. For example, the District may obtain grant and other special money for development of the Mayo magnet. (Nielsen Dep. at 36, 38, 51). If any such monies are awarded for magnet development, or other desegregation purposes, they shall be deducted from the State's 15% share.

ii. *Compensatory Education Programs.* The State Defendants are hereby ordered to pay 15% of all costs associated with the compensatory education programs specified in the Consent Order for Rosenwald and St. David's Elementary Schools and St. John's High School. As discussed above, ample precedent exists for requiring the State to bear part of the cost of such *Milliken II*-type remedies. Compensatory education programs are needed because of the attendance by students at vestige schools continuing to provide inferior education opportunities after the 1970 order.

iii. *Consolidation/Pairing Costs.* The State Defendants are ordered to pay 15% of the costs incurred by the District to implement the school consolidations and pairings set forth in the Consent Order. Such pairings are the most effective method of eliminating vestiges which continued to exist after the 1970 order.

iv. *Renovations to Southside Elementary School.* Under the Consent Order, Southside Elementary is to become a preschool center for four and five year old children. In order to meet State regulations, substantial renovations must be made to increase the

size of the classrooms and to install a rest room in each classroom, as well as meet other requirements. Because these expenditures are directly related to the elimination of vestiges, the State Defendants are ordered to pay 15% of such renovation costs.

## XI. CONCLUSION

Based on the foregoing reasons and the cited authorities, the court orders as follows:

1. the Motion to Dismiss by the State Defendants is GRANTED with respect to the State Budget and Control Board and its members, and DENIED in all other respects;

2. the Consent Order filed June 3, 1994, is approved, and shall be implemented according to its terms;

3. the "Motion for a New Trial and/or to Alter or Amend Judgment," and the "Second Motion for New Trial," filed by five individuals purporting to be class members, is DENIED;

4. the District shall establish a magnet school at Mayo in accordance with the terms of this Order, and shall file a Magnet Proposal with the court within sixty days of the filing of this Order;

5. the State Defendants shall participate jointly with the District in the desegregation remedies set forth in the Consent Order and this Order;

6. the State Defendants shall provide all transportation services and facilities necessary to accomplish the desegregation measures in the Consent Order and this Order;

7. the State Defendants shall pay 15% of the capital costs and operating expenses of the desegregation remedies contained in the Consent Order and this Order, and the State Department of Education shall make available the services of its consultants and staff in the design, planning, and implementation of the Mayo magnet program;

8. the District shall, within sixty days of the filing date of this Order, file and serve a First Proposed Comprehensive Budget. The District and the State shall confer about the budget in a good faith attempt to resolve differences. The State shall file any objections to the First Proposed Comprehensive Budget within thirty days from the filing date of the Budget. The District shall file its response within thirty days of the filing date of the State's Objections;

9. this court shall maintain continuing jurisdiction in this case until the District achieves unitary status.

IT IS SO ORDERED.